No. 23-55325

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

TERRY SONNEVELDT, ESTHER WRIGHT SCHNEIDER, BRIAN HUME,
JEAN LEVASSEUR, CHRISTOPHER LACASSE, TIM HALWAS, ERIN
MATHENY, LEWIS DELVECCHIO, JON SOWARDS, LAWRENCE
BOHANA, MONIKA BOHANA, DAVID DENNIS, AND
JAQUELINE S. ASLAN,

*Plaintiffs-Appellants*,

v.

MAZDA MOTOR OF AMERICA, INC. d/b/a MAZDA NORTH AMERICAN
OPERATIONS AND MAZDA MOTOR CORPORATION,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Central District of California
No. 8:19-cv-01298-JLS-KES
Honorable Josephine L. Staton

---

## APPELLANTS' OPENING BRIEF
## FILED UNDER SEAL

---

KESSLER TOPAZ MELTZER & CHECK LLP
Joseph H. Meltzer
Melissa L. Yeates
Tyler S. Graden
Jonathan F. Neumann
Jordan E. Jacobson
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
jmeltzer@ktmc.com
myeates@ktmc.com
tgraden@ktmc.com

KIESEL LAW LLP
Paul R. Kiesel
Jeffrey A. Koncius
Cherisse H. Cleofe
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Tel: (310) 854-4444
kiesel@kiesel.law
koncius@kiesel.law
cleofe@kiesel.law

jneumann@ktmc.com
jjacobson@ktmc.com

ROBBINS GELLER RUDMAN & DOWD LLP
Robert M. Rothman
Francis P. Karam
58 South Service Road, Suite 200
Melville, NY 11747
Tel.: (631) 367-7100
rrothman@rgrdlaw.com
fkaram@rgrdlaw.com

THE MILLER LAW FIRM, P.C.
E. Powell Miller
Sharon S. Almonrode
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel.: (248) 841-2200
epm@miller.law
ssa@miller.law

ROBBINS GELLER RUDMAN & DOWD LLP
Andrew S. Love
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel: (415) 288-4545
alove@rgrdlaw.com

*Attorneys for Plaintiffs-Appellants*

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ............................................... 4

ISSUES PRESENTED.................................................................. 5

STATEMENT OF THE CASE....................................................... 5

    I.    FACTS RELEVANT TO ISSUES SUBMITTED FOR REVIEW.... 5

    II.   PROCEDURAL HISTORY ............................................... 11

         A.  THE DISTRICT COURT GRANTED CLASS
             CERTIFICATION AND CORRECTLY FOUND WHITE'S
             TESTIMONY WAS RELEVANT AND RELIABLE................. 13

         B.  THE DISTRICT COURT CHANGED COURSE,
             EXCLUDING WHITE'S TESTIMONY, REVERSING
             CLASS CERTIFICATION, AND GRANTING
             SUMMARY JUDGMENT............................................ 14

SUMMARY OF ARGUMENT ..................................................... 16

STANDARD OF REVIEW ......................................................... 18

ARGUMENT ........................................................................... 19

    I.    WHITE IS QUALIFIED AND HIS OPINIONS ARE
        RELEVANT, RELIABLE, AND ADMISSIBLE UNDER
        RULE 702 ...................................................................... 19

    II.   THE DISTRICT COURT MISAPPLIED RULE 702 AND
        ERRED BY WEIGHING EVIDENCE, IGNORING DATA,
        AND EXCLUDING WHITE BECAUSE IT DISAGREED
        WITH HIS CONCLUSIONS ............................................. 22

         A. THE DISTRICT COURT ERRED BY REQUIRING
             COMPARATIVE DATA, WEIGHING EVIDENCE, AND
             REQUIRING ADDITIONAL TESTING ................................... 23

         B.  THE DISTRICT COURT ERRED BY IGNORING DATA
             AND WEIGHING EVIDENCE.................................................. 28

         C.  THE DISTRICT COURT ERRED BY FINDING WHITE'S
             ROOT CAUSE OPINION NOT ADEQUATELY
             SUPPORTED ........................................................ 33

         D.  THE DISTRICT COURT ERRED BY FAILING TO GIVE
             WEIGHT TO FORD'S 2020 REDESIGN................................. 44

III.    GENUINE ISSUES OF MATERIAL FACT EXIST
PRECLUDING SUMMARY JUDGMENT ...................................... 46

    A.  THE DISTRICT COURT ERRED BY IGNORING RECORD
EVIDENCE OF A COGNIZABLE INJURY ............................. 46

    B.  THE DISTRICT COURT ERRED BY FAILING TO GIVE
WEIGHT TO EVIDENCE SHOWING THE DEFECT WAS
MATERIAL ................................................................. 49

IV.    THE DISTRICT COURT ERRED BY DECERTIFYING
THE CLASSES .................................................................. 58

CONCLUSION ................................................................. 59

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*,
  738 F.3d 960 (9th Cir. 2013) ............................................................3, 21, 22, 26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).......................................................................................54

*Barlow v. Ground*,
  943 F.2d 1132 (9th Cir. 1991) ...................................................................*passim*

*Beaty v. Ford*,
  854 F. App'x 845 (9th Cir. 2021) ...............................................................55, 56

*Bellville v. Ford Motor Co.*,
  919 F.3d 224 (4th Cir. 2019) ...........................................................................41

*Braverman v. BMW of N. Am., LLC*,
  2021 WL 1020408 (C.D. Cal. Mar. 17, 2021)...................................................48

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018)................................................................47

*City of Pomona v. SQM N. Am. Corp.*,
  750 F.3d 1036 (9th Cir. 2014) ...................................................................*passim*

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) .............................................................50, 53, 58

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993).....................................................................................*passim*

*In re Denture Cream Prods. Liab. Litig.*,
  795 F. Supp. 2d 1345 (S.D. Fla. 2011)........................................................30, 40

*Domingo ex rel. Domingo v. T.K.*,
  289 F.3d 600 (9th Cir. 2002) ...........................................................................44

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ..................................................................*passim*

*Falk v. Gen. Motors Corp.*,
    496 F. Supp. 2d 1088 (N.D. Cal. 2007) .............................................47

*Fuller v. Idaho Dep't of Corr.*,
    865 F.3d 1154 (9th Cir. 2017) ...........................................................52

*In re Gen. Motors Ignition Switch Litig.*,
    2016 WL 3920353 (S.D.N.Y. July 15, 2016) .....................................47

*In re Gen. Motors Ignition Switch Litig.*,
    257 F. Supp. 3d 372 (S.D.N.Y. 2017) ..............................................47

*Gonzalez v. U.S. Immigr. & Customs Enf't*,
    975 F.3d 788 (9th Cir. 2020) ...............................................................5

*Grimstad v. FCA US LLC*,
    2018 WL 6427339 (C.D. Cal. Dec. 3, 2018)......................................49

*Grodzitsky v. Am. Honda Motor Co.*,
    2017 WL 8943159 (C.D. Cal. Oct. 30, 2017) ....................................15

*Grodzitsky v. Am. Honda Motor Co.*,
    957 F.3d 979 (9th Cir. 2020) ..................................................*passim*

*Hardeman v. Monsanto Co.*,
    997 F.3d 941 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2834 (2022) .................18

*Hawkins v. Nestle U.S.A. Inc.*,
    309 F. Supp. 3d 696 (E.D. Mo. 2018) ..............................................47

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
    524 F. Supp. 3d 1007 (S.D. Cal. 2021), *aff'd*,
    2022 WL 898595 (9th Cir. Mar. 28, 2022) ...........................31, 40, 44

*J & J Sports Prods., Inc. v. All Star Grill, Inc.*,
    2008 WL 11429564 (E.D.N.C. May 7, 2008) ....................................47

*Johnson v. Ford Motor Co.*,
    2018 WL 1512377 (S.D. W. Va. Mar. 26, 2018) ..........................45, 53

iv

*Kennedy v. Collagen Corp.*,
    161 F.3d 1226 (9th Cir. 1998) ....................................................................*passim*

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)...........................................................................................20

*Lassen v. Nissan N. Am., Inc.*,
    211 F. Supp. 3d 1267 (C.D. Cal. 2016) .............................................................45

*Leslie v. Grupo ICA*,
    198 F.3d 1152 (9th Cir. 1999) ........................................................49, 53, 55, 57

*Linares v. Crown Equip. Corp.*,
    2017 WL 10403360 (C.D. Cal. Sept. 19, 2017) ................................................28

*Maldonado v. Apple, Inc.*,
    2021 WL 1947512 (N.D. Cal. May 14, 2021)....................................................27

*Messick v. Novartis Pharms. Corp.*,
    747 F.3d 1193 (9th Cir. 2014) .............................................................19, 20, 31

*Milward v. Acuity Specialty Prods. Grp.*,
    639 F.3d 11 (1st Cir. 2011).................................................................................44

*Nguyen v. Nissan N. Am., Inc.*,
    932 F.3d 811 (9th Cir. 2019) ...............................................................47, 48, 49

*Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ..............................................................................58

*Pavoni v. Chrysler Grp.*,
    789 F.3d 1095 (9th Cir. 2015) ...........................................................................19

*Primiano v. Cook*,
    598 F.3d 558, 565 (9th Cir. 2010) .....................................................16, 22, 28, 32

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
    752 F.3d 807 (9th Cir. 2014) .......................................................................17, 31

*Ramirez v. ITW Food Equip. Grp.*,
    686 F. App'x 435 (9th Cir. 2017).........................................................16, 17, 27

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ...............................................................19

*Siqueiros v. Gen. Motors LLC*,
2022 WL 74182 (N.D. Cal. Jan. 7, 2022).........................36, 37, 41, 42

*Tamraz v. Lincoln Elec. Co.*,
620 F.3d 665 (6th Cir. 2010) ...............................................................44

*Torres v. City of Madera*,
648 F.3d 1119 (9th Cir. 2011) .................................................50, 51, 57

*In re Toyota Motor Corp. Hybrid Brake Marketing., Sales Pracs. &
Prod. Liab. Litig.*,
959 F. Supp. 2d 1244 (C.D. Cal. 2013) ...............................................53

*Wendell v. GlaxoSmithKline LLC*,
858 F.3d 1227 (9th Cir. 2017) .......................................................18, 20

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) .............................................................47

*Wyman v. Sunbeam Prods., Inc.*,
2021 WL 1531000 (N.D. Cal. Apr. 19, 2021)....................................27

**State Cases**

*Miles v. Perpetual Sav. & Loan Co.*,
388 N.E.2d 1367 (Ohio 1979) .............................................................47

**State Statutes**

La. Stat. Ann. § 9:2800.57 (2013) ............................................................47

Tex. Bus. & Com. Code Ann. §§ 17.45-46 (2019).................................47

**Rules**

Fed. R. Civ. P. 23 ..............................................................................*passim*

Fed. R. Evid. 702 ..............................................................................*passim*

## INTRODUCTION

This case is about a known design defect in water pumps, which were installed inside the engine block, in certain Mazda CX-9s and Mazda6s.[1] Given their placement inside the engine, water pump failures in the Vehicles have significant consequences, including costly repairs, catastrophic engine failure, and dangerous driving conditions where the Vehicles become inoperable. In July 2019, after news of this class action spread and a General Manager asked whether Mazda knew about the issue, Mazda internally admitted: "Yes, it is a known problem." 2-ER-264. However, Mazda never disclosed the defect and instead, sold cars to unwitting customers at inflated prices.

Plaintiffs brought fraud and consumer protection claims under the laws of the states where they purchased their Vehicles, on their own behalf and on behalf of state Classes, to recoup the amount they and members of the Classes overpaid for Vehicles with the concealed Defect. Under those laws, Plaintiffs need to show

---

[1] All internal citations and quotations are omitted and all emphases are added. "Mazda" refers to Defendants Mazda Motor Corporation ("MC") and Mazda Motor of America, Inc. d/b/a Mazda North American Operations ("MNAO"). "Plaintiffs" are Esther Wright Schneider, Lawrence and Monika Bohana, Brian Hume, David Dennis, Jean Levasseur, Terry Sonneveldt, Jacqueline S. Aslan, Christopher Lacasse, Tim Halwas, Erin Matheny, Jon Sowards, and Lewis Delvecchio. The "Vehicles" or "Class Vehicles" are 2008-2015 Mazda CX-9s and 2009-2013 Mazda6s with 3.5 L or 3.7 L Cyclone engines. All Class Vehicles are equipped with identical or substantially similar water pumps mounted inside the engine ("Internal Water Pumps" or "Water Pumps"). 9-ER-1897.

Mazda acted fraudulently and/or deceptively by failing to disclose the design defect and that Mazda's conduct injured Plaintiffs and members of the Classes by causing them to overpay for Vehicles with an undisclosed Defect.

Plaintiffs bring this appeal after the District Court committed reversible error by excluding the opinions of Plaintiffs' eminently qualified engineering expert, Dr. Christopher White—who proffered a reliable opinion that the Internal Water Pumps in the Vehicles have a common defect. Then, having stripped Plaintiffs' case of expert evidence of the defect, the District Court further erred by reversing class certification and granting summary judgment to Mazda.

Specifically, the District Court misapplied Federal Rule of Evidence 702 ("Rule 702") by adding testing and comparative data requirements that are not part of a *Daubert* reliability analysis and overstepped its gatekeeper role by weighing evidence and substituting its credibility and factual determinations for that of the jury. This was an abuse of discretion. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043-44 (9th Cir. 2014) ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").

White's opinions were relevant and reliable because they were based on his: (i) extensive education and professional experience;[2] (ii) fulsome engineering analysis (8-ER-1466-84); (iii) review of publicly available articles and literature (8-ER-1471, 1474-76, 1479-80; (iv) empirical inspection and measurement of new and failed Internal Water Pumps (8-ER-1484-1500); and (v) analysis of production documents (8-ER-1466, 1469, 1472-76, 1481, 1484, 1486, 1492, 1495-97, 1499-1500, 1504-09). *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969 (9th Cir. 2013) (expert testimony is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline").

Contrary to this Court's precedent, the District Court failed to focus on White's qualifications, relevance, and methodology and ignored the studies, facts, data, and analysis White used to support his opinions, while demanding that White provide additional corroborating evidence. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1023-24 (9th Cir. 2022) (trial court erred in excluding expert's testimony where court's "concerns speak to corroboration, not foundation, and are properly addressed through impeachment before a jury at trial—not exclusion by a district judge at the admissibility stage"). Where, as here, the District Court usurps the role of the jury, reversal is required. *See id.* at 1020 (reversing expert exclusion).

---

[2] Dr. White holds a Ph.D. in Mechanical Engineering from Yale University, has over 20 years of experience in internal combustion engines and serves as Chair of the Department of Mechanical Engineering at the University of New Hampshire.

In addition to wrongfully excluding White's testimony, the District Court ignored record evidence supporting Plaintiffs' claims while drawing inferences in favor of Mazda, the moving party on summary judgment. This too is reversible error. *Barlow v. Ground*, 943 F.2d 1132, 1134 (9th Cir. 1991) ("We reverse a grant of summary judgment if, viewing the evidence in the light most favorable to the non-moving party, there are genuine issues of material fact.").

Finally, the District Court erred by decertifying the Classes based on its summary judgment ruling without engaging in a rigorous Rule 23 analysis as it had when previously finding in favor of certification.

Accordingly, Plaintiffs respectfully request this Court reverse the District Court's Order in its entirety.

## JURISDICTIONAL STATEMENT

The District Court entered judgment on March 4, 2023. 1-ER-3-4. Plaintiffs filed notice of appeal within 30 days after entry of judgment, on April 3, 2023. 6-ER-1267. The District Court had jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), and this Court has jurisdiction to review the District Court's grant of summary judgment as a final order pursuant to 28 U.S.C. § 1291. This Court also has jurisdiction over the order striking White's testimony and class certification reversal because Section 1291 subsumes

"previously nonfinal orders that have merged with the judgment[.]" *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 802 (9th Cir. 2020).

## ISSUES PRESENTED

1.  Did the District Court err by misapplying Federal Rule of Evidence 702 and excluding Plaintiffs' engineering expert, Dr. White?

2.  Should this Court reverse summary judgment where White was wrongfully excluded and the District Court failed to consider record evidence that created triable issues of fact as to the existence of the Defect, Mazda's fraudulent and/or deceptive conduct, and injury?

3.  Did the District Court err by decertifying the California, Massachusetts, Michigan, Missouri, Ohio, and Virginia Classes based on its flawed *Daubert* and summary judgment findings and without performing a rigorous Rule 23 analysis?

## STATEMENT OF THE CASE

## I.   FACTS RELEVANT TO ISSUES SUBMITTED FOR REVIEW

Unlike traditional water pumps which are externally mounted, the Water Pumps in the Vehicles[3] are mounted inside the engine block, making the consequences of a failed Water Pump significant because leaking coolant can mix

---

[3] Mazda used the same design in the 2007 CX-9, but that model year is not in the Classes.

with oil and destroy the engine.[4] In addition, the Water Pumps' placement makes inspection, repair, or replacement of the Water Pumps very costly because the entire engine must be removed to access the Water Pumps. Given the heightened consequences of Internal Water Pump failures, Mazda never should have sold the Vehicles without disclosing the Defect.

As White's Reports[5] detail, the mechanical seals[6] inside the Water Pumps use an HNBR bellows to provide the force necessary to hold the mechanical seal faces together and prevent leakage. 8-ER-1467-74, ¶¶37-54. White opines:

> [T]he design defect in the Internal Water Pump in the Class Vehicles is the use of hydrogenated acrylonitrile butadiene rubber ("HNBR") for the elastomer bellows in the mechanical seals in combination with a bellows design such that the bellows are fully immersed in, and in full contact with, the engine coolant and exposed to high temperatures (the "Defect")

8-ER-1464, ¶12. "The mechanical properties of HNBR are known to degrade over time in coolant, particularly at high temperatures" and this "degradation of the HNBR leads to a loss of elasticity and/or the growth of fatigue cracks in the

---

[4] *See, e.g.*, 8-ER-1543 (Mazda employees acknowledging "potential for a class action lawsuit regarding engine failure due to water pump failure" and that, even if there is no engine failure, "[i]n the best case [scenario] it takes over 8 labor hours to replace under warranty for a $70 part").

[5] White's submitted reports on: (1) March 10, 2022 (9-ER-1893-1925) ("White Class Report"); (2) June 23, 2022 (9-ER-1927-58) ("White Rebuttal Report"); and (3) July 26, 2022 (8-ER-1460-1523) ("White Merits Report").

[6] A "mechanical seal" is a seal where one side rotates and the other side is stationary. 8-ER-1467-69, ¶¶37-39.

6

elastomer bellow." 8-ER-1465-66, ¶25; *see also* 8-ER-1474-75, ¶¶55-58 (citing scientific literature and production documents).

By placing the Water Pumps inside the engine, and otherwise failing to shield the HNBR bellows, Mazda did not protect against—but exposed—the Internal Water Pumps' bellows to hot coolant. 8-ER-1473-84, ¶¶52, 61-99. In particular, the Internal Water Pumps' casing is exposed to hot oil, which rapidly heats the coolant in the spring-bellows chamber where the coolant is in contact with the bellows. 8-ER-1476-84, ¶¶66-97.

As White explains, once degraded, the bellows fails to provide sufficient force to hold the seal faces tight against each other, allowing coolant to leak past the seal. 8-ER-1489-1500, ¶¶117-167. In the best-case scenario, small leaks are channeled through a weep hole and require costly water pump replacement; however, larger leaks allow coolant to penetrate the bearing assembly, wash out the bearing lubricant, and, given the Water Pumps' internal placement above the oil pan, cause catastrophic engine failure when the coolant mixes with oil. 8-ER-1467, 1488-89, 1499, ¶¶33-36, 114-117, 161-163. When this happens, the Vehicles stall, often with no warning.

Mazda knew not only that the Internal Water Pumps leaked, but also that leaks were caused by a defect in the mechanical seal.[7] As early as 2005, Mazda knew that

---

[7] *See* 8-ER-1395-1413.

"[m]echanic[al] seal leaks are significant" and that this was particularly problematic in the types of engines in Plaintiffs' vehicles because the water pumps were located inside the engine. 8-ER-1587. On November 1, 2006, Ford[8] engineers observed an "extreme coolant leak" through the mechanical seal and pointed to the "bellows" as a potential cause. 8-ER-1669. On May 28, 2007, Mazda opened an investigation into a 2007 CX-9 where coolant leaked inside the engine and mixed with oil, noting that "presumably an issue occurred inside the engine[.]" 8-ER-1673-74. On February 12, 2009, after receiving additional reports of Internal Water Pump leaks, Mazda issued a company-wide "Repair Information Summary," informing technicians of the need to replace the pump to fix coolant leaks from the weep hole. 9-ER-1785. However, even after that, Mazda calculated *that 31.3% of Internal Water Pump failures required engine replacement.* 10-ER-2035. *See also* 10-ER-2010-11 (Mazda employees discussing why it is difficult to recognize Internal Water Pump leaks before engine damage occurs).

On December 16, 2010, after Mazda's warranty analysis again documented a high number of Internal Water Pump leaks, Mazda began another investigation into the root cause—again observing that most leaks were from the weep hole passage leading to the mechanical seal. 9-ER-1681. By February 9, 2011, Mazda's

---

[8] Ford and Mazda jointly developed the Cyclone engines that incorporated the Internal Water Pumps. 2-ER-288-93.

investigation concluded that a possible cause was "[c]oolant leak[ing] through a defected water pump seal" and sent several failed Internal Water Pumps to Ford for further analysis. 9-ER-1795. The following month, Mazda received information from Ford about certain "improvements to the mechanical seal" that had already been made as well as additional measures Ford was working on to fix the "Defected Water Pump Seal." 9-ER-1802-1805. Two months later, Mazda received a teardown report issued by the supplier pointing to "low system pressure and/or high temperatures around the seal" as causing the water pump failures. 9-ER-1800. The problem had become so widespread that, in 2017 alone, Mazda prepared 22 FQIRs[9] concerning Internal Water Pump Failures, again documenting leaks from the weep hole and engine oil contaminated with coolant. 4-ER-725-46.

Just like White, Mazda and Ford engineers understood that thermal degradation of the HNBR bellows caused these Internal Water Pump failures. In a February 2017 exchange regarding the Water Pump "leakage problem" in Vehicles, Mazda employees recognized: "The bellows rubber used for the mechanical seal is generally HNBR, and [that] it has been found that thermal degradation causes deterioration" and loss of elasticity of the bellows. 9-ER-1844. Mazda further found when the bellows degrades and loses elasticity, "water leaks from the sliding surface

---

[9] Field Quality Information Reports ("FQIRs") are formal requests by MNAO "reporting issues or concerns to MC." 3-ER-489.

9

of the mechanical seal, which leads to water intrusion into the bearing and bearing seizure." *Id*. In a September 2017 email, Ford informed Mazda that Internal Water Pump failures were caused when "the dynamic seal was leaking for an extended period of time" and noted that the "hole in the bellows" Mazda observed "was interesting" because:

> The bellows material is good up to the 135C range and then it deteriates [sic]. The oil gets hotter. The seal is pressed into the water pump casting. That casting where the bellows is situated sees hot oil. The temperature of the casting in that area is closer to the oil temperature than the coolant temperature. We fixed this with a casting update a year or so ago.

9-ER-1830. Ford's investigation further revealed that all of the failed Internal Water Pumps showed "bellows material degradation (HNBR) due to accelerated thermal aging," and "complete compression set due to accelerated heat aging," which was caused when "increased oil temperatures are heating up the [water pump] casting, and reflecting upon the bellows in the Dynamic Seal." 9-ER-1883-88. This is the same conclusion White reached about the Defect. 8-ER-1465-66, 1474-76, 1489-90, 1497. Ford's proposed fix was to "separate the oil from the casting where the dynamic seal is housed" (9-ER-1888), which Ford adopted, but Mazda did not. 8-ER-1484.

The Defect did not cause one-off failures, but led to "a higher than normal warranty defect rate." 4-ER-761. In fact, due to the Defect, replacement engines were on back order. 6-ER-1195. Even after attempted fixes, Mazda recognized it

was still "a chronic problem" which "Mazda cannot be indifferent to" and continued "trying to find any countermeasure." 9-ER-1820. However, with the 2016 CX-9 being the last Mazda vehicle with an Internal Water Pump, Mazda stopped trying to fix the problem and never disclosed it. 10-ER-2093-96.

## II.   PROCEDURAL HISTORY

On June 28, 2019, the Complaint was filed (ECF 1), and on November 1, 2019, the Amended Complaint was filed, including additional Plaintiffs and claims (ECF 54). On January 4, 2021, the District Court dismissed with leave to amend. 6-ER-1265-66. On February 4, 2021, Plaintiffs filed a Second Amended Complaint. 11-ER-2100. Mazda again moved to dismiss, but on July 29, 2021, the District Court largely denied the motion, finding Plaintiffs adequately alleged a material defect which "created a safety risk that the engine may suddenly seize or become inoperable while driving, and also imposed unexpected and significant costs to repair or replace[.]" 6-ER-1212.

Thereafter, the parties engaged in extensive fact and expert discovery. On March 11, 2022, Plaintiffs moved for class certification (ECF 317) and submitted the White Class Report,[10] in which he opined that all the Vehicles share a common Defect. 9-ER-1892-1925. On April 29, 2022, Mazda opposed class certification. ECF 342. On June 23, 2022, Plaintiffs filed their class certification Reply (ECF 373),

---

[10] Plaintiffs submitted additional expert reports.

which included the White Rebuttal Report. 9-ER-1926-58. The Court also permitted a sur-reply and sur-rebuttal expert reports, which Mazda filed on September 2, 2022. ECF 404.

On April 29, 2022, Mazda moved to exclude White ("First *Daubert* Motion"). ECF 343. Plaintiffs opposed on September 9, 2022 (ECF 445), and Defendants replied on September 16, 2022 (ECF 460).

On July 26, 2022, Plaintiffs produced the White Merits Report and Mazda moved for summary judgment (ECF 496). On August 26, 2022, Mazda produced rebuttal reports. On September 26, 2022, Plaintiffs filed their opposition to summary judgment. ECF 473.

On September 29, 2022, Mazda again moved to exclude White's testimony ("Second *Daubert* Motion") (ECF 478), raising the same challenges to White's testimony that it had previously raised. On November 17, 2022, Plaintiffs opposed (ECF 527), and Mazda replied on December 23, 2022 (ECF 548). On October 14, 2023, the Court held oral argument on Plaintiffs' motion for class certification and Mazda's First *Daubert* Motion.

**A.    THE DISTRICT COURT GRANTED CLASS CERTIFICATION AND CORRECTLY FOUND WHITE'S TESTIMONY WAS RELEVANT AND RELIABLE**

On October 21, 2022, the District Court denied Mazda's First *Daubert* Motion, and granted Class Certification in part, rejecting every argument Mazda raised challenging White's testimony. It correctly found:

- White's opinion was "sufficiently well" supported because White "explained why the loss of elasticity that he observed in the bellows of the failed water pumps would, based on his engineering analysis … affect the functionality of the bellows." 5-ER-987.

- Ninth Circuit precedent did not require that White conduct additional empirical testing, because "[t]esting is not a prerequisite for an adequately supported expert analysis under *Daubert*" and where an expert is "analyzing physical products that had already broken down using established scientific techniques," their opinions are "not the sort … that needed to be physically tested[.]" 5-ER-987-89; rather, "[t]he reliability of an expert's theory turns on whether it can be tested, not whether he has tested it himself." 5-ER-988 (quoting *Ramirez v. ITW Food Equip. Grp.*, 686 F. App'x 435, 440 (9th Cir. 2017).

- Defendants' "claim that White's opinion on the alleged design defect is based only on a visual inspection of four failed water pumps is misleading," because "White's analysis is based on more than his examination of the four failed water pumps," and accordingly, the size of the sample was "not as significant as Mazda suggests." 5-ER-994-95.

- *Grodzitsky v. American Honda Motor Co.*, 957 F.3d 979 (9th Cir. 2020) ("*Grodzitsky*") is not "on all fours" with this case because it stands "for the much narrower proposition that, if an expert will make ***probabilistic claims*** about the causes of failure in a large product population, 'some minimal level of statistical significance needs to be met,'" but here White did not make "probabilistic claims about how many water pumps in the Class Vehicles have failed because of the defect" and thus did not "make the type of claim that requires 'statistical significance.'" 5-ER-995-96.

13

- White did not need to demonstrate that the Defect had an effect on the failure rate because White's engineering analysis "is sufficiently well supported to constitute evidence on which Plaintiffs may rely to prove the existence of an alleged defect common to all Class Vehicles." 5-ER-998.

- Mazda's arguments about White's use of production documents and peer reviewed literature, his opinions about the HNBR bellows' exposure to high temperature coolant, and his opinions about the effect of Ford's redesigned water pumps went to weight rather than admissibility. 5-ER-993.

- Mazda's argument that used car purchasers were on notice of "the risks and effects of a failing water pump" through certain disclosures made in a Buyer's Guide or Mazda's Powertrain Limited Warranty "*is a stretch*." 5-ER-1020.

Mazda filed a Rule 23(f) petition, which this Court denied on December 8, 2022.

No. 22-80127, ECF 6.

## B.   THE DISTRICT COURT CHANGED COURSE, EXCLUDING WHITE'S TESTIMONY, REVERSING CLASS CERTIFICATION, AND GRANTING SUMMARY JUDGMENT

On February 23, 2023, the District Court granted Mazda's Second *Daubert* Motion, granted summary judgment, and decertified the Classes. 1-ER-38.

In excluding White's testimony, the District Court adopted many of the same arguments that it had previously rejected. For example, while it previously found other potential causes of water pump failures could be "raise[d] [by Mazda] on cross-examination" (5-ER-1005) and did not support exclusion because it "demands weighing the evidence[,]" the District Court later excluded White based on its finding that he did "not explain clearly how he ruled out other possible causes of the

failure of the water pumps that he examined." 1-ER-22. Similarly, while the District Court previously rejected Mazda's reliance on *Grodzitsky* for the proposition that White was required to opine on a failure rate, it subsequently held that White's opinion was inadmissible without a failure rate. 1-ER-25-26. The District Court also previously rejected Mazda's attempt to "analogize[] White's examination of a small sample of water pumps to the statistically inadequate examination of 26 regulators that the district court deemed an inadequate basis" in *Grodzitsky v. Am. Honda Motor Co.* ("*Grodzitsky I*"), 2017 WL 8943159 (C.D. Cal. Oct. 30, 2017) (5-ER-994), but later held that *Grodzitsky I* required White to inspect "a statistically significant sample of failed parts." 1-ER-27-28.

The District Court also revisited its conclusions regarding the Buyer's Guide and Mazda's warranty, the relevancy of which it initially found was "a stretch," (5-ER-1020), now finding them compelling evidence that a reasonable consumer would not consider the Defect material. 1-ER-35-36.

After excluding White's opinion, the Court held that there were no triable issues related to the existence of an actionable defect. 1-ER-29-36. The Court granted summary judgment, decertified the Classes (1-ER-32-38), and entered judgment for Mazda. 1-ER-3-4.

## SUMMARY OF ARGUMENT

Rather than properly "screen the jury from unreliable, nonsense opinions," the District Court misapplied Rule 702 and abused its discretion by acting as a factfinder to improperly exclude White. *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

I.      White's credentials are unimpeachable and his opinions are relevant and reliable.

II.(A).  The District Court wrongfully redefined the Defect as a comparative one and abused its discretion by demanding additional corroborating evidence— which is not required under Rule 702. *See Elosu*, 26 F.4th at 1023-24 (trial court erred in excluding expert's testimony where the court's "concerns speak to corroboration, not foundation, and are properly addressed through impeachment before a jury at trial—not exclusion by a district judge at the admissibility stage"). Indeed, the District Court found an analytical gap of its own making, unnecessarily requiring White to: (1) cite comparator data regarding water pump failures in other vehicles; (2) go beyond his engineering expertise and conduct a statistical analysis of failure rates; and (3) perform additional empirical testing. *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998) (it is error to exclude based on a perceived analytical "gap … of the district court's making"); *Ramirez*, 686 F. App'x

at 440 ("The reliability of an expert's theory turns on whether it can be tested, … not whether he has tested it himself.").

II.(B).   The District Court further abused its discretion by weighing evidence to determine whether it agreed with White's conclusions, and improperly requiring additional testing and the ruling out of all other failure modes. *Elosu*, 26 F.4th at 1025-26 (district court cannot "engage in freeform factfinding … to determine the veracity of the expert's conclusions at the admissibility stage."); *Ramirez*, 686 F. App'x at 440.

II.(C).   The District Court incorrectly found White's opinion unsupported by: (1) ignoring data supporting White's opinions; (2) improperly requiring corroboration; and (3) erroneously finding that *Grodzitsky* required White to inspect a statistically significant number of failed parts. *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814-16 (9th Cir. 2014) (district court erred in failing to consider data expert relied on in forming conclusions); *Elosu*, 26 F.4th at 1025-26 (it is error to require corroboration).

II.(D). The District Court erred by deeming Ford's 2020 Redesign irrelevant, when it showed that other engineers attempted to address the very design defect White identified.

III.     The District Court improperly granted summary judgment by excluding White, ignoring record evidence creating genuine issues of material fact, and drawing inferences in favor of Mazda.

IV.     The District Court improperly decertified the Classes without conducting a rigorous Rule 23 analysis.

## STANDARD OF REVIEW

A District Court's decision on the admissibility of expert testimony is reviewed for abuse of discretion, but "[w]hether the district court applied the correct legal standard under *Daubert* is reviewed de novo." *Hardeman v. Monsanto Co.*, 997 F.3d 941, 960 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2834 (2022). *See also Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1231 (9th Cir. 2017) (with regard to Rule 702, "we review de novo the construction or interpretation of … the Federal Rules of Evidence"). A District Court errs when it fails to consider all of the facts on which an expert bases their opinion, and thus excludes the expert's testimony based on a perceived analytical "gap … of the district court's making." *Kennedy*, 161 F.3d at 1230. This Court has long "cautioned that the district court is 'a gatekeeper, not a fact finder.'" *Elosu*, 26 F.4th at 1020.

Decisions granting summary judgment are reviewed de novo, viewing the evidence in the light most favorable to the non-moving party to determine "whether there are any genuine issues of material fact and whether the district court correctly

18

applied the relevant substantive law." *Pavoni v. Chrysler Grp.*, 789 F.3d 1095, 1098 (9th Cir. 2015).

Class decertification decisions are reviewed first "for legal error under a de novo standard, and 'if no legal error occurred … for abuse of discretion.'" *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018).

## ARGUMENT

## I.  WHITE IS QUALIFIED AND HIS OPINIONS ARE RELEVANT, RELIABLE, AND ADMISSIBLE UNDER RULE 702

This case is not a close call. White is highly qualified and his opinions are relevant and reliable; they do not approach "junk science." *See Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014) (reversing expert exclusion and noting court's "gatekeeping role" is to exclude "junk science").

White is a Yale-trained mechanical engineer, served as a Senior Member of the Technical Staff at Sandia National Laboratories in the Engine Combustion Division, and has over two decades of experience with combustion engines, like those at issue here. White holds M.S. and Ph.D. degrees in Mechanical Engineering from Yale University, as well as dual B.S. and M.S. degrees in Mechanical Engineering from Stony Brook University. 8-ER-1463. He has authored peer reviewed literature and is currently Chair of the Department of Mechanical Engineering at the University of New Hampshire. *Id*. He teaches undergraduate and graduate courses in Fluid Mechanics, Thermodynamics, Experimental

19

Measurements and Data Analysis, Experimental Fluid Dynamics, Renewable Energy Technologies, and Fluid Turbulence and focuses his research on fluid mechanics, combustion, heat transfer, and energy conversion technologies. 8-ER-1462. In his research and academic instruction, White uses and provides instruction on pumps like those here. *Id.*

White's opinions are relevant and reliable. *City of Pomona*, 750 F.3d at 1044 ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."). The *Daubert* reliability analysis is "flexible" and is meant to shield the jury from "bogus" opinions. *Wendell*, 858 F.3d at 1235. No such shielding was necessary here. Indeed, White's opinions readily meet *Daubert's* reliability standard because they are based on his education, experience, and the type of engineering analysis that is standard in his field. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (*Daubert's* reliability inquiry focuses on if an expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

To determine whether there was a Defect, White inspected and took measurements of new and failed Water Pumps, performed a thermodynamic

analysis, modeled the Water Pump's spring-bellows chamber as both a closed and open thermodynamic systems, and performed closing force calculations, reviewed production documents, and examined design changes. 8-ER-1467-1500. Based on this analysis, White determined that there was a common design Defect in the Internal Water Pumps in the Vehicles. Specifically, he found that "the design defect in the Internal Water Pump in the Class Vehicles is the use of [HNBR] for the elastomer bellows in the mechanical seals in combination with a bellows design such that the bellows are fully immersed in, and in full contact with, the engine coolant and exposed to high temperatures" and that because "[t]he mechanical properties of HNBR are known to degrade over time in coolant, particularly at high temperatures" this "degradation of the HNBR leads to a loss of elasticity and/or the growth of fatigue cracks in the elastomer bellows" and leaks. 8-ER-1464-66. Given the Water Pumps' placement inside the engine, leaks lead to costly repairs, engine failure, and dangerous conditions where the Vehicles stall while driving. 8-ER-1467, 9-ER-1935-36, 10-ER-2010.

White's education, knowledge, and engineering analysis provide an adequate foundation for the reliability of his opinions. *See Alaska Rent-A-Car*, 738 F.3d at 969 (expert testimony "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline"); *Elosu*, 26 F.4th at 1024

("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.").

As such, it was error to exclude White.

## II.     THE DISTRICT COURT MISAPPLIED RULE 702 AND ERRED BY WEIGHING EVIDENCE, IGNORING DATA, AND EXCLUDING WHITE BECAUSE IT DISAGREED WITH HIS CONCLUSIONS

The trial court is "a gatekeeper, *not a fact finder*." *Primiano*, 598 F.3d at 565. While the trial court should "screen the jury from unreliable nonsense opinions," it should not "exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Indeed, "[s]haky, but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *City of Pomona*, 750 F.3d at 1043-44.

Accordingly, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 1044. Disputes related to purported "faults in an [expert's] use of [a particular] methodology, or lack of textual authority for his opinion, *go to the weight, not the admissibility*, of his testimony." *Kennedy*, 161 F.3d at 1231.

The District Court erred by failing to follow this black letter law.

22

**A. THE DISTRICT COURT ERRED BY REQUIRING COMPARATIVE DATA, WEIGHING EVIDENCE, AND REQUIRING ADDITIONAL TESTING**

This Court has held that testimony "rests on a 'reliable foundation' if it is rooted 'in the knowledge and experience of the relevant discipline'" *City of Pomona*, 750 F.3d at 1044. The District Court failed to apply that standard, and instead, misapplied Rule 702. *Id.* at 1041 (finding "the district court abused its discretion by not allowing a jury to resolve contested but otherwise admissible expert testimony"). Rather than evaluating the reliability of White's methodology, the Court abused its discretion by acting as a factfinder rather than gatekeeper, wrongfully adding a comparative data requirement, weighing evidence to determine it disagreed with White's conclusions, and adding a testing requirement.

*First*, the District Court erred by finding White's opinions "hypothetical" and without "an adequate factual and analytical basis" because White did not compare the Vehicles' failure rates to other vehicles. 1-ER-18-24. This conclusion rested on the District Court's mischaracterization of White's Defect theory as, "by definition, a comparative one." 1-ER-18. To reach this conclusion, the District Court latched onto two words that only appear in paragraph 97 of White's 41-page, 178-paragraph report. 1-ER-18-21. Yet, those two words—which the Court erroneously characterized as comprising a "crucial premise for White's conclusions"—***are not*** included in White's definition of the Defect, which appears in paragraphs 12 and 25

23

of his report and ***does not*** contain a comparator. Instead, White's defect theory focuses on the problems with this specific design in this specific application. *See* 8-ER-1464, ¶12 (defining the "Defect"); 8-ER-1465-66, ¶25 (describing the Defect).

The District Court required a comparator as corroborating evidence; it was not an essential component of White's defect theory. As such, the District Court's premise was flawed—White does not need to show that the bellows in the Vehicles perform worse than in other vehicles in order to provide a reliable methodology for his opinion on the existence of a design Defect. The District Court exceeded its authority by demanding such corroborating evidence. *Elosu*, 26 F. 4th at 1020.

*Second*, the Court improperly determined it disagreed with White's conclusions, instead of focusing on the reliability of his methodology, again abusing its discretion. *See City of Pomona*, 750 F.3d at 1044 (the reliability test "is not the correctness of the expert's conclusions but the soundness of his methodology"). Based on the unnecessary comparator it added, the District Court found White's engineering analysis lacking and required him to "analyze[] the rate at which the Class Vehicles water pumps fail prematurely" and "compare[] that rate with failure rates for external water pumps." 1-ER-19. However, in addition to the fact that White's defect theory is not dependent on a comparison to external water pumps, White is an engineer—not a statistician. He is neither qualified nor required to opine

on statistical failure rates.[11] Moreover, this ignores that the Internal Water Pumps, unlike external water pumps, are mounted inside the engine over the oil pan, making leaks more difficult to detect, costly to repair, and dangerous—by Mazda's calculations, leading to engine replacement ***in 31.3% of cases***. 10-ER-2035; 10-ER-2010-11.

As part of his analysis, White performed a thermodynamic analysis by modeling the Water Pump's spring-bellows chamber as both a closed and open systems, and performed closing force calculations, which showed that the heat generated in the spring bellows chamber from friction and hot oil on the Water Pump casing is sufficient to degrade the HNBR bellows to the point where it can no longer maintain a tight seal. 8-ER-1471-84 The District Court improperly weighed the merits of this thermodynamic analysis, finding that it "fails to show either the fact of accelerated degradation or that degradation is accelerated such that failures happen more often or earlier." 1-ER-20. Based on the Court's own view of White's thermodynamic analysis, it found that White "does not show … what effect—if any—this more demanding thermal environment has on the performance of the HNBR elastomer bellows in the Class Vehicles' water pumps relative to external

---

[11] Mazda's engineering expert, Hakim, attempted to opine on statistical failure rates, but as Plaintiffs' statistician Wachs, opined, "it is clear that he is unfamiliar with the most basic statistical concepts" and "[g]iven Mr. Hakim's lack of knowledge, experience, and training in statistical methods, his opinions on the field performance of Class Vehicles … are unsound." 4-ER-785; 8-ER-1448, ¶89.

water pumps." *Id*. Not only were these findings based on a flawed premise that comparative data was required, and an improper weighing of evidence to determine whether White was correct, they also ignore the scientific publications White cited, which show significant changes in the physical properties of HNBR as temperatures increase. 8-ER-1474-75, ¶¶55-58

In deciding *Daubert* motions, "the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *See Alaska Rent-A-Car*, 738 F.3d at 969. *See also id.* (trial court "is not tasked with deciding whether the expert is right or wrong"). However, instead of evaluating whether White's methodology was the type used in his field, and whether his conclusions were logically related to that methodology and the evidence, the District Court excluded White based on its own view of the evidence. *See* 1-ER-21. This is contrary to *Daubert* and Ninth Circuit law. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *City of Pomona*, 750 F.3d at 1044 ("Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge" and the reliability test "is not the correctness of the expert's conclusions but the soundness of his methodology").

26

*Third*, the District Court improperly deemed White's Defect opinion "hypothetical" and required White to provide additional "empirical data" to support admissibility, even though the reliability standard does not require ***testing*** and instead only requires ***testability***, i.e., whether someone else using the same data and methods could replicate the results. *See Ramirez*, 686 F. App'x at 440 ("The reliability of an expert's theory turns on whether it can be tested, … not whether he has tested it himself."); *Maldonado v. Apple, Inc.*, 2021 WL 1947512, at *11 (N.D. Cal. May 14, 2021) (an expert's opinion "is not the type that requires specific testing … to be reliable," where it "comes from fundamental principles of reliability engineering"); *Wyman v. Sunbeam Prods., Inc.*, 2021 WL 1531000, at *4 (N.D. Cal. Apr. 19, 2021) ("The Court is not aware of any caselaw indicating that an expert may not rely on peer reviewed literature as opposed to testing.").

Here, White utilized his education, experience, production documents, engineering analysis of failed water pumps, and thermodynamic analysis and modeling to explain how the Defect leads to loss of elasticity and/or growth of fatigue cracks in the elastomer bellows, causing coolant leaks. Indeed, White's report contains 18 pages of engineering analysis, including mathematical and thermal modeling and analysis, as well as 17 pages describing the inspected pumps and failure mode analysis he performed. 8-ER-1467-1500. No further testing was required. *See Ramirez*, 686 F. App'x at 440 (district court abused its discretion in

27

excluding engineer for failure to test); *Linares v. Crown Equip. Corp.*, 2017 WL 10403360, at *5 (C.D. Cal. Sept. 19, 2017) (holding that testing is "not required" and admitting an expert's opinion where the expert "utilized his education, training, and experience to independently analyze the issues underlying this litigation and form an opinion"); *Primiano*, 598 F.3d at 566 (reversing exclusion, finding that expert's educational background, publication history, familiarity with relevant peer-reviewed literature, and examination of the product at issue meant "[a] court would have to find that [he] is 'qualified as an expert by knowledge, skill, experience, training, or education' to render an opinion").

Any perceived analytical gap was due to the Court wrongly requiring corroboration, not due to the lack of a reliable analysis supporting White's conclusions. *Kennedy*, 161 F.3d at 1230 (finding district court errs when it excludes expert testimony based on perceived analytical "gap … of the district court's making."). The District Court abused its discretion by excluding White and should be reversed. *See Elosu*, 26 F.4th at 1025 (district court "abuses its discretion if it overlooks relevant data submitted as the foundation of an expert's remarks").

## B. The District Court Erred by Ignoring Data and Weighing Evidence

As described above, as part of his engineering analysis, White inspected and measured the mechanical properties of the bellows on two new Water Pumps and four failed Water Pumps. Based on this empirical data and his engineering analysis,

White determined that the Defect in the Internal Water Pumps' design causes the bellows to lose elasticity, and grow fatigue cracks, such that the bellows can no longer serve their function to hold the two seal rings tight against each other, causing leaks, and that the Defect causes Water Pump failures. 8-ER-1484-99.

The District Court further erred by ignoring this and other data supporting White's opinions and weighing evidence to determine whether it agreed with White's conclusions about the failed Water Pumps and the failure mode in the Water Pumps. Indeed, its finding that "White's opinion on the four failed water pumps is hypothetical" was admittedly based on its disagreement with his "conclusion that the four failed water pumps that he examined failed due to the Defect," ignoring White's analysis and instead surmising that "the material degradation and damage to the HNBR bellows that White examined firsthand could be the result—rather than the cause—of those water pumps' failure." 1-ER-21-22. But, this conclusion, apparently based on White's testimony about catastrophic failure of a pump being a "violent process," did not consider that the bellows *degradation* White identifies is different from the bellows *destruction* resulting from violent, catastrophic Water Pump failures, and that only Failed Pump #1 showed this sort of bellows destruction. 8-ER-1490.

Thereafter, the District Court then found that White's observations regarding "degradation and material damage" in the bellows of the failed pumps "is not enough

to support his hypotheses." 1-ER-22. But the question of whether White's analysis is sufficient to support his Defect theory is a question for the jury. *See Elosu*, 26 F.4th at 1020 (reversing expert exclusion and finding "[a]lthough a district court may screen an expert opinion for reliability, and may reject testimony that is wholly speculative, it may not weigh the expert's conclusions or assume a factfinding role").

In addition, the District Court again required additional "empirical testing" and "rul[ing] out other possible failure modes." 1-ER-21-22. Not only are the District Court's findings incorrect (White incorporated empirical testing), additional testing and ruling out other possible failure modes is not necessary. *See City of Pomona*, 750 F.3d at 1047 ("Under *Daubert*'s testability factor, the primary requirement is that '[s]omeone else using the same data and methods … be able to replicate the result[s]."); *Kennedy*, 161 F.3d at 1230 (finding "[c]ausation need not be established to a high degree of certainty for expert testimony to be admissible under Rule 702"). There is no requirement that an engineer rule out all other failure modes to opine on the existence of a design defect in a fraud and deceptive trade practice case such as this; that concept is taken from the "differential diagnosis" analysis used by causation experts in medical malpractice and product liability cases and does not apply here.[12]

---

[12] *See In re Denture Cream Prods. Liab. Litig*., 795 F. Supp. 2d 1345, 1365 (S.D. Fla. 2011) ("A differential diagnosis or differential etiology 'is a standard scientific

The District Court also ignored data that supported White's opinion even though it recognized "White measured the HNBR bellows from the four failed pumps to show that the bellows exhibited permanent compression set or deformation, which he argues 'allows coolant to leak past the mechanical seal'" and "then relie[d] on a mathematical engineering analysis to demonstrate 'the scenarios in which degradation of the HNBR bellows will lead to a leak past the mechanical seal[.]'" 1-ER-21. White's measurements and analysis showing that the degraded bellows in the failed pumps lack sufficient strength to maintain the mechanical seal, particularly when considered with the other evidence in White's Report, are more than sufficient to support his opinion that Water Pumps failed due to the Defect. *See* 8-ER-1489-1500.

But the District Court ignored the data White relied on, and instead of evaluating the reliability of White's methodology, substituted its own factual findings. *See Pyramid Techs., Inc.*, 752 F.3d at 814-16 (finding district court erred

---

technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated.'"); *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1050 n.20 (S.D. Cal. 2021), *aff'd*, 2022 WL 898595 (9th Cir. Mar. 28, 2022) (A "[d]ifferential diagnosis is 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings'"). The District Court cited both cases—which do not apply here. 1-ER-26. Even this product liability concept does not require the standard applied to White. *See Messick*, 747 F.3d at 1198-1199 (differential diagnosis does "not require that an expert be able to identify the sole cause of a medical condition in order for his or her testimony to be reliable").

in failing to consider data expert relied on in forming conclusions). The District Court focused on *its own belief* of what could cause mechanical seal overheating "to name a few examples" and found that these other things *could be* the cause of damage to the bellows White inspected as opposed to the design defect identified by White—straying far afield from its gatekeeper role. 1-ER-23 (citing nothing in the record). *See also Primiano*, 598 F.3d at 565 (the court is to act as a gatekeeper, not a fact finder).

Just last year in *Elosu*, this Court found that when a trial court "assume[s] a factfinding role[,]" like the District Court did here, it abuses its discretion. 26 F.4th at 1021, 1023-24. There, the trial court erred when it found an expert's testimony was not "based on sufficient facts or data[,]" because his conclusion was "too speculative[,]" "conflicted with [certain] testimony, and … relied too heavily on the testimony of the plaintiffs." *Id.* at 1023. This Court stated: "These concerns speak to corroboration, not foundation, and are properly addressed through impeachment before a jury at trial—not exclusion by a district judge at the admissibility stage." *Id.* at 1023-24.

Similarly here, the court erred in finding that White's opinion was "hypothetical" and lacked an "adequate factual and analytical basis" based on its own weighing of the evidence to discredit White's conclusions. 1-ER-18, 20. Any concerns about the accuracy of White's conclusions are to be addressed through

cross examination at trial, not through exclusion. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Elosu*, 26 F.4th at 1024 ("If the proposed testimony meets the thresholds of relevance and reliability, its proponent is 'entitled to have the jury decide upon its credibility, rather than the judge.'").

The District Court's failure to consider supportive data and its requirement that White rule out all other failure modes was an abuse of discretion. *Kennedy*, 161 F.3d at 1230 ("Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert.").

## C. THE DISTRICT COURT ERRED BY FINDING WHITE'S ROOT CAUSE OPINION NOT ADEQUATELY SUPPORTED

The District Court's erroneous holding that White must calculate a failure rate, and rule out all other possible causes of Water Pump failures also led the Court to wrongfully find that White's opinion that the Defect is the "root cause" of Internal Water Pump failures was not adequately supported. 1-ER-24-28. This Court has made clear that "Rule 702's 'sufficient facts or data' element requires foundation, not corroboration" and "does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu*, 26 F.4th at 1025-26.

Instead of applying this Court's precedent, the District Court misapplied case law which it had previously (correctly) determined was not "on all fours" with this case in order to improperly attempt to "determine the veracity" of White's conclusions. 5-ER-996; *Elosu*, 26 F.4th at 1026. It also overlooked substantial facts and data that provided an adequate foundation for White's conclusions.

First, to reach the erroneous conclusion that "White's failure to address other causes and factors that lead to water pump failures fatally undermines his attempt to extrapolate from four water pump failures to the effects of the Defect in the Class Vehicles generally," the District Court mischaracterized White's analysis. 1-ER-24. In truth, White did not simply extrapolate from his empirical examination of four failed water pumps. Rather, White: (a) first assessed the overall water pump design (8-ER-1466-67), (b) focused on the design of the mechanical seal which, as the name implies and White explains, is supposed to maintain a tight seal to prevent water pump leakage (8-ER-1467-74), (c) identified the unshielded HNBR bellows as a potentially problematic part because, as White understands from his years of robust relevant experience, and which is confirmed by the literature, HNBR degrades when exposed to coolant and heat (8-ER-1474), (d) identified production documents that also recognize degradation of the HNBR bellows as the root cause of the Water Pump failures (8-ER-1474-75), (e) assessed and explained through an engineering and thermal analysis how the HNBR bellows for Internal Water Pumps are exposed

34

to higher temperatures than displayed on the coolant gauge, specifically explaining how even small amounts of heat generated by friction between the seal faces an exposure to hot oil on the water pump casing will quickly lead to increased coolant temperatures in the spring-bellows chamber (8-ER-1475-84), (f) confirmed that the design of the Water Pumps he personally inspected are identical or substantially similar to the Water Pump design in all Vehicles (8-ER-1484-87), (g) explained that the design of the mechanical seal used in the Ford 2020 Redesign is different than that of the Vehicles, in particular discussing how Ford attempted to address HNBR degradation by shielding the bellows from heat and coolant (8-ER-1487-88), and then (h) confirmed through an empirical analysis of failed Water Pumps that the Defect he identified caused real world failures in the Vehicles (8-ER-1488-1500).

White's opinions flowed from the evidence he relied on and his reliable methodology. Any "analytical gap" found by the District Court is one of its own making. *Kennedy*, 161 F.3d at 1230; *see also Elosu*, 26 F.4th at 1026 ("The court's role is to determine the scientific validity of an expert's principles and methodology, not to determine whether their hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record. That is for the litigants to argue, and for the jury to decide."); *City of Pomona*, 750 F.3d at 1134 (holding "the *Daubert* inquiry does not require (or even allow) a district court to exclude an expert's opinion merely because the court is not persuaded that the expert's read of the

evidence is the best one," and "[plaintiffs] only have to demonstrate by a preponderance of the evidence that [the expert's] opinions are reliable").

In determining that White needed to rule out all other possible causes of Water Pump failures, the District Court misapplied *Siqueiros v. General Motors LLC*, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022). Nowhere in *Siqueiros* is there a rule requiring experts to identify all possible causes of auto part failures, and then systematically describe how those other potential failure modes are irrelevant, in order to opine on the root cause of part failure. Rather, *Siqueiros* excluded the expert's opinion because he only looked at documents produced in the litigation and then, ***without explaining why***, concluded that piston ring wear was the root cause of an alleged excessive oil consumption defect. *Id.* at *7. Significantly, the expert there did not inspect or examine a single engine or engine component, did not identify a specific defect, and could not "conclude what exactly is incorrect or defective about the piston ring design." *Id*. Indeed, when asked why the piston ring system was defective, he testified that "[t]he piston rings are clearly failing to perform the three functions that the piston rings have to perform in an engine" but that "the available evidence is not sufficient to determine specifically which one or more attributes of the piston ring system design were inadequate." *Id*.

Accordingly, the expert there merely "reason[ed] backwards, by starting with the conclusion that the piston rings are defective, and then showing how the evidence

in the record is consistent with this theory." *Id. Siqueiros* does not stand for the proposition that all other failure modes must be ruled out; it stands for the basic proposition that an expert opining on a design defect must identify the specific defect—not just present circular reasoning.

By contrast here, White identified a specific design Defect. 8-ER-1464-66, ¶¶12, 25. As described above, White did not circularly opine that the pumps are defective because they are failing; rather, he performed a detailed engineering analysis drawing from production documents, scientific literatures, and basic principles of physics and thermodynamics. White then ***confirmed*** his opinion through empirical analysis and testing of new and failed Water Pumps. 8-ER-1488 ("Inspection and Testing of Subject Water Pumps Confirms the Common Defect."). Unlike the expert in *Siqueiros*, there can be no serious debate as to whether White employed a reliable methodology—which is the appropriate *Daubert* inquiry. *City of Pomona*, 750 F.3d at 1044 (when engaging in a *Daubert* analysis "[t]he court must assess the expert's … methodology").

Second, in rejecting White's root cause opinion, the District Court erroneously found that White "does not point to any analysis by other engineers who inspected failed water pumps concluding that degradation or hardening of the bellows *caused* any given water pump in the Class Vehicles to fail." 1-ER-26.

Corroboration is not a necessary component of reliability. *See Elosu*, 26 F.4th at

1025. And, even if corroboration was required, White explains:

> My conclusion in this respect ***is supported by the record evidence***. For example, production documents ***also point to HNBR elastomer bellows degradation at 135C as causing water pump leaks*** in Ford Police Interceptor vehicles at less than 14 months of service. While this study was conducted on Ford Police Interceptor vehicles, and not on Class Vehicles, the mechanical seal in these vehicles and the pump casing (aside from a change in the outer pump gasket from a double o-ring to a single o-ring) are identical to the Class Vehicles.

8-ER-1474-75 at ¶58 (citing MNAO-016573).

This examination of Ford Police vehicles[13] states that all of the pumps

analyzed "showed bellows material degradation (HNBR) due to accelerated thermal

aging" and that the "[t]hermal aging failures resulted in" water pump leaks from

"extruded cups (6)" and "hole formations (10)" in the bellows. 10-ER-2000. In

another exchange between Ford and Mazda engineers, which White cites, a Ford

engineer informs Mazda that the failure was likely caused by a mechanical seal leak.

9-ER-1859. He further observes that "the hole in the bellows was interesting"

because Ford also had "[b]ellows issues in the seal" since "the bellows material is

good up to the 135C range and then it deteriates [sic]" through cracking and aging.[14]

---

[13] Ford designed the Cyclone engine and the Internal Water Pump and provided them to Mazda for use in the Vehicles.

[14] White cites additional teardown reports, concluding failures were caused by mechanical seal leaks washing out the bearing grease. 8-ER-1500, ¶165.

9-ER-1859. These internal findings confirm White's defect theory; yet, they were overlooked by the District Court.

White also points to teardown reports prepared by suppliers that similarly conclude that leaks were caused by thermal degradation of mechanical seal components, just as White opines. *See, e.g.*, 8-ER-1475 at ¶59 ("There is evidence that the seal was running in elevated temperatures. The bellows has hardened which would not be expected after only running for 23,155 km and therefore heat is the most likely cause for this."); *id.* ("The seal leaked due to an extruded cup. The darkened glue joints agree with the reports of high cooling system temperature."); *id.* at ¶60 ("[T]he seal leaked due to an extruded cup. The bellows has formed a compression set and some of the material has softened."). The District Court ignored this evidence when it determined that White did not point to an "analysis by other engineers who inspected failed water pumps concluding that degradation or hardening of the bellows caused any given water pump in the Class Vehicles to fail." 1-ER-26.

Rather than examine the totality of White's analysis and his citations to record evidence, the District Court highlighted White's word choice in a single paragraph in his Merits Report—noting that the conclusions in teardowns "*are fully in line with*" his opinion rather than that they "*confirm*" his opinion. *Id*. The District Court then erroneously concluded based on this single line that White's citations to

production documents simply "*do not disprove*" White's hypothesis, instead of confirming it. *Id*. But, when read as a whole, it is evident that White identifies numerous production documents that supported his opinion. Thus, in addition to improperly requiring corroboration, the District Court abused its discretion by ignoring facts supporting White's opinions. *See Kennedy*, 161 F.3d at 1231 (reversing exclusion where judge failed to consider "all of the reasoning or methodology relied on by [the expert]"); *Elosu*, 26 F.4th at 1025 (a court "abuses its discretion if it overlooks relevant data submitted as the foundation of an expert's remarks").

The District Court further erred by concluding that "[e]ven if the Court credits White's interpretation of the production documents, that interpretation is inadequate to nudge his hypothesis that bellows degradation and compression set cause water pump failures in the Class Vehicles beyond speculation," citing several cases which the Court suggests require White to perform additional empirical testing to support his opinion. 1-ER-26-27. None of these cases mandate such a requirement. *In re Incretin-Based Therapies*, 524 F. Supp. 3d 1007 and *In re Denture Cream*, 795 F. Supp. 2d 1345 are both toxic tort cases where it was not generally accepted that the allegedly toxic compound caused the claimed health conditions. Given that disconnect, the courts found the experts were required to do more to support their opinions to the contrary. By contrast here, White cites specific literature showing

HNBR degrades in coolant and at accelerated rates when exposed to high temperatures like those experienced by Internal Water Pumps. 8-ER-1474, ¶¶55-56. White also explains how the coolant in the spring-bellows chamber is exposed to high temperatures due to the Water Pumps' internal placement and how the resulting bellows degradation causes bellows failure and Water Pump leaks. 8-ER-1476, 79, ¶¶66, 77.[15]

Third, the District Court misapplied *Grodzitsky*, holding that *Grodzitsky* requires that White personally inspect a "statistically significant" number of failed parts in order to support a design defect opinion. 1-ER-27-28. *Grodzitsky* imposes no such requirement.

Like the expert in *Siqueiros* and unlike White, the expert in *Grodzitsky* failed to conduct an engineering analysis and failed to identify a specific design defect. Indeed, the District Court previously recognized that in *Grodzitsky*, the expert "did not articulate what common defect caused the window regulators to fail prematurely—he stated, circularly, that the regulators were defective because they were not durable and that they were not durable because they were defective." 5-ER-995. The District Court explained that White's analysis was different:

> Here, by contrast, ***White has articulated what he sees as a common defect*** that can cause the water pumps in the Class Vehicles to fail

---

[15] *Bellville v. Ford Motor Co*., 919 F.3d 224, 234 (4th Cir. 2019) also does not require empirical testing. In *Bellville*, the opinions were excluded because the testing "had been rejected by NASA and NHTSA." *See id.*

prematurely: the use of HNBR for the water pumps' elastomer bellows, which was designed to be immersed in coolant and exposed to high temperatures.

5-ER-995-96. The District Court concluded: "In light of these significant differences between the experts' testimony and reasoning, the Court is not persuaded that the facts here are 'on all fours' with *Grodzitsky*." 5-ER-996. This analysis was correct.

As the District Court also previously determined, "the district court's reasoning in *Grodzitsky*, is inapplicable here" because "[u]nlike White, in *Grodzitsky* [the expert] offered testimony '***couched in terms of probability***.'"[16] 5-ER-995 (quoting *Grodzitsky I*, 2017 WL 8943159, at *4). Accordingly, because Grodzitsky's expert made a "probabilistic claim" about failures due to a lack of durability (instead of a specific design defect), the district court held that "some minimal level of statistical significance needs to be met." [17] *Id*. On appeal, this Court affirmed, but neither the majority nor dissent announced a rule requiring engineering experts to physically inspect a statistically significant number of failed parts in order to support an opinion on the existence of a design defect.

---

[16] In *Grodzitsky*, the court faulted the expert for opining that the part should last the life of the vehicle with no support. Here, it is undisputed that the Internal Water Pumps, because of their placement inside the engine block, should last the useful life of the engine, or at least 150,000 miles. 8-ER-1615.

[17] Like in *Siqueiros*, the expert in *Grodzitsky* employed circular reasoning, opining that "the window regulators are defective because they do not last as long as they should, therefore they are defective." *Id*. at 984.

Tellingly, rather than citing the majority, the District Court looked to the dissent in *Grodzitsky*, finding that "even the dissent recognized that '[the expert's] views on the probabilities that any given failure is due to the alleged defect, and [the expert's] opinion that the alleged defect in fact caused the regulators he examined to fail' had been properly excluded because [the expert] failed 'to test a statistically significant number of regulators.'" 1-ER-27 (quoting *Grodzitsky*, 957 F.3d at 988 (Murguia, J., dissenting)). However, this dissent simply notes that, on the facts of that case, such testing was required to support the opinion regarding the probabilistic claim about failures due to lack of durability. Indeed, as the dissent explained:

> [The expert]'s failure to test a statistically significant number of regulators posed a problem only to [the expert]'s opinion regarding the *probability* that a given regulator failed because of the alleged defect. That is, [the expert] does not need to test a statistically significant number of regulators to give his general observations and conclusions about the design of Honda Pilot regulators.

*Id.* at 989.

The District Court recognized that White's opinion is "not couched in probabilistic terms," but rather, "White's opinion is that the Defect has caused, does cause, and will cause water pump failures in the Class Vehicles." 1-ER-17, 27. Accordingly, because White's opinion is undisputedly *not* based in probabilistic terms, there was no basis to conclude that White was required to examine a "statistically significant" number of failed parts. In fact, unlike *Grodzitsky*, White's inspection of the failed Water Pumps confirmed his opinion that the Defect *was not*

43

*just a probable* cause of Water Pump failures but *the cause* of Water Pump failures.[18]

It is for the jury to decide whether it agrees with the accuracy of White's conclusions. *See City of Pomona*, 750 F.3d at 1044 ("[T]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury."); *Milward v. Acuity Specialty Prods. Grp.*, 639 F.3d 11, 15 (1st Cir. 2011) (finding trial courts are not "empowered to 'determine which of several competing scientific theories has the best provenance'").

## D. THE DISTRICT COURT ERRED BY FAILING TO GIVE WEIGHT TO FORD'S 2020 REDESIGN

The District Court also erred by deeming the 2020 Redesign irrelevant. White did not point to the 2020 Redesign as proof of the Defect. Rather, White pointed to Ford's design changes, which specifically addressed the Defect he identified, to support his opinion regarding the nature of the Defect. 8-ER-1488, ¶112 ("[T]he revisions to the replacement Redesigned Water Pump *address* the common Design Defect in the Internal Water Pumps.").

---

[18] The District Court quotes toxic tort cases, *In re Incretin-Based Therapies*, 524 F. Supp. 3d at 1042) and *Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 677 (6th Cir. 2010), which involve unique issues of medical causation not at issue here. The expert in *Tamraz* did not testify that the toxic substance caused the medical condition, only that it "seemed the most likely explanation," and conceded that literature did not support his conclusion. 620 F.3d at 670. *Domingo ex rel. Domingo v. T.K.*, a medical malpractice case, involved unique issues of medical causation where literature did not support the expert's conclusion. 289 F.3d 600, 606-07 (9th Cir. 2002).

The District Court's reliance on *Johnson v. Ford Motor Co.*, 2018 WL 1512377, at *6 (S.D. W. Va. Mar. 26, 2018) and *Lassen v. Nissan North America, Inc.*, 211 F. Supp. 3d 1267, 1288 (C.D. Cal. 2016) was misplaced because plaintiffs there sought to use the existence of a safer design as proof that the initial design was defective.

Here, White explains that the design changes made during the 2020 Redesign support his conclusion because they specifically address design issues he identified. For example, White opined that; (1) "the compactness of the mechanical seal and the use of a wave spring in the Redesigned Water Pump reduces the flexing of, and time-dependent variable straining on the elastomer bellows" and (2) "[i]mportantly, the elastomer bellows is shielded (by a metal frame) in the Redesigned Water Pump" and this "shielding of the bellows reduces surface contact between the bellows and the coolant and mitigates/prevents degradation of the elastomer bellows." 8-ER-1488, ¶111. Thus, White concludes "the revisions to the replacement Redesigned Water Pump address the common Design Defect in the Internal Water Pumps in the Class Vehicles by shielding the elastomer bellows from the coolant and reducing the flexing of, and time-dependent variable straining on, the elastomer bellows" which "mitigate mechanical degradation to the elastomer bellows." *Id.* at ¶112.

Because White does not point to the Redesign to show that a better design existed, but instead to show other engineers attempted to address the Defect, it was

45

not necessary to provide "evidence in the record that water pumps with the 2020 revised design perform better[.]" (1-ER-29). Ford's decision to redesign the pump to shield the HNBR bellows from coolant and high temperatures by using a compact seal shows not just that White's opinion on the root cause of the failures is accurate, but that other engineers also reached the same conclusion about the design Defect— the very corroboration that the District Court found lacking. *See* 1-ER-26. *See also Elosu*, 26 F.4th at 1020 ("In its findings, the court disregarded much of the expert's scientific analysis, weighed the evidence on record, and demanded corroboration— factfinding steps that exceed the court's gatekeeping role.").

## III. GENUINE ISSUES OF MATERIAL FACT EXIST PRECLUDING SUMMARY JUDGMENT

The District Court erroneously granted summary judgment by excluding Dr. White's testimony and ignoring record evidence creating triable issues of fact, and drawing inferences in favor of Mazda, the moving party.

### A. THE DISTRICT COURT ERRED BY IGNORING RECORD EVIDENCE OF A COGNIZABLE INJURY

The District Court's improper exclusion of White undermined its summary judgment determination. But even without White's opinions, the record at summary judgment was replete with evidence that Plaintiffs experienced water pump failures due to the Defect and were injured by overpaying for Vehicles with an undisclosed Defect. Plaintiffs' claims are based on Mazda's failure to disclose the Defect at the

46

point of purchase and Mazda harmed Plaintiffs by causing them to overpay for Vehicles with an undisclosed Defect.[19] This Court recognizes this as a cognizable injury. *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 821-22 (9th Cir. 2019) (rejecting argument that plaintiff must show "a product actually manifests an alleged defect" because "[t]he primary right alleged to have been violated … was the right to take a product free from defect. The defect did not *cause* the plaintiffs' injury; the defect *was* the injury"); *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010) (finding it is not necessary to "prove that [an auto] defect manifested" in order to state consumer protection claims).

Mazda's documents support the existence of a design defect causing Water Pump failures in the Vehicles sufficient to create triable issues of fact. First, it is undisputed that every Plaintiffs' Water Pump failed before their Vehicle reached the

---

[19] Plaintiffs assert California, Ohio, and Virginia common law fraud claims and California, Louisiana, Massachusetts, Michigan, Missouri, North Carolina, Texas, and Virginia consumer protection claims. These laws only require Plaintiffs show Mazda failed to disclose relevant information pursuant to the sale of its Vehicles— *not* that any Plaintiff experienced a failure caused by the alleged Defect. **CA:** *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1094-98 (N.D. Cal. 2007); **LA**: La. Stat. Ann. § 9:2800.57 (2013); **MA**: *In re Gen. Motors Ignition Switch Litig.*, 257 F. Supp. 3d 372, 417-18 (S.D.N.Y. 2017); **MI**: *id.* at 420-24; **MO**: *Hawkins v. Nestle U.S.A. Inc.*, 309 F. Supp. 3d 696, 702 (E.D. Mo. 2018); **NC:** *J & J Sports Prods., Inc. v. All Star Grill, Inc*., 2008 WL 11429564, at *3-5 (E.D.N.C. May 7, 2008); **OH**: *Miles v. Perpetual Sav. & Loan Co.*, 388 N.E.2d 1367, 1369 (Ohio 1979); **TX**: Tex. Bus. & Com. Code Ann. §§ 17.45-46 (2019); **VA**: *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1011-12 (N.D. Cal. 2018); *In re Gen. Motors Ignition Switch Litig.*, 2016 WL 3920353, at *39 (S.D.N.Y. July 15, 2016).

end of the useful life of the engine. 8-ER-1440. Second, the existence of the Defect—
which causes the mechanical seal to leak—is supported by Mazda's documents. In
fact, Mazda internally referred to the mechanical seal as "Defected." 9-ER-1795; 9-
ER-1802-1805. *See also supra* at 7-11. The District Court failed to consider this
evidence, demonstrating the presence of a known Defect in the Vehicles. 1-ER-30-
32. *Barlow*, 943 F.2d at 1134 ("We reverse a grant of summary judgment if, viewing
the evidence in the light most favorable to the non-moving party, there are genuine
issues of material fact.")

The District Court also ignored record evidence of causation of harm and
damages. Again, the District Court improperly applied products liability concepts[20]
to find that Plaintiffs must show their Vehicles "malfunctioned due to a defect"
rather than applying Ninth Circuit precedent holding that the types of claims at issue
here are cognizable based on evidence demonstrating that Mazda failed to disclose
a known defect at the point of sale, causing overpayment injury. *See Nguyen*, 932
F.3d at 822 (finding requiring manifestation of a defect improper because "Plaintiff's
theory is that the allegedly defective clutch is itself the injury, regardless of whether
the faulty clutch caused performance issues.").[21]

---

[20] 1-ER-31.

[21] Cases relied on by the District Court are distinguishable. In *Braverman v. BMW
of North America, LLC*, the *only* other evidence of a defect was the plaintiffs'
testimony. 2021 WL 1020408, at *2-3 (C.D. Cal. Mar. 17, 2021). Here, Mazda's

Here, Plaintiffs produced an expert report prepared by an experienced market researcher who conducted a conjoint survey and found that consumers would pay less if it was disclosed that the vehicle had the Defect. 5-ER-822-85. This evidence, combined with Plaintiffs' testimony that they would have paid less for their Vehicles if the Defect had been disclosed, established triable issues of fact as to whether the Defect caused Plaintiffs' injury—overpayment damages. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999) (reversing grant of summary judgment where district court failed to address evidence proffered by plaintiff); *Nguyen*, 932 F.3d at 822.

### B. THE DISTRICT COURT ERRED BY FAILING TO GIVE WEIGHT TO EVIDENCE SHOWING THE DEFECT WAS MATERIAL

There was sufficient evidence of an actionable Defect to survive summary judgment. Under the claims at issue, Mazda had a duty to disclose material information.[22] The record showed there were triable issues of fact as to whether the Defect poses an unreasonable safety risk and results in costly repairs such that it was material and should have been disclosed. Thus, granting summary judgment was error. *See Barlow*, 943 F.2d at 1134 ("We reverse a grant of summary judgment if,

---

documents support the existence of the Defect. In *Grimstad v. FCA US LLC*, plaintiffs also did not have internal documents supporting the defect. 2018 WL 6427339, at *6 (C.D. Cal. Dec. 3, 2018).

[22] *See supra*, note 19.

viewing the evidence in the light most favorable to the non-moving party, there are genuine issues of material fact.").

First, as this Court has held, "[a]lleged [auto] defects that create 'unreasonable safety risks' are considered material" and there is evidence of an unreasonable safety risk if a "reasonable fact finder could infer that a vehicle that experiences [the defect] would pose an unreasonable safety risk." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225-26 (9th Cir. 2015). As discussed below, the record evidence shows the Defect could cause engine failure, resulting in Vehicles becoming suddenly and unexpectedly inoperable while being driven. Plaintiffs testified to such experiences and Mazda's documents confirmed this safety risk. *See infra*, 3-ER-533, 4-ER-704. It is common sense and certainly "a reasonable fact finder could infer" that a defect that can lead to engine failure while driving creates an unreasonable safety risk. *See Daniel*, 806 F.3d at 1226. Given this evidence, it was for the jury to decide whether the Defect was material to consumers. *Torres v. City of Madera*, 648 F.3d 1119, 1125 (9th Cir. 2011) (reversing grant of summary judgment and noting "[t]he standard on summary judgment review requires that we 'draw all reasonable inferences in favor of … the nonmoving party,' and prohibits us from 'substituting [our] judgment concerning the weight of the evidence for the jury's'").

Plaintiffs testified about the safety risks associated with the Defect, including dangerous driving experiences when their Water Pumps failed. The Bohanas were

driving home from a doctor's appointment when their Vehicle suddenly lost power without displaying any warning lights at the transition between the 105 and 405 freeways in Los Angeles. 2-ER-66-70. They had to pull their Vehicle onto the shoulder and receive assistance from highway traffic safety so that their Vehicle would not be hit after it stalled and failed to restart. *Id*. Schneider experienced sudden engine failure and extreme difficulty steering while driving with her son on the 101 freeway outside San Francisco on Mother's Day. 2-ER-233-35. Lacasse experienced sudden engine failure and was unable to brake or steer his Vehicle on the highway while driving his children. 2-ER-162-63. Dennis' engine shut off and his Vehicle veered into an oncoming traffic lane without any warning. 2-ER-119-120.

Mazda's documents also demonstrate that ***it knew*** Internal Water Pumps failures in Class Vehicles ***posed a safety concern***. As Mazda recognized, in a document with the subject line "[e]ngine water pump issue," by "the time the customer recognizes the overheating, abnormality in [the] engine has already occurred" and several factors prevent the safety risk from being detected by the driver before failure occurs. 10-ER-2010. Mazda also received numerous complaints from consumers who similarly described Internal Water Pump failures in their Vehicles creating harrowing experiences, including where customers who "had to pull over and almost got hit," whose "car stalled out and quit running" while on the highway, and who detailed a "very frightening" experience when the vehicle stalled

while driving 60 MPH on the freeway. 3-ER-533, 4-ER-555, 704. Many of the reports Mazda received noted that the failures caused Vehicles to become inoperable, without warning. 3-ER-512 (Internal Water Pump failure caused the vehicle to "[die] randomly" leaving the customer "stuck in the middle of the freeway"); 3-ER-513 (Internal Water Pump failure resulted in the vehicle "turn[ing] off in the middle of the road without any warning") 3-ER-518 (Internal Water Pump failure "while driving on the highway" and where "[n]o engine lights came on warning him of any issues"); 3-ER-522 (Internal Water Pump failure without " any warning lights until the moment when simultaneously the car lost all power and the engine light came on"). Mazda's documents also show that it received Hotline inquiries related to Water Pump failures that Mazda deemed "safety related." 4-ER-780. Mazda learned about dangerous incidents occurring after Water Pump failures caused Vehicles to stall, including one report of a serious accident. 8-ER-1652-54.

This evidence stands in stark contrast to the District Court's finding that Plaintiffs had not proffered evidence showing the Water Pumps were prone to failure without warning. 1-ER-36. Triable issues of fact regarding a safety risk existed and summary judgment should have been denied. *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017) ("[W]here evidence is genuinely disputed on a particular issue … that issue is inappropriate for resolution on summary judgment.").

Moreover, the District Court's conclusion that it could dismiss this evidence as irrelevant because lay people cannot opine on the existence of a Defect (1-ER-34) is incorrect because a reasonable fact finder could find this was sufficient evidence of an unreasonable safety risk. *See Daniel*, 806 F.3d at 1226 (finding summary judgment improper where there was sufficient evidence for a "reasonable fact finder [to] infer that a vehicle that experiences [a defect causing premature ware] would pose an unreasonable safety risk").

Ultimately, this evidence belies the District Court's finding that there was no evidence of the Defect's "real-world performance or its impact on [Mazda's vehicles'] safety" and its grant of summary judgment should be reversed. 1-ER-34; *See Leslie*, 198 F.3d at 1159 (reversing grant of summary judgment where district court failed to credit evidence proffered by plaintiff); *Barlow*, 943 F.2d at 1134 ("We reverse a grant of summary judgment if, viewing the evidence in the light most favorable to the non-moving party, there are genuine issues of material fact.").[23]

---

[23] Despite robust in-Circuit authority on these issues, the District Court primarily relied on inapposite out-of-Circuit cases, including, *Johnson v. Ford Motor Co.*, 2018 WL 1512377, where there was no evidence supporting the existence of a defect. In *In re Toyota Motor Corp. Hybrid Brake Marketing., Sales Practices & Product Liability Litig*ation, plaintiff's testimony did not establish that he experienced anything other than normal performance of the allegedly defective breaks. 959 F. Supp. 2d 1244, 1254 (C.D. Cal. 2013). Here, Plaintiffs testified about experiencing premature Water Pump failure and about dangerous situations while driving due to unexpected Water Pump failures.

Second, the District Court gave no consideration to evidence demonstrating that the Defect results in costly repairs because the Water Pump's internal placement requires removal of the entire engine in order to replace a failed Water Pump. 8-ER-1587 (recognizing that leaking mechanical seals for vehicles with internal water pumps were problematic because of the length of time needed for repair); 8-ER-1543 (recognizing CX-9s were prone to "engine failure due to water pump failure" and that "[i]n the best case it takes over 8 labor hours to replace" and that "most of these cars are not under … warranty … then 1000 miles later the pump fails [and] the engine fails."); 9-ER-1791, 1795 (recognizing Internal Water Pump failures were occurring at "low mileage" and required a "costly repair."); 2-ER-251 (Sowards testifying that Mazda charged $8,600 to replace his Vehicle's engine after the Internal Water Pump failed); 2-ER-53 (Aslan testifying that she was forced to sell her Class Vehicle for $3,835 even though she still "owed a little bit over $10,000" after the Defect caused catastrophic engine failure).[24] Ignoring this record evidence about the high cost of replacing the Water Pump after failure—which a reasonable

---

[24] Mazda made *no* showing that a defect must pose a safety risk to be considered material pursuant to the laws of states other than California. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (holding, the moving party must show that, "under the governing law, there can be but one reasonable conclusion as to the verdict."). Rather, as discussed above, Plaintiffs' claims simply require a showing that Mazda had superior knowledge of material information that it failed to disclose.

consumer may consider material—was also in error. *Leslie*, 198 F.3d at 1159; *see also Barlow*, 943 F.2d at 1134.

The District Court also incorrectly required Plaintiffs to proffer evidence that the "water pumps or engines fail at higher rates than those of other vehicles" in order to demonstrate materiality. 1-ER-35. Again, the District Court improperly inserted its own belief that reasonable consumers expect water pumps to fail, ignoring that a jury could find reasonable consumers would find it material that a failure of these Internal Water Pumps can lead to costly repairs and engine destruction due to their placement inside the engine block. The above evidence details the significant, undisclosed repair costs and safety risk associated with ***Internal*** Water Pump failure, which could be considered material by a reasonable consumer, regardless of the rate at which such failures occur. Yet, the District Court gave no weight to this evidence.

The District Court also made much of the fact that only Mazda identified a failure rate. 1-ER-35. But Plaintiffs were not required to provide failure rates and Mazda's documents showed Internal Water Pump failures were significant enough to get Mazda's attention and, if disclosed, could be material to a reasonable consumer. *Supra* at 7-11; 8-ER-1551-53 (Mazda's expert estimating 2.45% to 9.54% failure rate for both vehicles outside of warranty); *see also Beaty v. Ford*, 854 F. App'x 845, 849-50 (9th Cir. 2021) (holding 0.05% failure rate could be material and

that "a reasonable juror could find that even a small risk that a [sunroof] might explode without warning is a material fact").

The District Court incorrectly found *Beaty* inapplicable. 1-ER-35. *Beaty* is analogous because here there is record evidence to support the inference that a reasonable consumer may consider the Defect material due to the high costs of repair and safety risk, regardless of failure rates. Just as this Court found that consumers may consider exploding sunroofs material, reasonable consumers may also consider the Defect—which can destroy their engine and cause their Vehicle to become inoperable, or lead to costly repairs—material. *See id*.

Further, the District Court's conclusion that, because "a reasonable consumer would understand that a water pump can fail," the only way to demonstrate that the Defect is material is to show Internal Water Pumps "fail earlier or more frequently" improperly weighs evidence in Mazda's favor. 1-ER-36. To reach this conclusion, the District Court incorrectly accepted Mazda's contention that consumers were made aware of the possibility of water pump failure because (1) Mazda's Powertrain Limited Warranty noted a water pump may need replacement (not due to a defect) and (2) a federally mandated used car purchaser Buyers Guide listed the water pump as a vehicle part that may malfunction (not due to a defect). 1-ER-35-36. The District Court favoring this evidence is noteworthy given that, in its Class Certification Order, it correctly concluded that: "Though the Buyers Guide and the PLW mention

56

water pump failure and malfunction, *it is a stretch* to suppose that buyers who received these documents *would have been on notice of the alleged defect at issue here or the risks and effects of a failing water pump*." 5-ER-1020.

The District Court also failed to give weight to Plaintiffs' testimony that they would not have purchased, or would have paid less, for their Vehicles had the Defect been disclosed and Plaintiffs' expert report detailing a consumer survey finding consumers would pay less for a Vehicle if the Defect was disclosed. 5-ER-822-885; 8-ER-1453.

This evidence creates a triable issue of fact as to whether a reasonable consumer would consider the Defect material regardless of failure rate and, unlike the Powertrain Limited Warranty and Buyers Guide, actually considers how consumers react to the disclosure of the Defect. By failing to give weight to Plaintiffs' evidence and favoring Mazda's evidence, the District Court erred in finding there were no genuine issues of material fact. *Leslie*, 198 F.3d at 1158 ("[I]f direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."); *Torres*, 648 F.3d at 1125 ("The standard on summary judgment … prohibits us from 'substituting [our] judgment concerning the weight of the evidence for the jury's.'")

## IV. THE DISTRICT COURT ERRED BY DECERTIFYING THE CLASSES

Without any analysis, the District Court incorrectly decertified the six state Classes it previously certified. 1-ER-38. In deciding whether class certification is appropriate, a district court must conduct a rigorous analysis of Rule 23's requirements and, critically, "[i]n determining whether [Rule 23's] 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666-67 (9th Cir. 2022).

The District Court previously conducted a rigorous Rule 23 analysis and determined that common questions predominated and class certification was warranted. 5-ER-975-1051. In decertifying the Classes, the District Court did not revisit its prior Rule 23 analysis. The merits issues addressed in its summary judgment opinion have no bearing on whether certification of the Classes was appropriate and therefore provide no basis to decertify the Classes. *See Olean Wholesale*, 31 F.4th at 666-67. Accordingly, this Court should reverse the decertification of the Classes. *See Daniel*, 806 F.3d at 1227 (reversing summary judgment order and "instruct[ing] the district court to reconsider its denial of Plaintiffs' motion for class certification").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Order and Judgment be overturned in their entirety.

Dated: August 16, 2023                    Respectfully submitted,

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

*/s/ Joseph H. Meltzer*
Joseph H. Meltzer
Melissa L. Yeates
Tyler S. Graden
Jonathan F. Neumann
Jordan E. Jacobson
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
myeates@ktmc.com
tgraden@ktmc.com
jneumann@ktmc.com
jjacobson@ktmc.com

Paul R. Kiesel
Jeffrey A. Koncius
Cherisse H. Cleofe
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Tel: (310) 854-4444
kiesel@kiesel.law
koncius@kiesel.law
cleofe@kiesel.law

Robert M. Rothman
Francis P. Karam
**ROBBINS GELLER**
 **RUDMAN & DOWD LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Tel.: (631) 367-7100
Fax: (631) 367-1173
rrothman@rgrdlaw.com
fkaram@rgrdlaw.com

Andrew S. Love
**ROBBINS GELLER**
 **RUDMAN & DOWD LLP**
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel: (415) 288-4545
alove@rgrdlaw.com

E. Powell Miller
Sharon S. Almonrode
**THE MILLER LAW FIRM, P.C.**
Miller Building
950 West University Drive
Suite 300
Rochester, MI 48307
Tel.: (248) 841-2200
Fax: (248) 652-2852
epm@miller.law
ssa@miller.law

*Counsel for Plaintiffs-Appellants*

John C. Goodson
Matt Keil
**KEIL & GOODSON P.A.**
406 Walnut Street
Texarkana, Arkansas 71854
Tel: (870) 772-4113

Fax: (870) 773-2967
jgoodson@kglawfirm.com
mkeil@kglawfirm.com

Robert H. Edwards
**THE EDWARDS FIRM, P.L.L.C.**
711 West Third Street
Little Rock, AR 72201
Tel.: (501) 372-1329
bob@bobedwardslaw.com

*Additional Counsel for Plaintiffs-Appellants*

61

<u>**CERTIFICATE OF COMPLIANCE**</u>

This document complies with the word limit of Federal Rule of Appellate Procedure 5(c)(1) because, excluding the Table of Contents, Index of Authorities, required certificates, and parts of the document exempted by Rule 5(c), this document contains 13,991 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Equity font.

/s/ *Joseph H. Meltzer*
Joseph H. Meltzer

## <u>CERTIFICATE OF SERVICE</u>

On August 16, 2023, a copy of Appellants' Opening Brief was served on all

the following counsel by email:

> **SHOOK, HARDY & BACON L.L.P.**
> Michael L. Mallow
> Darlene M. Cho
> 2049 Century Park East, Suite 3000
> Los Angeles, CA 90067
> Telephone: 424/285-8330
> Fax: 424/204-9093
> mmallow@shb.com
> dcho@shb.com
>
> Attorneys for Defendants-Appellees

/s/ *Joseph H. Meltzer*
Joseph H. Meltzer

63