No. 23-55325

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

TERRY SONNEVELDT, ESTHER WRIGHT SCHNEIDER, BRIAN HUME, JEAN LEVASSEUR, CHRISTOPHER LACASSE, TIM HALWAS, ERIN MATHENY, LEWIS DELVECCHIO, JON SOWARDS, LAWRENCE BOHANA, MONIKA BOHANA, DAVID DENNIS, AND JAQUELINE S. ASLAN,

*Plaintiffs-Appellants*,

v.

MAZDA MOTOR OF AMERICA, INC. d/b/a MAZDA NORTH AMERICAN OPERATIONS AND MAZDA MOTOR CORPORATION,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
No. 8:19-cv-01298-JLS-KES
Honorable Josephine L. Staton

### APPELLANTS' REPLY
### BRIEF FILED REDACTED

KESSLER TOPAZ MELTZER & CHECK LLP
Joseph H. Meltzer
Melissa L. Yeates
Tyler S. Graden
Jonathan F. Neumann
Jordan E. Jacobson
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
jmeltzer@ktmc.com
myeates@ktmc.com
tgraden@ktmc.com

KIESEL LAW LLP
Paul R. Kiesel
Jeffrey A. Koncius
Cherisse H. Cleofe
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Tel: (310) 854-4444
kiesel@kiesel.law
koncius@kiesel.law
cleofe@kiesel.law

jneumann@ktmc.com
jjacobson@ktmc.com

ROBBINS GELLER RUDMAN & DOWD LLP
Robert M. Rothman
Francis P. Karam
58 South Service Road, Suite 200
Melville, NY 11747
Tel.: (631) 367-7100
rrothman@rgrdlaw.com
fkaram@rgrdlaw.com

THE MILLER LAW FIRM, P.C.
E. Powell Miller
Sharon S. Almonrode
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel.: (248) 841-2200
epm@miller.law
ssa@miller.law

ROBBINS GELLER RUDMAN & DOWD LLP
Andrew S. Love
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel: (415) 288-4545
alove@rgrdlaw.com

*Attorneys for Plaintiffs-Appellants*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...............................................................................................1

RE-STATEMENT OF MATERIAL FACTS .......................................................4

ARGUMENT .....................................................................................................8

    I     THE DISTRICT COURT MISAPPLIED RULE 702 AND
         ERRED IN EXCLUDING WHITE ................................................8

         A.    RULE 702 DOES NOT REQUIRE COMPARATIVE
               DATA OR FAILURE RATES TO SUPPORT WHITE'S
               OPINION .................................................................................8

         B.    WHITE'S OPINION THAT THE DEFECT CAUSES
               THE WATER PUMPS' BELLOWS TO DEGRADE
               AND FAIL TO PERFORM THEIR ESSENTIAL
               FUNCTION WAS ADEQUATELY SUPPORTED ...............11

         C.    THE DISTRICT COURT IGNORED THAT WHITE
               PERFORMED A ROBUST ENGINEERING
               ANALYSIS ...............................................................................15

         D.    THE DISTRICT COURT ERRED IN FINDING
               WHITE'S OPINION REGARDING THE FAILED
               WATER PUMPS WAS HYPOTHETICAL...........................15

         E.    WHITE'S ROOT CAUSE OPINION IS ADEQUATELY
               SUPPORTED...........................................................................20

         F.    THE 2020 FORD REDESIGN ADDRESSES THE
               SAME DEFECTIVE DESIGN WHITE IDENTIFIES ...........23

    II    SUMMARY JUDGMENT WAS IMPROPER.................................24

         A.    THE DISTRICT COURT IMPROPERLY
               OVERLOOKED EVIDENCE ...............................................25

          B.    GENUINE ISSUES OF MATERIAL FACT EXIST
               CONCERNING MAZDA'S KNOWLEDGE OF
               THE DEFECT........................................................................27

CONCLUSION .................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*,
    738 F.3d 960 (9th Cir. 2013) ............................................................14, 15, 19, 24

*Alger v. FCA US LLC*,
    2022 WL 4366969 (E.D. Cal. Sept. 21, 2022) ...................................................29

*Barlow v. Ground*,
    943 F.2d 1132 (9th Cir. 1991) .....................................................................25, 27

*Beaty v. Ford*,
    854 F. App'x 845 (9th Cir. 2021) .......................................................................10

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) .........................................................10, 14, 16, 19

*Daniel v. Ford Motor Co.*,
    806 F.3d 1217 (9th Cir. 2015) ..............................................................................3

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...................................................................................1, 2, 16

*In re Davol Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods.
Liab. Litig*,
    2021 WL 4931996 (S.D. Ohio Oct. 22, 2021) ...................................................18

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ...................................................................*passim*

*In re Ford Motor Co. DPS6 Powershift Transmission Prods. Liab.
Litig.*,
    2019 WL 7185524 (C.D. Cal. Oct. 29, 2019) ....................................................29

*Ho v. Toyota Motor Corp.*,
    931 F. Supp. 2d 987 (N.D. Cal. 2013)................................................................28

*Kennedy v. Collagen Corp.*,
    161 F.3d 1226 (9th Cir. 1998) ..............................................................................9

ii

*Leslie v. Grupo ICA*,
198 F.3d 1152 (9th Cir. 1999) ..........................................................26, 28

*Lindal Cedar Homes, Inc. v. Wilkinson*,
35 F. App'x 507 (9th Cir. 2002) ...............................................................27

*Messick v. Novatris Pharms. Corp.*,
747 F.3d 1193 (9th Cir. 2014) .............................................................3, 18

*Nguyen v. Nissan N. Am., Inc.*,
932 F.3d 811 (9th Cir. 2019) .............................................................18, 25

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ...........................................................2, 8, 20

*Ramirez v. ITW Food Equip. Grp.*,
686 F. App'x 435 (9th Cir. 2017) ................................................3, 11, 14, 17

*Siqueros v. General Motors LLC*,
2022 WL 74182 (N.D. Cal. Jan 7, 2022) ......................................20, 21, 26

*Victorino v. FCA US LLC*,
2018 WL 1083395 (S.D. Cal. Feb. 27, 2018) .......................................29

**State Statutes**

Cal. Bus. & Prof. Code Ann. § 17200 ....................................................29

Cal. Civ. Code Ann. § 1760.................................................................29

# INTRODUCTION[1]

Reiterating the same legal errors made by the District Court, Mazda presents no valid argument that supports exclusion of White. At most, the issues raised by Mazda are its view of disputed facts, which do not support exclusion or summary judgment, and can be raised during cross examination of White at trial. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking ... admissible evidence.").

Notably absent is any discussion of the substantial Ninth Circuit authority discussed by Plaintiffs, which support their position that the District Court wrongfully excluded White. This authority demonstrates that the District Court erred when it failed to properly analyze White's methodology under *Daubert* and ignored facts, data, and analysis that White used to support his opinions, which were relevant and reliable. *See, e.g.*, *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("If the proposed testimony meets the thresholds of relevance and reliability, its proponent is 'entitled to have the jury decide upon its credibility, rather than the judge.'"). Instead, the District Court demanded that White provide additional

---

[1] All internal citations and quotations are omitted and all emphases are added. All terms not defined herein have the meaning ascribed to them in Plaintiffs' Opening Brief ("OB") (ECF No. 25). "AB" refers to Mazda's Answering Brief (ECF No. 28).

corroborating evidence, empirical testing, and comparative data—which is not required under Rule 702.

Indeed, Mazda asks this Court to impose novel standards for the exclusion of experts that are incompatible with Rule 702, *Daubert*, and this Court's precedent. Specifically, Mazda seeks a ruling from this Court that engineers opining on the existence of a design defect in a consumer fraud and deceptive trade practice case should be excluded if: (1) they do not serve as statisticians and offer opinions regarding failure rates; (2) they do not rule out the possibility that the component could also fail for reasons other than the design defect the engineer identified; and (3) an opponent contends the defect identified by the engineer would not be material to consumers or believes the engineer could have conducted additional testing. Mazda's proposed standards are contrary to this Court's robust authority, which holds that a district court may only act as "a gatekeeper, not a fact finder" when determining whether expert testimony should be excluded under Rule 702. *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

Further, none of Mazda's proposed standards are warranted here. In particular, the District Court erred in requiring White (who is not a statistician) to opine on failure rates. 1-ER-18. This ruling was the result of the District Court improperly determining whether it agreed with White's conclusions instead of determining if his methodology was sound—the relevant inquiry under Rule 702. *See Elosu*, 26 F.

4th at 1025-26 (district court cannot "engage in freeform factfinding ... to determine the veracity of the expert's conclusions"). At most, failure rate goes to materiality, which is supported here by record evidence related to safety risks, repair costs, and a conjoint study showing consumers viewed the Defect as material. Critically, the materiality of the Defect to consumers is a question of fact for the jury, not an engineer. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015) ("Materiality is judged from the perspective of a 'reasonable consumer,' and it is generally a question of fact."). Finally, there is no basis for finding that White was required to rule out all failure modes or conduct additional empirical testing. Indeed, "[t]he reliability of an expert's theory turns on whether it 'can be tested,' … not whether he has tested it himself" and White offered a thorough engineering analysis to support his conclusion that the Defect caused Water Pump failures. *Ramirez v. ITW Food Equip. Grp.*, 686 F. App'x 435, 440 (9th Cir. 2017). The question for the jury is whether Mazda's lack of disclosure of the known Defect caused Plaintiffs to overpay for Vehicles at the point of sale, not whether all water pump failures that occur in Vehicles are caused by the Defect.

Ultimately, White proffered reliable opinions based on his education, knowledge, and a methodologically-sound engineering analysis. This is a far cry from the junk-science a district court must screen from the jury. White's exclusion should be reversed. *Messick v. Novatris Pharms. Corp.*, 747 F.3d 1193, 1197 (9th

3

Cir. 2014) (reversing expert exclusion and finding district court's "gatekeeping role" to exclude "junk science.").

## RE-STATEMENT OF MATERIAL FACTS

Plaintiffs provide this re-statement of material facts to correct the record regarding factual misstatements made by Mazda.

First, contrary to Mazda's representations, White *does not* opine that the Defect in the Vehicles is simply the use of HNBR. *See* AB 1. Rather, White opines that the Water Pumps' defective design is Mazda's decision to use HNBR "for the elastomer bellows in the mechanical seals *in combination with a bellows design such that the bellows are fully immersed in, and in full contact with, the engine coolant and exposed to high temperatures.*" 8-ER-1464 ¶12.

Mazda also placed the Water Pump with this design internal to the engine block, where temperatures are high and failures often have catastrophic results. Indeed, the bulk of White's report explains why this bellows design is not appropriate for internal water pumps. *See, e.g.*, 8-ER-1473-84 ¶¶52, 55-99. By mischaracterizing the Defect as *the use* of HNBR, Mazda ignores other design choices—including those incorporated into the 2020 Ford Redesign—that made this particular mechanical seal design unsuitable for these pumps.

Second, Mazda misrepresents the opinions of the Society of Automotive Engineers ("SAE"), which *does not* "recommend" the use of HNBR in the Internal

4

Water Pumps as Mazda suggests without citation. *See* AB 1. Rather, SAE 2003-01-0616, which Mazda later describes as a "standard," merely describes a series of tests performed on primary and mating rings—*not* bellows—to determine the most effective seal face materials and does not reference HNBR. *See* 2-SER-376-85. Moreover, as Mazda's expert admitted, SAE 2003-01-0616 is "not a standard" at all, but rather a "paper or report" that needs to be read in context. 8-ER-1540.

Third, Mazda falsely claims that HNBR is "particularly suitable to be immersed in coolant, at high temperatures, and for extended periods of time." *See* AB 4. But this statement is not supported by the scientific literature. In particular, White cites a scientific paper showing that HNBR ages at increasing rates even at temperatures below the normal engine operating temperature range of 195-200 °F (91-104 °C).



8-ER-1474 ¶55. Moreover, another SAE paper shows that this thermal degradation is in addition to chemical degradation when the bellows are immersed in high temperature coolant as is the case here. *Id.* ¶56.

Fourth, while the seal design may be "typical of automotive water pumps," that does not mean that this design is appropriate for internally mounted water pumps. AB 4. The design considerations for internal water pumps must account for the fact that failures often occur with no warning and result in dangerous and expensive consequences. 8-ER-1467.

Fifth, HNBR's temperature rating does not establish that HNBR can or should be used for all designs in that temperature range. As described above, even within that temperature rating, HNBR degradation increases as temperatures increase, particularly when exposed to coolant and under an applied strain as occurs when the Vehicles are operated. 8-ER-1474-75 ¶¶55-60.

Sixth, Mazda's reliance on the "operating temperatures" of the Vehicles is misleading because those temperatures are "measured by a coolant temperature sensor located away from the mechanical seal." 9-ER-1932. However, the bellows is exposed to hot coolant at the spring-bellows chamber, which is a small pocket inside the mechanical seal that traps coolant and, as shown through White's thermal analysis and discovery, rapidly heats up when exposed to hot oil due to the water pump's internal placement. There are no temperature sensors located within the

6

spring-bellows chamber and the record is devoid of any attempt by Mazda and its experts to measure coolant temperature there.

Seventh, none of the internal testing Mazda cites disproves White's opinion. While Mazda cites to the "bench durability" and "reflux" tests (AB 6), the record lacks any evidence regarding how these tests were conducted or what their specific results were. 1-FER-17-20. Mazda's reliance on a "Bomb test" is equally irrelevant, as this test was not conducted on the mechanical seal used in the Water Pumps. 1-FER-6-8. Nor did these tests come close to approximating the useful life of the engine, which is 10 years/150,000 miles. The durability test was conducted for just ███ hours and the Bomb test was conducted for just ███ hours. AB 6-7.

Finally, Mazda knew that the Water Pumps leaked and that these leaks were caused by a defect in the mechanical seal as early as 2005 and in 2006 the bellows was identified as a cause of leaks during pre-production testing. *See* 8-ER-1395-1413;8-ER-1587, 9-ER-1669. Moreover, shortly after the first Vehicles were sold, Mazda investigated coolant leaking and contaminating engine oil, eventually issuing guidance about needing to replace Water Pumps leaking through the mechanical seal. 8-ER-1673-74, 9-ER-1785. Mazda's warranty analyses also identified high numbers of internal water pump failures, and indicated that the mechanical seal was the source of the leaks, with additional investigations continuing to identify the seal as the source of the leaks. *Id.* at 9-ER-1681, 1795, 1800. The persistent problem

resulted in multiple requests by MNAO to MC to fix the problem, including twenty-two such reports in 2017 alone. 4-ER-725-46.

## ARGUMENT

## I    THE DISTRICT COURT MISAPPLIED RULE 702 AND ERRED IN EXCLUDING WHITE

The District Court did not follow black letter law requiring it to act as "a gatekeeper, not a fact finder," *Primiano*, 598 F.3d at 565, and Mazda has not shown otherwise.

### A.    RULE 702 DOES NOT REQUIRE COMPARATIVE DATA OR FAILURE RATES TO SUPPORT WHITE'S OPINION

Mazda points to no law supporting the District Court's comparative data or failure rate requirements.

Instead, Mazda argues, without authority, that White was correctly excluded because his Defect opinions did not include evidence that the Defect "causes failures faster than other designs." AB 27-28. Mazda further asserts such a showing is necessary because Plaintiffs allege that the Defect causes premature failure—which Mazda argues must be "premature relative to something." *Id*. However, for the Defect to be material, it does not need to cause premature failures as compared to other water pumps; rather, due to the pumps' internal placement, they must be designed to last the useful life of the Vehicles' engine, or 150,000 miles. Mazda's own employees agree. 8-ER-1615; 8-ER-1543. Because the pumps are placed internal to the engine block, they are not subject to regular inspection and

8

replacement, and their failure leads to significant safety risks and expensive repairs. As such, internal water pumps must be designed to last as long as the engine and comparison to external pumps is irrelevant.

Mazda presents no authority for this Court to hold that an engineer opining on the existence of a design defect in a consumer fraud action must opine on and present a comparison to alternative designs. Ultimately, White presented a reliable methodology supporting his Defect opinions and the District Court's insistence on comparative data was simply an analytical "gap … of the district court's making"— not a proper basis for exclusion. *Kennedy v. Collagen Corp*., 161 F.3d 1226, 1230 (9th Cir. 1998).[2]

Similarly, Mazda has no support for its assertion that White had to opine on failure rates to support his opinions.[3] White is an engineer—not a statistician—and imposing a requirement for him to opine on failure rates would improperly require experts to offer opinions outside of their expertise. The rate at which the Water Pumps fail is an issue that, at most, goes to materiality of the Defect, not whether a defect exists. White opined on the existence of a design Defect (which existed when

---

[2] The argument made in a proposed amicus brief (ECF No. 33-1) that *Kennedy* is not good law because it predates 2000 amendments to Rule 702 is unfounded. *Kennedy* is consistent with Rule 702's current iteration and this Court continues to follow *Kennedy*. Indeed, *Elosu*, decided last year, discusses and relies on *Kennedy* at length. 26 F.4th at 1025.

[3] Mazda repeats the argument that White should have opined on failure rates throughout its Answering Brief. *See* AB 1, 17, 24, 38.

Water Pumps were installed in the Vehicles) based on a reliable methodology informed by his substantial engineering experience—all that is required under Rule 702. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (Rule 702's reliability test "is not the correctness of the expert's conclusions but the soundness of his methodology").

To the extent Mazda believes that the contested failure rates proffered by their expert (which ranged from 2.45% to 9.54%) weigh against finding that the Defect is material, this is nothing more than a disputed fact for the jury to decide after weighing other record evidence supporting materiality. OB 49-57. And, given the serious consequences of Internal Water Pump failures, a jury could find the design Defect material even based on Mazda's expert's failure rates. *See Beaty v. Ford*, 854 F. App'x 845, 849-50 (9th Cir. 2021) (holding 0.05% failure rate calculated by defendant could be material and "a reasonable juror could find that even a small risk that a [sunroof] might explode without warning is a material fact"). Certainly, the existence of disputed facts on an issue outside the scope of White's expertise and opinions does not support exclusion. *See Elosu*, 26 F.4th at 1024 ("If the proposed testimony meets the thresholds of relevance and reliability, its proponent is 'entitled to have the jury decide upon its credibility, rather than the judge.'").

10

**B.** **WHITE'S OPINION THAT THE DEFECT CAUSES THE WATER PUMPS' BELLOWS TO DEGRADE AND FAIL TO PERFORM THEIR ESSENTIAL FUNCTION WAS ADEQUATELY SUPPORTED**

The District Court was wrong to find no support for White's conclusion that the Water Pumps have a Defect that causes their bellows to degrade and no longer serve their function. White's opinions were adequately supported by the scientific literature as well as his thermodynamic analysis and inspection and analysis of pumps; the Court's requirement that White provide additional testing or corroborating evidence is contrary to law. *Ramirez*, 686 F. App'x at 440 ("The reliability of an expert's theory turns on whether 'it can be tested,' … not whether he has tested it himself.").

*First*, White points to scientific literature that "shows that HNBR ages at temperatures below the normal engine operating temperature range of … 91-104 °C" and that exposure to such temperatures over time leads to compression set, i.e., degradation. 8-ER-1474 ¶55. White further explains that scientific literature shows that "thermal degradation *is in addition to chemical degradation* when the bellows are immersed in high temperature coolant" like the Water Pumps' bellows are. 8-ER-1474 ¶56.

White's analysis did not end with citations to literature. Rather, White also conducted a thermodynamic analysis which shows that, because of Mazda's design choices, the bellows are exposed to temperatures that will cause HNBR to degrade

11

and fail to maintain a tight, effective seal. 8-ER-1474-1484. This analysis provides exactly what the District Court erroneously concluded was missing—adequate support for White's opinion that the HNBR bellows are exposed to temperatures that cause the bellows to degrade and no longer serve their function.

Notably, as part of his thermodynamic analysis, White specifically opined and pointed to evidence that the thermal environment for an internal pump is "more demanding" than the thermal environment for an external pump, explaining:

> In an internal water pump, the pump casing is within the engine block behind the engine timing chain cover and exposed to hot oil ... [a]s such, the surface temperature of the pump casing will be at or close to the engine oil temperature that is at least 10-15 °C higher than the coolant temperature displayed on the coolant temperature gauge. In this case, heat is conducted through the pump casing into the seal chamber (positive heat soak).

8-ER-1476 ¶66. In contrast, White explained:

> For a water pump mounted external to the engine block, the surface temperature of the pump casing can be approximated by the ambient air temperature, which is lower than the coolant temperature, and heat is conducted out of the seal chamber through the pump casing and into the atmosphere (negative heat soak). The difference in the sign (negative or positive) of the heat soak is a fundamental and important difference between internal and external mounted water pumps.

8-ER-1477 ¶67. This analysis stands in stark contrast to Mazda's (and the District Court's) erroneous assertion, based on their own view of conflicting evidence, that White's analysis fails to show that the bellows in the Internal Water Pumps are

exposed to a "thermal environment" that is "more demanding" than the one to which external water pumps are exposed. 1-ER-20.

Additionally, White's thermodynamic analysis included modeling the Water Pumps' spring-bellows chamber as both closed and open systems, and performing closing force calculations, which showed that the heat generated in the spring bellows chamber from friction and hot oil on the Water Pump casing is sufficient to degrade the HNBR bellows to the point where it can no longer maintain a tight seal. 8-ER-1471-84. Specifically, White explained that the essential function of the bellows is to (1) "compensate for shaft movement and wear that causes the [Water Pump's] ring face to rotate out-of-plane relative to the primary ring face" which prevents "an excessive leak path" and (2) provide closing force that holds the Water Pump's two face seals together and prevent leaks. 8-ER-1469, 1471 ¶¶40, 44-45. White then looked at real life examples of degradation affecting the ability of the bellows to perform its compensation function (8-ER-1490-92) and analyzed how degradation causes the bellows to fail to perform this essential function through, *inter alia*, principles of physics, inspection of Water Pumps, and production documents. 8-ER-1492-99.

Accordingly, it is untrue that White lacked support for his conclusion that the HNBR bellows were exposed to temperatures and chemicals which would cause them to degrade and fail to perform their function. While Mazda may challenge

13

White's conclusions, this is not a basis for exclusion because Rule 702's reliability test "is not [concerned with] the correctness of the expert's conclusions but the soundness of his methodology." *City of Pomona*, 750 F.3d at 1044.

Nor is it true that White failed to perform testing. White inspected and measured the pump components and testified that he conducted an engineering analysis, including "looking at the … spring bellows chamber, looking at that as a control volume, and in doing a thermal analysis on that control volume, looking at heat input for that system and heat output from that system." 3-SER-576-7. Any arguments that White could have performed different or additional testing are for cross examination and do not support exclusion. *Ramirez*, 686 F. App'x at 440; *see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969 (9th Cir. 2013) ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").[4]

In sum, White's opinions regarding the Defect were based on a reliable methodology supporting his conclusions and his exclusion was error. *Elosu*, 26 F.4th at 1025 (district court "abuses its discretion if it overlooks relevant data submitted as the foundation of an expert's remarks").

---

[4] White clearly testified that, while he did not perform the specific testing Mazda's counsel thought he should have performed, he did perform other testing including "an analysis in terms of looking at the … spring bellows chamber, looking at that as a control volume, and in doing a thermal analysis on that control volume, looking at heat input for that system and heat output from that system." 3-SER 576-77.

## C. THE DISTRICT COURT IGNORED THAT WHITE PERFORMED A ROBUST ENGINEERING ANALYSIS

The District Court incorrectly determined that White's inspection of failed Water Pumps was insufficient to support his opinion that the Defect causes Water Pump failures. *See* 1-ER-21-28. This conclusion ignored that White's methodology consisted of a robust engineering analysis, which included inspecting and taking measurements of new and failed Water Pumps, performing a thermodynamic analysis, modeling the Water Pump's spring-bellows chamber as both a closed and open thermodynamic system, performing closing force calculations, reviewing production documents and scientific literature, and examining design changes. 8-ER-1467-1500. White's inspection and measurement of the mechanical properties of the bellows on two new and four failed Water Pumps was only a part of this engineering analysis. Again, any attacks on his analysis, at most, go to weight and are not a basis for exclusion. *Alaska Rent-A-Car*, 738 F.3d at 969 (district court should not "exclude opinions merely because they are impeachable").

## D. THE DISTRICT COURT ERRED IN FINDING WHITE'S OPINION REGARDING THE FAILED WATER PUMPS WAS HYPOTHETICAL

The District Court's chicken or the egg argument (1-ER-23) (reiterated by Mazda (AB 30-31)), which focuses on the question of whether the degradation causes failure or the failure causes degradation, represents a fundamental misunderstanding of White's analysis and opinions. Critically, there is *no* evidence

15

in the record that a Water Pump failure causes degradation, and neither the District Court nor Mazda cite to any. Rather, the District Court's opinion was based on its misunderstanding of White's testimony about what happens to the bellows after a catastrophic failure (i.e. a violent water pump failure where the bellows is essentially torn apart), which is different from the bellows degradation that White found causes catastrophic and non-catastrophic failures alike.

The District Court's assertion that White offered "no explanation" to support his opinion that the degradation he observed in the failed Water Pumps occurred before failure is incorrect. White details and explains in eleven pages of his report how the empirical data he collected shows that the Defect causes the bellows to lose elasticity, and grow fatigue cracks (i.e., degrade), such that the bellows can no longer serve their function to hold the two seal rings right against each other, which causes leaks. 8-ER-1490-1500. In particular, White observed that the failed Water Pumps "showed material damage and/or a loss of elasticity" caused by exposure to high heat and coolant. 8-ER-1489. White measured the failed Water Pumps, which he compared to new Water Pumps, and performed detailed calculations supporting his conclusion that the degradation and resulting Water Pump failures were caused by the Defect. 8-ER-1490-1500. This engineering analysis is standard in White's field and is based on his education and experience, rendering it reliable under Rule 702 and *Daubert*. *City of Pomona*, 750 F.3d at 1044 ("Expert opinion testimony . . . is

reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."). Whether White's detailed scientific analysis proves the existence of a Defect is a question for the jury; it is not the District Court's role to make that determination. *Elosu*, 26 F.4th at 1020 ("[A] district court may ... not weigh the expert's conclusions or assume a factfinding role").

Further, Mazda's argument that the District Court did not err because it purportedly did not require empirical testing (AB 33) is nonsensical. In excluding White, the District Court found dispositive that "White's analysis and scenarios are not founded upon and do not incorporate any empirical testing." 1-ER-21. It was error for the Court to require additional empirical testing. *Ramirez*, 686 F. App'x at 440 ("The reliability of an expert's theory turns on whether it can be tested, … not whether he has tested it himself.").

Moreover, Mazda's lack of citation to any relevant cases to support its proposition that the District Court was correct to find that White needed to rule out all other failure modes is telling. There simply is no requirement for an engineer to rule out all failure modes in order to opine on the existence of a design Defect in a fraud and consumer protection case like this where the injury alleged by plaintiffs is *not* the failure of the part, but rather overpayment for Vehicles with an undisclosed Defect that existed at the point of purchase.

Indeed, misunderstanding the claims and harm alleged in this consumer fraud action, the District Court improperly cited to differential diagnosis cases in support of its exclusion of White and, revealingly, Mazda again cites to differential diagnosis cases in support of its argument that White should have ruled out other failure modes. AB 31-32. But, these cases are inapposite and do not support White's exclusion.[5] Plaintiffs do not contend that Rule 702 has different applications in different types of cases as Mazda suggests. AB 34. Rather, the Court and Mazda rely on inapposite case law because a differential diagnosis analysis is a unique methodology used by medical causation experts in products liability cases. This is far different from the engineering analysis used here to identify a design defect and which does not need to rule out alternate causes in a consumer fraud case alleging Mazda failed to disclose a known defect. *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 821-22 (9th Cir. 2019) (rejecting argument that plaintiff must show "a product actually manifests an alleged defect" because "[t]he primary right alleged to have been

---

[5] Mazda cites *Messick*, a products liability action where an expert's exclusion was reversed, and quotes language discussing what must be shown to demonstrate "a medical cause and effect relationship." 747 F.3d at 1198-99. This analysis is irrelevant here where no product liability claim exists, and White is not tasked with opining on the medical cause of a plaintiff's condition. In *In re Davol Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, another product liability case, the court excluded an expert in part because he was "not qualified to opine" on certain topics, and admittedly was not opining on specific causation. 2021 WL 4931996, at *6-7 (S.D. Ohio Oct. 22, 2021). Here, Mazda concedes White is qualified and White is not opining on causation of Plaintiffs' injury (overpayment) but rather on the existence of the Defect.

violated … was the right to take a product free from defect. The defect did not cause the plaintiffs' injury; the defect was the injury").

Ultimately, the crux of Mazda's argument is that White could have "used other tools in the scientific toolbox to evaluate his causal theory." AB 32. But an opponent's argument that an expert could have conducted different or additional testing is nothing more than fodder for cross examination and is not a basis for exclusion. *Alaska Rent-A-Car*, 738 F.3d at 969 (courts should not "exclude opinions merely because they are impeachable"); *City of Pomona*, 750 F.3d at 1043-44 ("Shaky, but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). In essence, Mazda is asking this Court to make a rule that would require exclusion if the opposing party simply argues that their opponent's expert should have done something more or different. That is contrary to Rule 702 and Ninth Circuit law. *Elosu*, 26 F.4th at 1028 (holding attacks on sources used by an expert and materials relied on "go to the weight of the testimony and its credibility, not its admissibility"). This makes sense, as the rule put forth by Mazda would result in likely every expert being excluded.

The District Court did not actually grapple with the substance of White's analysis of the failed pumps where he explains, using measurements and physics, how the degraded bellows lack sufficient support to maintain the mechanical seal. 8-ER-1489-1500. Instead of evaluating whether White's methodology was sound,

the District Court ignored and disregarded White's data and analysis and improperly substituted its own factual findings about White's empirical testing and engineering analysis. This was an abuse of discretion, and the District Court should be reversed. *Primiano*, 598 F.3d at 565 (court is gatekeeper, not fact finder).

### E. WHITE'S ROOT CAUSE OPINION IS ADEQUATELY SUPPORTED

The District Court erred in finding that White's root cause opinion was unsupported because he did not "rule out other possible root causes." 1-ER-24. Mazda does nothing to support this, merely arguing, without authority, that the District Court was correct. It was not. *Elosu*, 26 F.4th at 1025-26 (district court cannot "engage in freeform factfinding … to determine the veracity of the expert's conclusions at the admissibility stage").

Notably, instead of explaining how such a requirement is consistent with Ninth Circuit authority (it is not), Mazda, like the District Court, relies on the inapposite *Siqueros v. General Motors LLC*, 2022 WL 74182 (N.D. Cal. Jan 7, 2022). Mazda quotes the *Siqueros* court's finding that the expert there "[did] not specifically describe what scientific principles or methods he applied to determine … [there was] a design defect." 2022 WL 74182, at *7. This language shows why *Siqueros* is inapplicable. In stark contrast, White detailed the scientific principles and methods he used—including, *inter alia*, inspecting pumps, performing a thermodynamic analysis, modeling the Water Pump's spring-bellows chamber as

20

both a closed and open thermodynamic system, and performing closing force calculations. 8-ER-1475-97. Unlike the expert in *Siqueros*, White also explained how he reached his conclusion that Class Vehicles have the specific Defect by detailing his engineering analysis, drawing from production documents and scientific literature, applying physics and thermodynamics, and confirming his opinions through empirical analysis and testing of new and failed Water Pumps. 8-ER-1464 ¶¶13-15.

Further, while Mazda's quibbles about whether certain documents White cites adequately support his opinions regarding the root cause of the Defect (AB 39-40) may be proper topics for a cross-examination, they do not support exclusion. *Elosu*, 26 F.4th at 1026 ("The court's role is to determine 'the scientific validity' of an expert's 'principles and methodology,' not to determine whether their hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record. That is for the litigants to argue, and for the jury to decide."). Regardless, Mazda's attacks on the relevance of these documents are meritless.[6]

First, Mazda's position that White did not demonstrate the relevance of a document showing that Ford police vehicles showed HNBR bellows degradation

---

[6] Mazda incorrectly implies that White cited two production documents to support his opinion. AB 39. In fact, White reviewed numerous production documents and cited several as examples that supported his opinions. 8-ER-1466, 1474-76, 1481, 1484, 1486-87, 1500-02, 1504-07.

and failures related to thermal aging, ignores that White specifically opined that "the mechanical seal in [the Ford Police vehicles] and the pump casing … are identical to the . . . Vehicles." 8-ER-1474-75 ¶58. Further, Mazda's assertion that the police vehicles have a different drive cycle that results "in higher oil temperatures, above 135C, on a more regular basis" (AB 39) does nothing to undermine this document's support for White's opinions. Indeed, as White noted, the document states that Ford police vehicles were experiencing water pump failures at less than 14 months of service. 8-ER-1474-75 ¶58. Accordingly, to the extent these vehicles did experience higher temperatures more often, they were simply experiencing failures caused by the Defect sooner—which is fully consistent with the scientific literature and White's opinion that HNBR degrades faster at higher temperatures and that the design Defect causes failures in Class Vehicles before 150,000 miles.

Mazda's attack on the teardown reports cited by White fares no better. Mazda admits these documents "conclude that [Water Pump] leaks were caused by thermal degradation" and then simply asserts that the documents do not explicitly cite the spring bellows assembly as a root cause and that all the pumps inspected passed an undescribed "pressure test."[7] AB 39. These arguments are red herrings and do not contradict that these teardown reports directly support White's opinion that design

---

[7] There is no explanation of what a "pressure test" is meant to observe and what passing this test means.

choices made by Mazda resulted in thermal degradation of the HNBR bellows, which leads to Water Pump failures. And even if Mazda's position was accurate, it would merely create a disputed fact.

Finally, while Mazda's reliance on *Grodzitsky* is notably diminished, Mazda still incorrectly asserts that *Grodzitsky* supports its position that an engineer must always examine a "statistically-significant sample size" in order to opine on the existence of a design defect. But Mazda's argument ignores that White's opinion regarding the existence of the Defect was not based solely on an extrapolation of his observations from four failed Water Pumps, but rather, on a fulsome engineering analysis of which his inspection of the failed water pumps was a discrete part. *See supra*. There is no rule requiring an engineer to examine a statistically-significant sample size of failed parts to identify a design defect when otherwise applying a sound methodology using reliable scientific principles to support his conclusions. Any such rule would be untenable.

### F.   THE 2020 FORD REDESIGN ADDRESSES THE SAME DEFECTIVE DESIGN WHITE IDENTIFIES

Like the District Court, Mazda incorrectly argues that White was required to have corroborating evidence to support his opinion (he was not),[8] but also insists that Ford's 2020 Redesign—which is such corroborating evidence—was properly

---

[8] *Elosu*, 26 F.4th at 1023-24 (trial court erred in excluding expert's testimony where court's "concerns speak to corroboration, not foundation").

ignored. This bald attempt to impose a requirement unsupported by Rule 702 while dismissing the exact type of evidence purportedly required should be rejected.

Moreover, Mazda's assertion that the Redesign is irrelevant disregards that it was specifically implemented to address the very design issues White identified. *See* 8-ER-1488, ¶¶111-12. White does not rely on the Redesign to show that a Defect existed or that Ford fixed the Defect as Mazda argues. Rather, the Redesign further supports White's determination that Ford's engineers also understood that shielding the HNBR bellows from coolant and high temperatures helps prevent the thermal and chemical degradation that causes water pump failures. *Id*. The District Court erred in failing to give *any* weight to this relevant evidence supporting White's opinions. *Elosu*, 26 F.4th at 1020 ("[T]he court disregarded much of the expert's scientific analysis … and demanded corroboration—factfinding steps that exceed the court's gatekeeping role.").

Ultimately, White's opinion regarding the design Defect is based on his relevant education, experience, knowledge, and a robust engineering analysis and, thus, plainly meets Rule 702's reliability requirement. *Alaska Rent-A-Car*, 738 F.3d at 969. White's exclusion was improper and should be reversed.

## II    SUMMARY JUDGMENT WAS IMPROPER

Based on its erroneous exclusion of White, the District Court improperly granted summary judgment; because White's exclusion was error, summary

judgment should be reversed. Moreover, Mazda fails to refute that triable issues of fact preclude summary judgment. OB 46-57.

## A. THE DISTRICT COURT IMPROPERLY OVERLOOKED EVIDENCE

The District Court erred by ignoring evidence demonstrating triable issues of fact regarding cognizable injury and materiality—Mazda's arguments to the contrary fail.

Mazda mischaracterizes evidence of cognizable injury as only supporting damages. However, record evidence, including production documents, Plaintiffs' testimony, and a conjoint analysis, support the existence of a Defect and demonstrate that Mazda caused Plaintiffs injury by inducing them to overpay for Vehicles with an undisclosed Defect. *See Nguyen*, 932 F.3d at 821-22 (manifestation irrelevant to causation in consumer fraud case because "[t]he defect did not *cause* the plaintiffs' injury; the defect *was* the injury"); OB 46-49.

Mazda's documents provide sufficient evidence of a defect to create triable issues of fact and its attempt to re-characterize documents in which it discussed "Defected" Water Pumps only shows that there are disputed facts.[9] OB 47-48; *Barlow v. Ground*, 943 F.2d 1132, 1134 (9th Cir. 1991) ("We reverse a grant of

---

[9] Mazda falsely claims Plaintiffs cited three documents in support of this argument. In truth, Plaintiffs cite to four pages of factual background. OB 48.

summary judgment if, viewing the evidence in the light most favorable to the non-moving party, there are genuine issues of material fact.").

Mazda's causation argument distorts what Plaintiffs must show to prevail on their claims. It is not necessary for Plaintiffs to demonstrate the Defect caused all Water Pumps failures. Rather, Mazda's failure to disclose the known Defect caused Plaintiffs to overpay for Vehicles with an undisclosed Defect. Plaintiffs' testimony and conjoint support their claim that Mazda caused the relevant injury (overpayment); the District Court erred by not considering this evidence. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999) (reversing grant of summary judgment where district court failed to address evidence proffered by plaintiff).[10]

Mazda's arguments regarding materiality also fail. The Defect presents a safety risk as substantial evidence establishes that Internal Water Pump failures can lead to sudden catastrophic engine failure while individuals are driving. OB 50-53.[11] Similarly, a reasonable consumer could find it material that Water Pump failures result in repairs costing thousands of dollars—something Mazda acknowledged. *See, e.g.*, 8-ER-1543. To the extent Mazda believes that disputed failure rates proffered

---

[10] Mazda's reliance on *Siqueros*, 2022 WL 74182 at *10, for the proposition that Plaintiffs' conjoint cannot support evidence of a cognizable injury is misplaced. The *Siqueros* court made the uncontroversial observation that a damages expert may assume the existence of a defect. *Id*.

[11] White also provides an opinion regarding a safety defect as he opines that the Defect can cause catastrophic engine failure. 8-ER-1466-67, 1499.

by their engineering expert support finding that a reasonable consumer would not consider sudden catastrophic engine failure and/or expensive repairs material, these are disputed issues of fact. *Barlow*, 943 F.2d at 1134.

### B.   GENUINE   ISSUES   OF   MATERIAL   FACT   EXIST CONCERNING MAZDA'S KNOWLEDGE OF THE DEFECT

This Court should decline to address the fact-intensive inquiry of whether there are genuine issues of material fact concerning Mazda's pre-sale knowledge— an issue that the District Court did not address. *Lindal Cedar Homes, Inc. v. Wilkinson*, 35 F. App'x 507, 508 (9th Cir. 2002) ("We decline to consider ... other theories for reversal or ... alternative grounds for affirmance, as they were not addressed by the district court.").

Mazda's argument that there is no evidence of pre-sale knowledge is baseless. Tellingly, Mazda does not contend that 2005 and 2006 documents do not support pre-sale knowledge, instead arguing that there is no evidence "cited" showing it had knowledge of these documents' contents. However, evidence shows that Mazda worked with Ford developing the Water Pump and "absolutely" reviewed documents like these. 2-ER-292.

Mazda also attempts to re-frame the contents of other exemplar documents that show: (1) in 2007, Mazda investigated coolant leaking inside engines (a Defect consequence) and, (2) in 2009, in recognizing the prevalence of leaks, Mazda issued a company-wide Repair Information sheet informing technicians of the need to

replace the pump to fix coolant leaks from the weep hole. 8-ER-1673-84, 9-ER-1785. These documents show that, from early on, Mazda knew about design problems with the mechanical seals—both investigating the problem and advising technicians (but not their customers) of the need to replace the pumps. Dueling characterizations of these documents do not support summary judgment particularly because "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Leslie*, 198 F.3d at 1159.

Moreover, Mazda ignores that Plaintiffs proffered additional evidence of pre-sale knowledge including, *inter alia*, that: (1) Mazda conducted a warranty analysis in 2010, which indicated a high number of Water Pump leaks and began another investigation into the root cause, observing that most leaks were in the weep hole passage leading to the mechanical seal; (2) by February 2011, Mazda's investigation concluded that a possible cause was "[c]oolant leak[ing] through a defected water pump seal"; (3) teardown reports in 2011 pointed to "low system pressure and/or high temperatures around the seal" as causing the failures; and (4) Mazda prepared formal requests to report issues regarding leaks from the weep hole and engine oil contaminating with coolant. 9-ER-1681; 9-ER-1795; 9-ER-1800; 4-ER-725-46; *see also* 8-ER-1395-1413; *see Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 998 (N.D. Cal. 2013) (defendants' "non-public, internal data about the" defect sufficient

to show exclusive knowledge of a defect). This evidence demonstrates triable issues of fact concerning knowledge.

Mazda's suggestion that, because there is no document explaining the Defect in the exact language White uses, there is insufficient evidence of knowledge, is incorrect. AB 55.[12] It is sufficient that Plaintiffs have "proffered evidence that [d]efendant had actual knowledge there was a problem with its [water pumps], regardless of whether it then conducted the necessary inquiry to determine precisely what was causing the symptoms of the defect." *Alger v. FCA US LLC*, 2022 WL 4366969, at *3 (E.D. Cal. Sept. 21, 2022). Indeed, Mazda's standard would incentivize manufacturers not to investigate defects, which is inconsistent with the consumer protection statutes. *See, e.g.*, Cal. Civ. Code Ann. § 1760; Cal. Bus. & Prof. Code Ann. § 17200. Neither the Court nor the jury is required to believe Mazda's spin on these documents and Plaintiffs have set forth sufficient evidence supporting Mazda's knowledge.

---

[12] In *Victorino v. FCA US LLC*, 2018 WL 1083395, at *8 (S.D. Cal. Feb. 27, 2018), *on reconsideration*, 2018 WL 2149223 (S.D. Cal. May 10, 2018), the court held that pre-sale knowledge requires knowledge that a specific part is defective. Here, Mazda's documents demonstrate that it has long known about the specific part—i.e., the Water Pump—that was defective. In *In re Ford Motor Co. DPS6 Powershift Transmission Prods. Liab. Litig.*, 2019 WL 7185524, at *3 (C.D. Cal. Oct. 29, 2019), after a fact-specific inquiry and the court found there was insufficient evidence of pre-sale knowledge. Here, triable issues of fact exist based on evidence demonstrating Mazda was aware of a defect in its Water Pumps.

## CONCLUSION

Accordingly, Plaintiffs respectfully request that the Order and Judgment be overturned.

Dated: November 20, 2023                    Respectfully submitted,

**KESSLER TOPAZ
 MELTZER & CHECK, LLP**

*/s/ Joseph H. Meltzer*
Joseph H. Meltzer
Melissa L. Yeates
Tyler S. Graden
Jonathan F. Neumann
Jordan E. Jacobson
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
myeates@ktmc.com
tgraden@ktmc.com
jneumann@ktmc.com
jjacobson@ktmc.com

Paul R. Kiesel
Jeffrey A. Koncius
Cherisse H. Cleofe
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Tel: (310) 854-4444
kiesel@kiesel.law
koncius@kiesel.law
cleofe@kiesel.law

Robert M. Rothman
Francis P. Karam
**ROBBINS GELLER**
**RUDMAN & DOWD LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Tel.: (631) 367-7100
Fax: (631) 367-1173
rrothman@rgrdlaw.com
fkaram@rgrdlaw.com

Andrew S. Love
**ROBBINS GELLER**
**RUDMAN & DOWD LLP**
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel: (415) 288-4545
alove@rgrdlaw.com

E. Powell Miller
Sharon S. Almonrode
**THE MILLER LAW FIRM, P.C.**
Miller Building
950 West University Drive
Suite 300
Rochester, MI 48307
Tel.: (248) 841-2200
Fax: (248) 652-2852
epm@miller.law
ssa@miller.law

*Counsel for Plaintiffs-Appellants*

John C. Goodson
Matt Keil
**KEIL & GOODSON P.A.**
406 Walnut Street
Texarkana, Arkansas 71854
Tel: (870) 772-4113

Fax: (870) 773-2967
jgoodson@kglawfirm.com
mkeil@kglawfirm.com

Robert H. Edwards
**THE EDWARDS FIRM, P.L.L.C.**
711 West Third Street
Little Rock, AR 72201
Tel.: (501) 372-1329
bob@bobedwardslaw.com

*Additional Counsel for Plaintiffs-Appellants*

32

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Appellate Procedure 5(c)(1) because, excluding the Table of Contents, Index of Authorities, required certificates, and parts of the document exempted by Rule 5(c), this document contains 6,981 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Equity font.


/s/ *Joseph H. Meltzer*
Joseph H. Meltzer

33

## CERTIFICATE OF SERVICE

On November 20, 2023, a copy of Appellants' Reply Brief was served on all

the following counsel by email:

> **SHOOK, HARDY & BACON L.L.P.**
> Michael L. Mallow
> Darlene M. Cho
> Mark D. Campbell
> 2049 Century Park East, Suite 3000
> Los Angeles, CA 90067
> Telephone: 424/285-8330
> Fax: 424/204-9093
> mmallow@shb.com
> dcho@shb.com
> mdcampbell@shb.com
>
> Attorneys for Defendants-Appellees

/s/ *Joseph H. Meltzer*
Joseph H. Meltzer

34