FILED WITH REDACTIONS
PURSUANT TO ORDER OF THE
COURT DATED 1/17/2024
[ECF 56]

No. 23-55325

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

TERRY SONNEVELDT, ESTHER WRIGHT SCHNEIDER, BRIAN HUME,
JEAN LEVASSEUR, CHRISTOPHER LACASSE, TIM HALWAS, ERIN
MATHENY, LEWIS DELVECCHIO, JON SOWARDS, LAWRENCE
BOHANA, MONIKA BOHANA, DAVID DENNIS, AND
JAQUELINE S. ASLAN,

*Plaintiffs-Appellants,*

v.

MAZDA MOTOR OF AMERICA, INC. D/B/A MAZDA NORTH AMERICAN
OPERATIONS AND MAZDA MOTOR CORPORATION,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Central District of California
No. 8:19-cv-01298-JLS-KES
Honorable Josephine L. Staton

---

### DEFENDANTS-APPELLEES' ANSWERING BRIEF

---

SHOOK, HARDY & BACON LLP
Michael L. Mallow
Darlene M. Cho
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: (424) 285-8330
mmallow@shb.com
dcho@shb.com

*Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Mazda Motor of America, Inc. d/b/a Mazda North American Operations ("MNAO") states it is a wholly-owned subsidiary of Mazda Motor Corporation. No other publicly traded corporation owns 10% or more of the stock of MNAO.

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Mazda Motor Corporation ("MC") states there is no publicly held corporation that owns 10% or more of its stock.

Dated: October 30, 2023

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: */s/ Michael L. Mallow*
Michael L. Mallow
Attorneys for Defendants-Appellees

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ......................................................... 3

STATEMENT OF THE ISSUES ............................................................. 3

STATEMENT OF THE CASE ................................................................ 4

       A.    FACTS RELEVANT TO THE ISSUES SUBMITTED FOR REVIEW. ................................................................................. 4

           1.    The Class Vehicles' Water Pumps ................................... 4

           2.    Mazda's Investigations of General Water Pump Leaks. . 7

           3.    Mazda Learns of this Class Action Lawsuit................... 11

       B.    RELEVANT PROCEDURAL HISTORY. ............................. 12

           1.    Plaintiffs' Motion for Class Certification, Dr. White's March 10, 2022 and June 23, 2022 Expert Reports, and Related Motion to Exclude. ........................................... 12

           1.    The District Court's Ruling on Motion for Class Certification and Related Motion to Exclude. ............... 14

           2.    Mazda's Motion for Summary Judgment, Related Motion to Exclude Dr. White's "Merits" Report, and Rulings. . 15

SUMMARY OF THE ARGUMENT ..................................................... 17

STANDARD OF REVIEW ................................................................. 20

ARGUMENT ................................................................................... 21

     **I.**    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING DR. WHITE'S OPINIONS...................................... 21

       A.    The District Court Applied the Correct Legal Standards in Conducting a Rule 702 Analysis ........................................... 21

B.    White Presented a Comparative Defect Theory Without Comparative Data ................................................... 23

C.    White's Opinion on the Four Failed Water Pumps is Hypothetical, Speculative, and Unsupported........................... 29

D.    White's "Root Cause" Opinion is Not Adequately Supported 35

E.    The 2020 Redesign is Irrelevant Without Evidence of a Defect ............................................................................... 42

F.    Plaintiffs Other Complaints About the District Court's Analysis Are Misleading and Flawed ...................................... 44

II.    SUMMARY JUDGMENT WAS APPROPRIATE........................... 45

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DECERTIFIED ALL CLASSES. ................................... 56

CONCLUSION ................................................................................ 58

STATEMENT OF RELATED CASES .................................................. 60

CERTIFICATE OF COMPLIANCE...................................................... 61

CERTIFICATE OF SERVICE ............................................................ 62

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ...............................................................34

*Beaty v. Ford*,
   854 F. App'x 845 (9th Cir. 2021) ................................................51, 52

*Bell v. Wilmott Storage Servs., LLC*,
   12 F.4th 1065 (9th Cir. 2021) ...........................................................20

*Brady v. Deloitte & Touche*,
   587 F. App'x 363 (9th Cir. 2014) ......................................................20

*Daniel v. Ford Motor Co.*,
   806 F.3d 1217 (9th Cir. 2015) ..........................................................51

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ...................................................................*passim*

*In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod.*
   *Liab. Litig.*,
   2021 WL 4931996 (S.D. Ohio Oct. 22, 2021) ...........................32, 33

*Domingo ex rel. Domingo v. T.K.*,
   289 F.3d 600 (9th Cir. 2002) ..............................................29, 30, 31

*In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liaiblity*
   *Litig.*,
   2019 WL 7185524 (C.D. Cal. Oct. 29, 2019) ...................................54

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ...........................................................................26

*General Telephone Co. v. Falcon*,
   457 U.S. 147 (1982) ...........................................................................57

*Grodzitsky v. Am. Honda Motor Co.*,
   957 F.3d 979 (9th Cir. 2020) ........................................20, 21, 41, 42

iv

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
  305 F.R.D. 164 (N.D. Cal. 2015)..........................................................41

*Kansas City S. Ry. Co. v. Sny Island Levee Drainage Dist.*,
  831 F.3d 892 (7th Cir. 2016) ...............................................................21

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)..............................................................................20

*Marlo v. United Parcel Serv., Inc.*,
  639 F.3d 942 (9th Cir. 2011) ...............................................................58

*Messick v. Novartis Pharms. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) .............................................................31

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
  926 F.3d 528 (9th Cir. 2019) ...............................................................20

*Newkirk v. Conagra Foods, Inc.*,
  727 F. Supp. 2d 1006 (E.D. Wash. 2010)............................................41

*Ollier v. Sweetwater Union High Sch. Dist.*,
  768 F.3d 843 (9th Cir. 2014) ...............................................................20

*Parra v. Bashas', Inc.*,
  536 F.3d 975 (9th Cir. 2008) ...............................................................20

*Rector v. City & County of Denver*,
  348 F.3d 935 (10th Cir. 2003) .............................................................57

*Siqueiros v. General Motors*,
  2022 WL 74182 (N.D. Cal. Jan. 7, 2022).......................................36, 37, 39, 47

*Sully v. Ayers*,
  725 F.3d 1057 (9th Cir. 2013) .............................................................58

*Thompson v. Paul*,
  547 F.3d 1055 (9th Cir. 2008) .............................................................54

*In re Viagra & Cialis Prod. Liab. Litig.*,
  424 F. Supp. 3d 781 (N.D. Cal. 2020) ...........................................21, 22

v

*Victorino v. FCA US LLC*,
 2018 WL 1083395 (S.D. Cal. Feb. 27, 2018) *on reconsideration*,
 2018 WL 2149223 (S.D. Cal. May 10, 2018) ....................................54

*Webb v. Alpha & Omega Servs., Inc.*,
 2017 WL 3000014 (C.D. Cal. June 1, 2017)....................................58

*Williams v. Yamaha Motor Co.*,
 851 F.3d 1015 (9th Cir. 2017) .......................................................50

*Wilson v. Hewlett-Packard Co.*,
 668 F.3d 1136 (9th Cir. 2012) .......................................................53

*Wolin v. Jaguar Land Rover N. Am., LLC*,
 617 F.3d 1168 (9th Cir. 2010) .......................................................47

**Statutes**

28 U.S.C. § 1291 .............................................................................3

Class Action Fairness Act, 28 U.S.C. § 1332(d) ....................................3

**Rules**

Ninth Circuit Rule 32–1 ....................................................................61

Fed. R. Civ. P. 23 ...........................................................14, 15, 20, 57

Fed. R. Evid. 702 ....................................................................*passim*

Fed. R. App. P. 26.1 ..........................................................................1

Fed. R. App. P. 32(f) .......................................................................61

Fed. R. App. P. 32(g) ......................................................................61

**Other Authorities**

DEFECT, Black's Law Dictionary (11th ed. 2019)...................................28

FED. R. EVID. 702 COMMITTEE NOTES ON RULES—2000 AMENDMENT .................21

## INTRODUCTION

The named Plaintiffs are current and former Mazda owners whose engines had a water pump failure before their vehicles reached 150,000 miles. They allege their and all class vehicles were defective because the dynamic seal in the vehicles' water pumps used a part made from hydrogenated acrylonitrile butadiene rubber ("HNBR") that was exposed to engine coolant—as recommended by the Society of Automotive Engineers ("SAE"). Plaintiffs' technical expert, Dr. Christopher White ("White"), visually inspected just four failed water pumps, noted that the HNBR had "degraded" in each and leapt to the conclusion the use of HNBR caused the failures, not only in the four vehicles he examined, but in thousands of Class Vehicles.

The Honorable Josephine L. Staton excluded White's opinions under Federal Rule of Evidence 702, then granted summary judgment in Mazda's favor. The District Court found three major flaws in White's analysis. First, it concluded White's methodology was flawed because a crucial premise of his defect theory— that the HNBR elastomer bellows will degrade "much faster" in the Class Vehicles' internal water pumps than in other water pumps—was an unsubstantiated hypothetical. The District Court said he needed to support his conclusions with evidence that (1) Mazda's design was prematurely degrading the HNBR, and (2) this premature degradation actually resulted in failed water pumps. White had evidence of neither, since he did not compare class vehicle failure rates to other vehicles, or

1

do testing to gather evidence supporting the steps in his theory. In short, he failed to follow the scientific method.

Second, the District Court excluded White's root cause opinion. White observed degradation in the HNBR. Invoking Rule 702's requirement for sufficient facts and data, the District Court said that was not enough, since White did not actually show HNBR degradation caused water pump failure. It is possible HNBR degradation could cause water pump failure (as White hypothesized), or water pump failure could cause degradation. White made no attempt to understand the cause-and-effect relationship. White also made no attempt to rule out other admitted causes of failure, further rendering his root cause opinion unreliable.

Third, the District Court said White could not extrapolate from his examination of four failed water pumps to his conclusion *all* water pump failures in thousands of vehicles were from that cause. He had no evidence of how many or how often or from what cause water pumps were failing, and without that, the District Court said "there is no basis for concluding that the Defect is even a primary or significant cause of water pump failures—let alone *the* root cause." Similar to the methodological flaws in his root cause opinion, White did not rule out other causes of water pump failures.

Having excluded White's opinion, the District Court properly granted summary judgment because Plaintiffs had not proffered any evidence their alleged

design defect caused premature water pump failure in the Class Vehicles. Plaintiffs were thus left pointing to a handful of internal Mazda documents, but none of them were enough to survive summary judgment, since none of them posited a causal link between water pump failures in the Class Vehicles and Plaintiffs' defect theory.

## STATEMENT OF JURISDICTION

Defendants agree with Plaintiffs' statement of jurisdiction. The District Court had subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). On February 23, 2023, the District Court issued an order granting summary judgment and decertifying the classes. 1-ER-5-38. Judgment was entered on March 4, 2023. 1-ER-4. On April 3, 2023, Plaintiffs filed a timely appeal. 6-ER-1267. This Court has jurisdiction to review the District Court's grant of summary judgment as a final order pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Did the District Court act within its discretion in excluding the opinions of Plaintiffs' expert, Dr. Christopher White?

II.   Did the District Court err in granting summary judgment after the exclusion of Dr. Christopher White, given Plaintiffs had no other evidence of a design defect in their or the Class Vehicles?

III.  Did the District Court act within its discretion in decertifying the classes, given there were no longer representative plaintiffs for each class, since

3

summary judgment was granted on their individual claims?

## STATEMENT OF THE CASE

## A. FACTS RELEVANT TO THE ISSUES SUBMITTED FOR REVIEW.

### 1. The Class Vehicles' Water Pumps

The 2008-2015 CX-9 and 2009-2013 Mazda6 vehicles (the putative Class Vehicles) incorporated an internal water (or coolant) pump design that is typical of automotive water pumps. 8-ER-1555; 5-ER-912 (§ 3.1); 10-ER-1978–81. The water pump design conformed with SAE 2003-01-0616. 8-ER-1555; 2-SER-379; 5-SER-1142. The water pumps incorporated an elastomer bellows seal composed of HNBR. 8-ER-1555; 5-SER-1142 (Item 05). HNBR was (and is) widely used in the automotive industry because the properties of HNBR make it particularly suitable to be immersed in coolant, at high temperatures, and for extended periods of time. 5-SER-924–26 (§ 2.2); 5-ER-916 (§ 4.3.2).

For illustration and context, the diagram on the left below depicts the primary components of a water pump and the photograph on the right is a photo of an unused exemplar spring-bellows assembly taken from a replacement water pump used in class vehicles:

4



5-SER-921; 5-SER-943.

Below is a cross-section view of the mechanical seal in the putative class vehicles' water pumps:



5-SER-923; 5-SER-1142. As noted in the legend, the part highlighted in red ⑤ is the bellows and the helical coil spring in the photograph is depicted as ⑦.

Functionally, the mechanical seal is also referred to as a dynamic seal because one face of the seal ④ is stationary while the mating face seal ① rotates. 5-SER-921–24. Dynamic sealing takes place between the primary and mating rings, shown

5

as ④ and ① in the cross-section above. 8-ER-1555; 5-SER-922–23. Force is applied to the primary seal ring by the compression of the helical coil spring and bellows between the cartridge and primary seal ring. 8-ER-1555; 5-SER-922.

The design operating temperature rating for HNBR is in the range of -40° F to 302° F (-40°C to 150°C). 8-ER-1555; 5-ER-916; 10-ER-1981. The drawing for the elastomer bellows in the putative class vehicles also shows a maximum service temperature rating of ███████ 8-ER-1555–1556; 5-SER-1142. The putative class vehicles have an expected end-use operating temperature range of 176-223°F (80-106°C), well within the HNBR operating temperature rating. 5-SER-951–52; 2-SER-368; 2-SER-374. Accordingly, HNBR is compatible for the end-use environment expected in the class vehicles.

As part of the development process, the mechanical seal underwent a variety of tests, including tests that simulated use of the mechanical seal and bellows for 150,000 miles. 5-SER-927–28; 10-ER-1984; 3-SER-626–31; 5-SER-1144–45; 3-SER-624; 3-SER-591–92; 4-SER-725–750; 4-SER-756–852. For example, the Design Verification Plan and Report (DVPR) assessment involved long-term testing, including a "WP bench durability" test which required ███ hours of testing. 5-SER-927–28; 3-SER-624. The elastomer bellows passed testing that addressed prolonged exposure to coolant at elevated temperatures, including the "Bomb test" (which involved exposing the elastomer bellows to coolant at ███████ for

6

██ hours) and the "Reflux test." 5-SER-927–28; 3-SER-624; 4-SER-830–52. Three HNBR bellows were exposed to four different coolants with OAT/HOAT additives. 5-SER-927–28; 4-SER-833. After testing, the bellows underwent less than a 5% increase in hardness with minimal dimensional change. 5-SER-927–28; 3-SER-624. In the DVPR, the test result was considered a "Pass" with "no degradation." 5-SER-927–28; 3-SER-624.

### 2. Mazda's Investigations of General Water Pump Leaks.

The earliest evidence of a potential concern with water pump leaks generally was in late 2010.[1] 9-ER-1681–1784. On December 16, 2010, MC conducted a warranty analysis and identified 123 cases in which ████████████████

████████████████████████████████████████

████████████████████████████████████████

9-ER-1681.[2] Accordingly, in February 2011, MC initiated an investigation

---

[1] Plaintiffs refer to four documents that pre-date December 2010 as evidence Mazda knew of the alleged Defect "[a]s early as 2005." AOB7-AOB8. As discussed in Section II.D, the four documents have nothing to do with the alleged Defect.

[2] Plaintiffs reference the "weep hole" in several places of their brief. *See* AOB8 (citing 9-ER-1785 and 9-ER-1681); AOB9 (citing 4-ER-725–46). White mentions the "weep port" in one paragraph of his Report, describing it as a "channel to discharge coolant that has leaked across the mechanical seal." 8-ER-1467 (¶ 33). He states: "Owing to the small diameter of the weep port, only small leaks can be entirely contained and prevented from reaching the bearing assembly. In the event of a large leak, coolant can penetrate into the bearing assembly and wash out the bearing lubricant." *Id.* In other words, coolant leakage through the weep hole is not

concerning ███████████████████████████████████

███████ 9-ER-1791–92; 9-ER-1794–97. This apparently received MC's attention

because the problem ███████████████ 9-ER-1795.

Meccanotecnica performed pressure tests and teardown analyses of five water

pumps collected from the field. 1-SER-115–166.[3] In its teardown analysis report,

Meccanotecnica did not identify the spring bellows assembly as the root cause or

even a suspected cause; rather, it noted the water pumps all passed the pressure test.

9-ER-1799–800. MC also performed a data analysis of water pump claims. 1-SER-

79–90. MC's data analysis showed warranty claims flattened out through the 2010

month of production (MOP) after Ford implemented design change ECN# 09E0166

to change the roughness of the mechanical seal in 2009. 1-SER-90. MC concluded

that "[a]lthough the true cause could not be identified, we would like to see how the

market is doing since improvements to improve the wear resistance of mechanical

seals were incorporated in December 2009." 1-SER-170.

Plaintiffs do not dispute the next time MC became aware of a potential

_____

White's Defect theory, which requires coolant leakage to be so large that it washes
out the bearing lubrication. *See, e.g.*, 8-ER-1488–89, 1499 (¶¶ 114–117, 162).
   [3] In 2009, Ford made a roughness change to the dynamic seal, which resulted in
part number 978M-8A559-**AA** being superseded by 978M-8A559-**AB**. 9-ER-1897
(¶¶ 21-22). The water pumps Meccanotecnica inspected incorporated the superseded
mechanical seal number 978M-8A559-**AA**. 1-SER-116; 1-SER-126; 1-SER-137; 1-
SER-147; 1-SER-158 (Customer Seal No.).

concern related to water pump leaks generally was almost seven years later in 2017. *See* AOB9; 8-ER-1395. It is undisputed that this was (a) after any Plaintiffs purchased/leased new vehicles (8-ER-1424–26, ¶¶28-36)); (b) after all Plaintiffs (with the exception of Sonneveldt and Sowards) purchased used vehicles from third-parties (8-ER-1426–26, ¶¶ 37-43)); and (c) approximately, two years after the last putative class vehicles were sold as new vehicles. 8-ER-1395.

As part of MC's efforts to investigate a potential root cause, in September 2017, MC engineers reached out to Ford engineers. 9-ER-1827–37. Contrary to Plaintiffs' argument, Ford did not inform "Mazda that Internal Water Pump failures were caused when 'the dynamic seal was leaking for an extended period of time.'" AOB10. Rather, after reviewing a teardown report, Ford's engineer indicated "[i]t's difficult to say what the root cause may have been." 9-ER-1830. But he hypothesized two possible scenarios: (1) a faulty oil cooler or head gasket or (2) the bellows material to the extent exposed to temperatures above 135C (275°F). *Id.* Ford's engineer also shared with MC that Ford had implemented a casting change that "was not introduced to Mazda." 9-ER-1873–74. The reason the design change was not introduced to Mazda was because the water pump casting in Ford vehicles was different. *Id.* ("Mazda has a dual PIP seal casting.")[4] At the same time, Ford's

---

[4] Plaintiffs state Mazda did not adopt the casting change. AOB10. They also say Mazda "decline[d]" the casting change in March 2015. 8-ER-1395. But these

engineer shared a document providing more information about the root cause for Ford's casting change in police vehicles. 9-ER-1873–91. As noted in the document, "[p]olice vehicles have a different drive cycle and calibration than the non-police vehicles that use the TiVCT and IVCT water pumps." 9-ER-1888. "The Calibration and duty cycle [were] resulting in higher oil temperatures, above 135C, on a more regular basis." *Id.*[5]

MC's analysis of warranty data showed a failure rate of no more than 0.40% for vehicles produced in 2011 and after. 9-ER-1874. In January 2018, Mazda also observed the 10-year CDF[6] for water pump and engine failures in CX-9 vehicles

---

statements are incomplete and not quite correct. On March 26, 2015, Ford's engineer informed Mazda that it would be implementing a casting change due to "the Ford Police Interceptor vehicle's driving duty cycle being too severe for the Water Pump Dynamic seal for the current casting configuration, so we are modifying the casting to improve durability of the dynamic seal." 1-SER-173–74. Both Mazda and Ford agreed at that time that Mazda was "unaffected" by this casting change. *Id.*

[5] Plaintiffs' excerpt of an email communication from February 2017 discussing the HNBR bellows is incomplete and misleading as a result. AOB9-AOB10 (citing 9-ER-1844). The email reflects an explanation by one of MC's engineers regarding ████████████████████████ 9-ER-1844. He hypothesized that two out of the three possible scenarios applicable to J35C vehicles (non-putative class vehicles) might apply to J50 (class vehicles), "except (3)." 9-ER-1844; 9-ER-1848. Plaintiffs' excerpt omits that the discussion about thermal degradation concerns thermal degradation ██ ██████████████████████████████ 9-ER-1844 (emphasis added), meaning ████████████████████ ██████████ 9-ER-1848. Insufficient cold resistance is not White's defect theory.

[6] CDF refers to a prediction of the future failure rate of a part based on an extrapolation of warranty data. 1-SER-265–66;1-SER-272.

were comparable to the CX-7 vehicles, which use an external water pump. 1-SER-188; 1-SER-265–71; 1-ER-35. Ultimately, given the low occurrence rate and the costs and process of verifying the performance and compatibility of Ford's housing in Mazda vehicles, MC concluded there would be no additional improvement. 10-ER-2095; 8-ER-1571–76.

### 3. Mazda Learns of this Class Action Lawsuit.

On May 13, 2019, Plaintiffs' counsel in this action sent a demand letter to Mazda. 11-ER-2170, ¶ 210. Thereafter, on May 28, 2019, MC engineers inquired about the D37 engine water pumps. 10-ER-2035–44. MC engineers advised that as of February 2018, the ████████████████████████████████████ ███████████████████████████ 10-ER-2043. In June of 2019, MC further analyzed the ratio of engine to water pump replacements. 10-ER-2036. There were ████ warranty claims for water pump replacements and ███ warranty claims for partial engine replacements. 10-ER-2035. This meant that out of the total of ███ raw warranty claims for engine or water pump replacements, ████ were for water pump replacements and ████ were for partial engine replacements. 10-ER-2035.[7]

---

[7] Plaintiffs assert that 10-ER-2035 reflects "that 31.3% of Internal Water Pump failures required engine replacement." AOB8. But there is nothing in the evidence cited by Plaintiffs (or elsewhere) that suggests the 680 warranty claims for partial engine replacements were *caused by* internal water pump failures, much less caused by the alleged Defect.

On June 28, 2019, this action was filed. 7-ER-1312. On July 15, 2019, an MC engineer advised internally that the media had reported the filing of "a class action regarding the W.P. problem in the U.S." 2-ER-265. In that context, when asked "was the CX-9 water pump a known problem," an MC associate responded "Yes, it is a known problem." 2-ER-264.[8]

## B. RELEVANT PROCEDURAL HISTORY.

### 1. Plaintiffs' Motion for Class Certification, Dr. White's March 10, 2022 and June 23, 2022 Expert Reports, and Related Motion to Exclude.

On March 12, 2022, Plaintiffs moved for class certification (ECF 317), submitting in support White's March 10, 2022 report. Although this case commenced on June 28, 2019 (ECF 1), it was not until March 12, 2022, when Plaintiffs submitted White's report, Plaintiffs' root cause theory, pointing to the spring-bellows assembly in the mechanical seal, was first disclosed.[9] In this report,

---

[8] There is nothing in the evidence cited by Plaintiffs to support their proposed inference that the "known problem" referenced in the email is of the alleged "Defect" as opposed to general water pump failures or the class action lawsuit. AOB1 (citing 2-ER-264).

[9] On November 1, 2019, Plaintiffs filed their First Amended Complaint, alleging they had retained "a consultant with a Ph.D. in mechanical engineering and an extensive engineering mechanical design background to conduct a preliminary analysis of the Cyclone Engine." 2-SER-449 (¶ 60). However, Plaintiffs did not disclose their defect theory until they submitted White's Reports.

White described the defect as "the use of hydrogenated acrylonitrile butadiene rubber ('HNBR') for the elastomer bellows in the mechanical seals in combination with a bellows design such that the bellows are fully immersed in, and in full contact with, the engine coolant and exposed to high temperatures." 9-ER-1896 (¶ 15). He claimed "[o]nce degraded, the bellows *can no longer serve their function* to hold the two seal rings tight against each other, which allows coolant to leak past the seal rings, often into the oil pan where it mixes with and contaminates the oil." 9-ER-1897 (¶ 19, emphasis added).

On April 29, 2022, Mazda filed its opposition to Plaintiffs' motion for class certification (ECF 342), submitting in support the April 29, 2022 expert report of Dr. Corissa Lee (3-SER-633–97) and the April 24, 2022 expert report of Victor Hakim (8-ER-1546–69), and moved to exclude White's opinions (ECF 343).[10] On June 23, 2022, Plaintiffs filed their reply brief and submitted another report from White dated June 23, 2022 (ECF 373).

On July 12, 2022, Mazda filed an *ex parte* application for an order permitting the filing of a sur-reply and sur-rebuttal expert reports because Plaintiffs had presented new arguments and new evidence with their reply brief (ECF 386). On July 21, 2022, the District Court granted Mazda's request (ECF 404). On September

---

[10] Mazda also moved to exclude the opinions and reports of Steven Gaskin and Colin Weir (ECF 341).

2, 2022, Mazda filed its sur-reply and the September 2, 2022 expert reports from Dr. Corissa Lee and Victor Hakim (ECF 438). 5-SER-919–60; 9-SER-1959–73.

### 1. The District Court's Ruling on Motion for Class Certification and Related Motion to Exclude.

In ruling on the motion to exclude at the class certification stage, the District Court analyzed the Rule 702 requirements in context with Plaintiffs' Rule 23 burden. As the District Court explained, at the class certification stage, the "rigorous analysis" required by a court is whether expert evidence adduced to support class certification is "capable of answering a common question for the entire class in one stroke, and could reasonably sustain a jury verdict in favor of [Plaintiffs.]" 5-ER-1002; 7-ER-1381 (ECF 520, 10/14/22 Hrg. Tr.) 42:21-43:14. Throughout the Class Certification Order, the District Court made clear it was avoiding considering the merits beyond what was necessary to decide whether Plaintiffs' Rule 23 burden was satisfied. For example, the District Court held "[w]hether White can prove that his hypothesized defect has in fact caused water pumps in the Class Vehicles *to fail*" and whether or not White can ultimately "prove his theory" were merits issues. 5-ER-996–97 (emphasis added). The District Court found "White's engineering analysis [was] sufficiently well supported to constitute evidence on which Plaintiffs *may rely to prove* the existence of an alleged defect common to all Class Vehicles." 5-ER-998 (emphasis added). Evidently viewing the Rule 702 and Rule 23 elements

as inter-related at the class certification stage, the District Court held "White's testimony clear[ed] both the *Daubert* and the Rule 23 hurdles." 5-ER-1005.

> **2.** **Mazda's Motion for Summary Judgment, Related Motion to Exclude Dr. White's "Merits" Report, and Rulings.**

On July 26, 2022, Mazda moved for summary judgment (ECF 411). On September 26, 2022, Plaintiffs filed their opposition to Mazda's summary judgment motion (ECF 473). On October 14, 2022, Mazda filed its reply brief in further support of its motion for summary judgment (ECF 499).

On July 26, 2022, Plaintiffs' counsel served an additional expert report from White dated July 26, 2022.[11] On August 26, 2022, Mazda served its rebuttal reports from Dr. Lee and Victor Hakim. 3-SER-454–505; 10-ER-1976–97. On September 29, 2022, Mazda moved to exclude White's "merits" opinions as reflected in his July 26, 2022 "Merits" Report (ECF 478). On November 17, 2022, Plaintiffs opposed (ECF 527), and Mazda replied on December 23, 2022 (ECF 548).

In his "merits" report, White provided the same definition of the Defect as in his prior reports. 8-ER-1464 (¶¶ 12, 25). He further theorized "Ford's 'Redesigned Water Pump' can be retrofit into all Class Vehicles. The Redesigned Water Pump does not have the Defect and can serve as a replacement internal water pump for all

---

[11] Plaintiffs also served additional expert reports from Steven Gaskin and Colin Weir, and from another expert, Susan Thompson.

Class Vehicles to repair the Defect." 8-ER-1466 (¶ 29).

On January 6, 2023, the District Court held extensive oral argument, for over three hours, on Mazda's Motion for Summary Judgment and Mazda's Rule 702 motions. 1-ER-12; 7-ER-1388 (ECF 571, 1/6/2023 Hrg. Tr.) At the hearing, Plaintiffs made clear that White's opinions in this case are "the defect *will* cause failure, that it *does* cause failure, that it *has* caused failure" and White "is saying *definitively* this is what is *causing* the failures in the class vehicles." 1/6/2023 Hrg. Tr. 79:23-80:24 (emphases added). Despite arguing at the hearing White's opinion is that the Defect was definitively *causing* failures in class vehicles, Plaintiffs contended it does not matter if the alleged Defect manifested one in a million times or one in 100 times or every time prior to reaching 150,000 miles. *Id.* 33:9-33:15. Plaintiffs also said "a named plaintiff who never even experienced water pump failure" would be entitled to remedies under their liability theory. *Id.* 43:7-45:17.

Unlike at the class certification stage where the Court avoided the merits, at summary judgment, the District Court had to determine "whether Plaintiffs can demonstrate triable issues of fact . . . including the existence of the Design Defect and whether its existence is a material fact that Mazda should have disclosed to consumers." 1-ER-16. These key facts turned entirely on "[t]he admissibility of White's opinions and testimony." 1-ER-16; *see also* 1-ER-29–30.

After considering White's Merits Report, his deposition testimony (*see* 7-ER-

1385, ECF 551), and the parties' discussion of White's theory of the Defect and its foundations, the District Court held White's opinions that "the Defect has caused, does cause, and will cause water pump failures in the Class Vehicles," 1-ER-17, and that "'the HNBR elastomer bellows in the mechanical seal and the bellows design' is 'the root cause of the Internal Water Pump failures,'" 1-ER-18, lacked an adequate factual and analytical basis. 1-ER-18. Because Plaintiffs no longer had individual claims against Mazda, the Court decertified all remaining Classes in this action for lack of a representative plaintiff. 1-ER-38.

## SUMMARY OF THE ARGUMENT

The District Court's order should be affirmed in full.

I.     The District Court did not abuse its discretion in excluding Dr. White's opinions and applied the correct legal standards in its Rule 702 analysis.

The District Court recognized numerous flaws in White's methodology, including three major ones. <u>First</u>, it concluded White's defect theory did not adequately flow from his abbreviated analysis of four failed water pumps and a few internal documents. White needed evidence of two facts: (1) Mazda's design was prematurely degrading the HNBR, and (2) this premature degradation was affecting performance, resulting in failed water pumps. White had evidence of neither fact, since he did not compare the failure rates to other vehicles, or do testing to gather evidence supporting the steps in his theory.

17

Second, the District Court focused on White's failure to find evidence of the "root cause" of the individual water pumps he examined. White did not actually show HNBR degradation caused failure of the water pumps. The relationship could go one of two ways: it was possible the degradation could have caused the failure (as White hypothesized), but it was possible, and more likely, the failure could have caused the degradation. White made no attempt to establish the causal direction went his way. White also failed to rule out other failure modes having nothing to do with his theory, another fact that undermined his root cause opinion.

Third, the District Court said White could not extrapolate from his examination of four failed water pumps to his conclusion that *all* water pump failures in thousands of vehicles were from that cause. He had no evidence of how many or how often water pumps were failing because of his defect theory, and without that, the District Court said "there is no basis for concluding that the Defect is even a primary or significant cause of water pump failures—let alone *the* root cause." Similar to the methodological flaws in his root cause opinion, White did not rule out other causes of water pump failures. The District Court also said his sample size was too small. These conclusions were correct: the analytical gap between White's sparse data and his sweeping conclusion was simply too much.

II.    The District Court did not err in granting summary judgment. Without the testimony of their expert, Plaintiffs had no evidence of a defect, a failure of proof

18

which justifies summary judgment. In their opening brief, Plaintiffs offer various legal theories that would get them to trial, but each of them fail. First, they claim because their pumps "failed before their Vehicle reached the end of the useful life of the engine," they should survive summary judgment. That is not enough: they need evidence the pumps failed *because of* the defect. They also claim they were damaged, pointing to their individual testimony, and the damages model built by their damages experts. But testimony of damages is not a substitute for evidence of causation; or put otherwise, Plaintiffs must have evidence their claimed damages were *caused* by the alleged defect.

In addition, the lack of evidence of Mazda's pre-sale knowledge of the "Defect" provides an independent basis for affirmance of the summary judgment decision. Evidence that merely shows knowledge of a generalized concern cannot be sufficient to create a triable issue of material fact regarding pre-sale knowledge of the alleged "Defect," but that is all Plaintiffs have here. They have never shown that Mazda knew of the defect they allege prior to their purchase or lease.

III.    The District Court did not abuse its discretion when it decertified all classes.

Having granted summary judgment on the named plaintiffs' claims, there were no

longer the representative parties required by Federal Rules of Civil Procedure 23(a)(3) and (4).[12]

## STANDARD OF REVIEW

The exclusion of expert testimony under Rule 702 is reviewed for abuse of discretion. *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020). "The Supreme Court has said that district courts have 'broad latitude' to determine whether expert testimony is sufficiently reliable to be admitted." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843 (9th Cir. 2014) (*quoting Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)).

The Ninth Circuit reviews a "district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1068 (9th Cir. 2021).

A district court's decertification order is reviewed for abuse of discretion. *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 531 (9th Cir. 2019) (citation omitted). On appeal, review is limited to "'whether the district court correctly selected and applied Rule 23's criteria.'" *Brady v. Deloitte & Touche*, 587 F. App'x 363, 364 (9th Cir. 2014) (*quoting Parra v. Bashas', Inc.*, 536

---

[12] The Court requested supplemental briefing on the pre-sale knowledge issue, but ultimately did not reach the issue. 7-ER-1383 (ECF 534).

F.3d 975, 977 (9th Cir. 2008)).

# ARGUMENT

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING DR. WHITE'S OPINIONS.

### A. The District Court Applied the Correct Legal Standards in Conducting a Rule 702 Analysis

Rule 702 requires that testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods" which have been "reliably applied" to "the facts of the case." FED. R. EVID. 702(b)-(d). Additionally, the expert's knowledge must "help the trier of fact to understand the evidence" or "determine a fact in issue." FED. R. EVID. 702(a).

In evaluating challenged expert testimony, a district court should evaluate admissibility under the standard set forth in the Supreme Court's *Daubert* decision. *Grodzitsky*, 957 F.3d at 983 (cleaned up) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). More accurately, an analysis should be conducted pursuant to Rule 702, which was "amended in response to *Daubert*." *See* FED. R. EVID. 702 COMMITTEE NOTES ON RULES—2000 AMENDMENT; *see also Kansas City S. Ry. Co. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 900 (7th Cir. 2016) (stating litigants "should have paid more attention to Federal Rule of Evidence 702, which superseded *Daubert* many years ago"); *In re Viagra & Cialis Prod. Liab.*

21

*Litig.*, 424 F. Supp. 3d 781, 788-89 (N.D. Cal. 2020) ("Strictly speaking, however, the governing rule is set out in Rule 702 … as opposed to *Daubert* itself.").[13] Under that standard, district courts are "charged … with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and … this gatekeeper function applies to all expert testimony, not just testimony based in science." *Id.*

The District Court applied this standard. *See* 1-ER-15-16 (recognizing that "[w]hether expert testimony is admissible is determined under Federal Rule of Evidence 702," then discussing the Rule's subparts and caselaw interpreting it).

The District Court began by discussing the essence of White's opinion. It found White's opinion is that the alleged defect has and does cause water pump failures prior to Class Vehicles reaching 150,000 miles. Citing White's report, the District Court found his opinion was "the HNBR elastomer bellows in the mechanical seal and the bellows design" is "the root cause of the" premature water pump failures. 1-ER-18. Based on this, the District Court determined the key question is whether White's "diagnosis … has proper support" and whether his root cause conclusion "adequately flows from his analysis." 1-ER-18. This is an invocation of Rule 702, which requires testimony be "based on sufficient facts or data" and be "the product of reliable principles and methods" which have been

---

[13] Plaintiffs appear to use Rule 702 and *Daubert* interchangeably, but the Rule 702 standard controls, as set forth above. *See, e.g.,* AOB2.

"reliably applied" to "the facts of the case." FED. R. EVID. 702(b)-(d).

The District Court's Rule 702 analysis then followed this standard. Ultimately, it concluded White's opinions were not adequately supported. 1-ER-18–29. It based this on a review his report, his deposition testimony (*see* 7-ER-1385, ECF 551), and the parties' briefing and oral argument. 1-ER18. It found "White's opinions on the Defect lack an adequate factual and analytical basis." *Id.*

It reached that conclusion by walking through four different major (but independent) problems with the adequacy of White's data, the reliability of his principles and methods, and the gaps between those factors and the conclusions he drew from them. Each of those gaps are discussed in turn.

## B.   White Presented a Comparative Defect Theory Without Comparative Data

The District Court's first major criticism of White was he was offering an opinion of a *comparative* defect without *comparative* data. 1-ER-18–21. "This alone warrant[ed] exclusion of his testimony about the Defect." 1-ER-21.

HNBR will degrade, an undisputed fact the District Court called "an inevitability, not a defect." 1-ER-20. HNBR Degradation will happen over time in internal water pumps—like the one used by Mazda—and in external pumps. As the District Court found, to show a defect, White had to show this "degradation [was] in fact accelerated in a certain application," meaning its use in these internal water

23

pumps. 1-ER-20-21. But he also had to show "the accelerated degradation affects performance," meaning it actually resulted in failing water pumps prior to 150,000 miles. 1-ER-21.

Both showings were necessary, and his methodology falls if he is missing just one of them. But as the District Court held, "White has shown neither." *Id*. Specifically, the District Court noted "White's theory of the Defect at best demonstrates what is a necessary condition of a defect—that HNBR elastomer bellows degrade—but not sufficient conditions—that the HNBR elastomer bellows in the Class Vehicles degrade faster and perform worse than in other vehicles." *Id*.

White could have gathered data or designed a methodology to support those conclusions, but he did not. He could have shown the impact of any supposed defect indirectly, by comparing "the rate at which the Class Vehicles' water pumps fail" to the failure rates for other vehicles with external water pumps.[14] 1-ER-19. He did not take that step. In fact, Plaintiffs have never put forward any evidence of what the manifestation rate is of their alleged defect, let alone comparative data.

White could have tested the coolant temperature surrounding the HNBR bellows, a critical component of his theory, but he did not. He could have shown HNBR degradation causes water pump failure by testing his hypothesis or otherwise

[14] Even then, he would have to somehow link any difference to the internal use of HNBR, since correlation does not equal causation.

24

gathering corroborating scientific data for his theory. He did not do that either. As the District Court found, "White admitted in his deposition that he did not attempt to validate his hypothesis about the" significance of the HNBR being exposed to higher temperatures internally. 1-ER-19-20. He had admitted, "I did not do any testing," observing this would be a "nontrivial test to do." *Id.* Nothing in Rule 702—nor in the scientific method—allows an expert to only pursue "trivial" tests.

White theorized the internal temperature of water pumps will always be higher (though higher than *what* is not clear) based on his "thermodynamic" review, but as the District Court observed, he had no evidence of that, and he certainly had no evidence of *how much* higher, if at all, the temperature would be, a critical fact he needed to establish in order to conclude HNBR would degrade to the point of failing its intended function. 1-ER-19. Critically, he also never offered evidence to support his conclusion that "degradation is accelerated such that failures happen ***more often*** or ***earlier***." 1-ER-20 (emphasis added). In other words, he was missing both necessary elements: he needed evidence of higher temperatures, *and* evidence those higher temperatures actually mattered. And, to add yet another layer of what he did not consider, he would have needed to show that any additional failures were occurring before the vehicles reached the end of their 150,000 useful life.

Not only did White not put such information forward, Plaintiffs never point to any in their brief. Plaintiffs discuss White's "thermodynamic analysis" at length.

AOB25-26. Plaintiffs say the District Court improperly weighed the merits of White's "thermodynamics analysis." AOB25. That is incorrect. There is nothing to suggest the District Court weighed anything (and Plaintiffs tellingly never say what the District Court weighed the evidence against). Moreover, there is nothing to suggest temperatures in Mazda's actual engines were getting hot enough under normal operating conditions to cause the HNBR to fail in its intended function.

Additionally, because White's "thermodynamics analysis" only purports to show that the level of heat is "sufficient to degrade," that is an insufficient methodology for White's conclusion that once degraded, the bellows can *no longer serve their function*. AOB25. Plaintiffs never once point to actual evidence HNBR was degrading faster because of Mazda's design, nor do they offer any evidence degradation resulted in any water pump failures. That makes White's opinion nothing more than unadorned *ipse dixit*. But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. . . . A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The District Court found a gap here, and that is why White was excluded. The District Court made the right call.

Tellingly, Plaintiffs do not argue White had comparative data. Rather, they

26

complain "the District Court wrongfully redefined the Defect as a comparative one and abused its discretion by demanding additional corroborating evidence." AOB16. But there are three problems with their point of view.

First, White did in fact opine the alleged defect is comparative, even if he didn't bother to put that aspect of his case in his defect "definition." His opinion is the water pump design "will degrade (age) the HNBR bellows much faster." 8-ER-1481. He says the design will lead to a "premature fatigue failure." 8-ER-1494. These are comparative opinions: he is saying Mazda's design will fail quicker than other designs.

Second, for White to prove the existence of a defect, his opinion *needs* to somehow invoke premature failure. Otherwise, Plaintiffs do not have a case, since there would be nothing wrong with Mazda's design. Plaintiffs repeatedly point to White's defect definition, which is the use of HNBR in an internal water pump. AOB23-24 (citing 8-ER-1461-62). They somehow feel that because his definitional paragraphs themselves do not invoke premature failure they can get by with White not having data on that issue.[15] This is nonsensical: setting aside their defect definition involves premature failure before 150,000 miles, their so-called defect

---

[15] Plaintiffs are also offering an unsupported—and unsupportable—point of view in that their defect definition is all that strictly matters. But Rule 702 applies to the expert's opinion in its entirety.

27

definition is incomplete without them describing some sort of shortcoming. Otherwise, they're not defining the defect: they're just describing the design. White's opinion *must* be that this design causes failures faster than other designs, or he hasn't opined on a defect at all. A defect is defined as "[a]n imperfection or shortcoming, esp. in a part that is essential to the operation … of a product." DEFECT, Black's Law Dictionary (11th ed. 2019). Here, that shortcoming is premature failure, which itself invokes a comparative statement, since it must be premature relative to something. Given White's opinion necessarily invokes a comparison, the District Court was well within its discretion to ask how White met the requirements of Rule 702. Neither Dr. White nor Plaintiffs do or could assert that a substantial portion of the putative class vehicles have experienced or will experience a failure before 150,000 miles. In fact, most of the putative class vehicles have already surpassed that milestone without any reported water pump failure. 8-ER-1551–54.

And third, the District Court was right to demand "additional corroborating evidence." Plaintiffs treat this as a problem with the District Court's analysis, complaining the "District Court required a comparator as corroborating evidence." AOB23-24. They insist "the District Court misapplied Federal Rule of Evidence 702 … by adding testing and comparative data requirements that are not part of a *Daubert* reliability analysis." AOB2. But once again, they misunderstand Rule 702, and they are misreading the District Court's opinion. The District Court did not read

a testing or comparative data requirement into Rule 702. Rather, it was simply evaluating if White, given the nature of his opinions, met the admissibility requirements of Rule 702, which demands "sufficient facts or data" and "reliable principles and methods" which have been "reliably applied" to "the facts of the case." FED. R. EVID. 702(b)-(d). The District Court waded into this territory because White waded into this territory.

An expert must "provide support for every necessary link" in their theory. *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002). But here, there are numerous links missing for White: he does not have any data of high internal temperatures, any data directly linking the non-existent high temperatures from the internal design to the degradation of HNBR, any data linking that degradation to failure, nor any comparative data to show the internal design fails at a higher rate than in other vehicles or as compared to external water pumps. Without that information, the District Court got it right: White was properly excluded.

## C. White's Opinion on the Four Failed Water Pumps is Hypothetical, Speculative, and Unsupported

White's methodology of examining four failed water pumps to derive the conclusion that once degraded, the bellows can no longer serve their function, relied on insufficient data, constituted an unreliable methodology, and is purely speculative. Based on his examination of four failed water pumps, White concluded

those pumps failed because of the alleged defect. The District Court criticized this analysis, saying that while "White observe[d] that the HNBR bellows in the water pumps" had degraded, and while he "offer[ed] various hypotheses about how that degradation resulted" in their failure, he did not actually "show that any of those scenarios in fact caused failure in the water pumps he examined." 1-ER-21.

The problem, as the District Court found, is the mere observation the "bellows that he examined showed degradation … is not enough to support [White's] hypothesis about how" that degradation "causes water pump failures." 1-ER-22. There are two reasons for this.

First is the question of cause and effect: it could be the degradation caused the failure, or it could alternatively be the failure caused the degradation. The District Court put a spotlight on this conundrum. *See* 1-ER-22 ("[T]he material degradation and damage to the HNBR bellows that White examined firsthand could be the result—rather than the cause—of those water pumps' failure."). As it found, "White offers no explanation as to how he determined that the HNBR bellows that he inspected became deformed and damaged before the water pumps' failure rather than as the pumps were failing." 1-ER-23. Excessive heat could arise from various sources, everything from "a failing cooling fan, insufficient coolant, cavitation, or metal-to-metal contact," and if any of those were the culprit, heat could "degrade and damage the HNBR bellows." *Id.* But in those situations, the District Court

rightly concluded "degradation and damage of the HNBR bellows did not cause the water pump to fail—attributing the failure to the HNBR bellows requires overlooking the cause of whatever abnormal overheating event that damaged the bellows and resulted in the water pump's failure." *Id.*

Experts do not necessarily need to prove a cause and effect relationship to survive a Rule 702 challenge, but they still need "sufficiently compelling proof" for their view of the causal direction, plus an explanation of their belief. *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014). Here, White only had observational correlation, silence, and speculation.

Second, and relatedly, White failed to rule out other failure modes, a step (like testing) he could have taken to actually support his theory of causation. Given White is offering a causal opinion, ruling out alternative causes of failure would constitute part of a valid methodology under Rule 702. White claimed, at his deposition, he considered "all potential failure modes." 1-ER-22. The District Court searched for White's methodology from which he derived his opinion the "defect" (rather than the numerous other undisputed potential causes of water pump failure)[16] caused the

---

[16] Plaintiffs say the "District Court focused on ***its own belief*** of what could cause mechanical seal overheating." AOB32 (emphasis added). That misstates the record and the District Court's order. The District Court did not insert its "own belief" of other potential causes for mechanical seal overheating. Rather, and as Plaintiffs' own expert concedes, there is no genuine dispute excessive heat can result from multiple

bellows to fail their intended function, but "the process by which White considered and ruled out other potential failure modes for the water pumps that he examined [could not] be ascertained from either his Merits Report or his deposition testimony." 1-ER-22.[17] The District Court's exclusion is unsurprising: Rule 702 "requires that courts ensure experts employ the requisite level of rigor in forming their opinions, which means that experts must show their work." *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 2021 WL 4931996, at *6 (S.D. Ohio Oct. 22, 2021). White skipped that step.

Once again, White could have prevented his own exclusion. He could have done testing or used other tools in the scientific toolbox to evaluate his causal theory. 1-ER-21. He could have documented his approach to ruling out other failure modes, which would have allowed the District Court to determine he did rule out other causes. 1-ER-22. Or he could have better explained his belief that the causal direction points in the way he believes. But he took none of these steps. From his conclusion that four pumps had degraded HNBR, he leapt to the conclusion degradation is why they failed, versus HNBR being a byproduct of the pump failure.

---

and various causes. 1-ER-23; 3-SER-553–57, 564–67, 578–79; 9-ER-1967; 1-SER-17–21.

[17] White's methodology and process stand in stark contrast to the extensive and multiple teardown analyses performed by industry experts to determine the root cause of general water pump failures in Class Vehicles. *See, e.g.*, Facts Section A.2; 1-SER-116–66; 1-SER-188–89; 4-SER-878–916; 5-SER-1011–17; 8-ER-1571–76.

There was nothing in between those steps, but there needed to be, since correlation does not equal causation.

Plaintiffs do not refute this. They do not point to any evidence that would bolster White's theory. Instead, they cry foul, saying the District Court improperly "required White to provide additional 'empirical data' to support admissibility." AOB27. They later add the District Court required "empirical testing." AOB30. Neither statement is true: at no point did the District Court say empirical data was strictly necessary. Rather, it simply observed "White's analysis and scenarios are not founded upon and do not incorporate any empirical testing." 1-ER-21. The District Court's statement is correct,[18] and at no point was it *requiring* testing (as Plaintiffs believe), but rather saying (correctly) White didn't have any. 1-ER-21-22. At most, this can be construed as the District Court pointing out a potential tool in the toolbox, something that could have helped White avoid having insufficient data for his causal opinion, which White did not employ. *Id*. White needed something to show that the use of HNBR "caused failure in the water pumps he examined." 1-ER-21. But he had no such evidence.

---

[18] Plaintiffs say the statement is not correct, claiming "White incorporated empirical testing." AOB30. They do not offer a citation, and it is unclear what they are referring to. If they are referring to White testing just four water pumps, it would be a stretch to call it empirical: given the small sample size, it would better be described as anecdotal.

Plaintiffs respond by saying the primary factor under Rule 702 is on the ability to replicate results, adding causation "need not be established to a high degree of certainty." AOB30. That may be true, but the problem is that White did not establish it to *any* degree of certainty, and Plaintiffs' briefing cites no example of any such evidence. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). White did nothing to bridge the analytical gap between his observations of a mere four failed water pumps with degraded HNBR and his conclusion the degradation caused the failure. He was therefore properly excluded.

Plaintiffs' final complaint on this point is that "[t]here is no requirement that an engineer rule out all other failure modes to opine on the existence of a design defect in a fraud and deceptive trade practice case such as this." AOB30. They claim, without any authority, that concept is taken from "causation experts in medical malpractice and product liability cases and does not apply here." *Id.* As a threshold matter, Plaintiff's view that this case is somehow different is unsupported—and unsupportable. Rule 702 is the same across these types of cases, and Plaintiffs cite no caselaw holding basic Rule 702 principles do not apply to White's analysis. Their legal argument is as conclusory as White's opinion.

34

But setting that aside, Plaintiffs are once again misconstruing the District Court's opinion. The District Court did not require White to rule out "all other failure modes," but rather required some way for White to "distinguish[] between HNBR bellows deformation and damage that are *causes* of water pump failure rather than the failure's *effects*." 1-ER-22-23. White eschewed an evaluation of alternative causes of failure, or empirical testing, or even tools in the scientific toolbox that could have helped him differentiate cause from effect. He needed something to bridge the analytical gap. But he had nothing, and it is revealing that Plaintiffs keep trying to fight a strawman by implying that the District Court created rules where it did not.

As the District Court concluded, "White offers no explanation as to how he determined that the HNBR bellows that he inspected became deformed and damaged before the water pumps' failure rather than as the pumps were failing." 1-ER-23. Without that explanation, White's causation testimony is hypothetical and speculative *ipse dixit*. It was properly excluded.

### D. White's "Root Cause" Opinion is Not Adequately Supported

White opined not just on the pumps he examined, but also on the Class Vehicles generally. The District Court concluded that was improper, since White did not have enough data or analysis to leap from his analysis of just four pumps to opining on thousands of vehicles. 1-ER-24 ("White failed to bridge the analytical

gap between his conclusion about the four pumps he examined and his conclusion as to the 'root cause' of water pump failure in all Class Vehicles."). This was true for four reasons.

First, White purports to be opining on the cause of *all* water pump failures, but as the District Court explained, he has done nothing "to account in any way for other factors or causes that can lead to water pump failures." 1-ER-24. Just as he made no effort to rule out alternative causes on the four pumps he examined, he also made no attempt to do so on a classwide basis. This hole in his methodology was inexcusable in his evaluation of just four pumps, and it is all the more egregious when he extrapolates to the entire class.

The District Court cited *Siqueiros v. General Motors*, 2022 WL 74182, at *7 (N.D. Cal. Jan. 7, 2022), a case in which the expert did not "explain how he reached his conclusion that every Class Vehicle experiences the same defect." The expert in *Siqueiros* reasoned "backwards," in that he started "with the conclusion that the piston rings are defective, and then show[ed] how the evidence in the record is consistent with this theory." *Id.* That is precisely what White did here: he looked at four defective pumps, developed a half-baked theory on *why* they were defective,

and then leapt to the conclusion that *all* pumps in the Class Vehicles fail for that reason.[19]

Plaintiffs do not bridge White's analytical gap. Instead, they decry the use of *Siqueiros*, saying it only "stands for the basic proposition that an expert opinion on a defect must identify the specific defect." AOB37. Their characterization of the case is undone by the text of the *Siqueiros* opinion itself, which said the expert there was excluded because "his report does not specifically describe what scientific principles or methods he applied to determine that the root cause of the oil consumption defect is a design defect in the" vehicle part. *Siqueiros*, 2022 WL 74182, at *7. The expert in that case was also excluded because he does not "explain how he reached his conclusion that *every* Class Vehicle experiences the *same* defect." *Id.* (emphasis in original). White makes that same mistake here, so the District Court was right to point out that White did not "[a]ccount in any way for other factors or causes that can lead to water pump failures." 1-ER-24.

---

[19] *See* 3-SER-578 ("So, again, there's nothing here that I see inconsistent with my theory, and, in fact, heat generated is consistent with my theory. My theory, of course, is not metal to metal contact would generate that heat, but it's consistent."); 3-SER-578–79 ("It would depend, you know, one would have to look at the analysis, but certainly heat is generated by metal to metal contact. I'm not disputing that. I'm just saying this is consistent with -- with my opinion of what the design defect is. It's not inconsistent in any way.")

Second, White is making an assessment on the overall impact of the Defect on the Class Vehicles, but he "has no opinion on how many pumps failed because of the Defect." It is uncontested that many Class Vehicles have reached the 150,000 miles. 8-ER-1551–54. White provides no opinion as to how many 2008-2011 model year Class Vehicles experienced water pump failure due to the "Defect." White's view is extreme: he opines that the defect "will cause vehicles to fail" before reaching 150,000 miles, but he also said he has "no opinion" as to what "the expected manifestation rate would be for failures caused by the design." 1-ER-25. In short, he says there is a defect that exists *independent* of whether it ever manifests.

White thinks a defect exists in *all* class vehicles, regardless of whether a single water pump has ever failed before 150,000 miles due to the Defect. That is an unadorned, unscientific, and untestable conclusion. But even setting the *ipse dixit* nature of the opinion aside, this viewpoint exposes a methodological flaw. As the District Court pointed out, "[i]f, as no one disputes, water pumps can and do fail for various reasons and there is no measure of how many of the Class Vehicles' water pumps failed because of the Defect, there is no basis for concluding that the Defect is even a primary or significant cause of water pump failures—let alone *the* root cause." 1-ER-26 (emphasis in original). Such a view eschews causation. This case is premised, in part, on the twin suppositions that (a) there is a defect, and (b) it is the cause of the water pump failures. But without undertaking any effort to assess

38

the impact of his hypothesized defect, White cannot opine on causation whatsoever. White has not earned his certainty any pumps—let alone *all* pumps—are failing from the defect being the "root cause."

Third, the documents White cites do not support his position. Plaintiffs claim otherwise, arguing "White identifies numerous production documents that supported his opinion." AOB40. They cite just two. The first is, according to them, an "examination of Ford Police vehicles." AOB38. But it does not and cannot support White's conclusion, as the document itself states "[p]olice vehicles have a different drive cycle and calibration than the non-police vehicles that use the … water pumps." 9-ER-1888. "The Calibration and duty cycle [result] in higher oil temperatures, above 135C, on a more regular basis." *Id.* White has no data or analysis that could bridge the gap between a study of *different* vehicles, with different calibrations, different motor oil (that allows for high temperatures), and different drive cycles (i.e. demands) and the ones in this case. 10-ER-1984–86; 9-ER-1961–64. The second report cited by White includes "teardown reports prepared by suppliers that … conclude that leaks were caused by thermal degradation." AOB39. These documents do not support White's position either. Those documents did not identify the spring bellows assembly as the root cause or even a suspected cause; rather, it noted the water pumps all passed the pressure test. 9-ER-1799–800.

But even if these documents did support White's theory, he still has an analytical gap. He does not explain how he jumped from these few anecdotes to his opinion *all* classwide vehicles have a defect. He also cannot explain how they support his view that his defect theory is the root cause in *all* failures. As the District Court noted, any consistency between White's opinion and these documents may not disprove his hypothesis, but do not necessarily confirm it. 1-ER-26.

Plaintiffs criticize the District Court by returning to their refrain that it "improperly requir[ed] corroboration." AOB40. But at no point did the District Court say it was requiring corroborating evidence: it was simply pointing out the documents White cited were insufficient evidence from which to draw his conclusion.

Fourth and finally, White's examination of just four failed pumps is a statistically insignificant sample size for such an expansive conclusion. As the District Court explained, White is attempting an "extrapolation from a statistically insignificant set of examples to the Class Vehicles as a whole." 1-ER-27. The District Court is correct: without a statistically significant sample, all White did was observe some pumps failed. He had no basis to draw conclusions about whether or how often the pumps will fail in the Class Vehicles, many of which have reached 150,000 miles without experiencing a water pump failure. 8-ER-1551–54. Courts properly recognize an expert cannot reliably extrapolate from a sample to the general

40

population unless the sample is of a sufficient size (and not subject to selection bias), but White suffers from both problems here. *Grodzitsky,* 957 F.3d at 983-84 (affirming exclusion of an expert for use of "small sample size [of 26] to prove a common defect"); *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 180 (N.D. Cal. 2015) ("the small sample size raises serious questions"); *Newkirk v. Conagra Foods, Inc.*, 727 F. Supp. 2d 1006, 1022 (E.D. Wash. 2010) (an expert "fails to apply reliable scientific methods when he extrapolates from extremely small samplings to make sweeping conclusions").

Plaintiffs respond there is no requirement for a statistically-significant sample size. AOB41. They quibble with the District Court's reading of *Grodzitsky*, but it is indisputable that both the majority and dissent there criticized the expert for failing to use a statistically significant sample size. *Grodzitsky,* 957 F.3d at 983-84 (the majority criticizing the use of a "small sample size"), 988 (the dissent noting that the expert "failed to … test a statistically significant number of [parts] to opine on the probabilities that any given [part] failed because of the alleged defect").

Plaintiffs' other retort is that White's opinion is not probabilistic, and thus, they believe *Grodzitsky* is distinguishable. AOB43-44. But as a preliminary matter, nothing in *Grodzitsky* requires an opinion to be probabilistic before a statistically valid sample is required. Rule 702(b) itself requires "sufficient facts or data" for *all*

expert opinion. Plaintiffs do not explain how White met such a requirement with his too-small sample size—and they never dare claim his sample size was sufficient.

More importantly, Plaintiffs are misguided if they think White offering his opinion as a certainty—rather than a probability—somehow saves him. Plaintiffs apparently have such a belief. AOB43-44 ("[U]nlike *Grodzitsky*, White's inspection of the failed Water Pumps confirmed his opinion that the Defect *was not just a probable* cause of Water Pump failures but *the cause* of Water Pump failures.") (emphasis in original). But White has not earned such certainty. If the expert in *Grodzitksy* was excluded for a probabilistic opinion based on a review of just 26 auto parts, then White is properly excluded for his doggedly certain opinion based on review of just 6, only four of which were failures. Confidence and conclusiveness should require more evidence, not less.

In short, Plaintiffs cannot leap from White's inspection and testing to their conclusion that *all* pumps are failing because of the alleged defect. The District Court had an ample basis to conclude White did not offer enough evidence to support his opinion otherwise. As explained above, White has little idea why the failed pumps he examined broke. He has no more evidence to support a classwide inference. The District Court acted within its discretion in excluding his opinion.

### E.    The 2020 Redesign is Irrelevant Without Evidence of a Defect

Noting Ford redesigned the water pumps in 2020, White opines "the revisions to the Redesigned Water Pump address the common Design Defect in the Internal Water Pumps in the Class Vehicles." 8-ER-1485. The District Court correctly excluded this opinion as irrelevant, holding the fact "[t]hat Ford ultimately implemented design revisions in its water pumps does not show that the Class Vehicles' water pumps were defective." 1-ER-28. "Indeed, there is no evidence in the record that water pumps with the 2020 revised design perform better than the Class Vehicles' water pumps." *Id.*

Plaintiffs criticize the District Court's exclusion, arguing the District Court "erred by failing to give weight to Ford's 2020 redesign." AOB44. They do so by splitting hairs, saying "White does not point to the Redesign to show that a better design existed," but instead claim he was offering that "opinion regarding the nature of the defect." *Id.* This is a distinction without a difference. Whether White was opining on the *nature* of the defect or the *existence* of a defect, his opinion was rightly excluded.[20]

There is simply no reason to believe a redesign of the water pump casing in Ford's vehicles reveals anything about the nature of the defect in Class Vehicles.

---

[20] The *nature* of a defect presupposes the *existence* of one, so the District Court's attack on White's opinion is all the more appropriate if, as Plaintiffs claim, he was opining on its alleged nature.

White says the new design addresses the design defect, which shows his "root cause of the failures is accurate," and "other engineers also reached the same conclusion." AOB46. Plaintiffs do not cite a single case for such a proposition. Nor do they even explain their point: they jump to the conclusion the redesign is evidence, without explaining how that is possibly the case. They assume because something was changed it was fixed, but that is an unsupported—and, in this case, unsupportable— conclusion.[21] As the District Court pointed out, they needed to adduce that the prior design is defective in the Class Vehicles, a step White never took, revealing yet another hole in his methodology. 1-ER-28-29.

### F. Plaintiffs Other Complaints About the District Court's Analysis Are Misleading and Flawed

Plaintiffs say White is an "eminently qualified engineering expert," and they criticize the district court for "fail[ing] to focus on White's qualifications." AOB2-3. They go so far as to say White's opinions should be admitted because he is "highly qualified," adding his "education, knowledge, and engineering analysis provided an adequate foundation for the reliability of his opinions." AOB19-21. The District

---

[21] White's methodology and process are again in stark contrast to the performance verification Mazda engineers indicated would be necessary before adopting Ford's housing change. 8-ER-1571. Even White acknowledged it "would certainly be good practice" to perform validation testing to ensure Ford's redesign can actually be retrofitted. 3-SER-558–63.

Court never questioned White's qualifications and assumed he was qualified. He ran afoul of Rule 702 because he did not have sufficient facts or data, a reliability methodology, nor a reliable application. FED. R. EVID. 702(b)-(d); *see* Sections I.A– I.E *supra*.

Plaintiffs also claim, at various points, the District Court weighed evidence. *See, e.g.*, AOB2, AOB17, AOB23, AOB25-26, AOB29, AOB32, AOB56-57. They're wrong. It appears this complaint—like their other protestations—comes more from them uttering a Rule 702-themed word salad than them having a fair criticism of Judge Station's thorough and well-reasoned analysis. The District Court focused solely on methodology, repeatedly pointing out logical flaws, analytical gaps, and methodological shortcomings in White's hired-gun opinion. The District Court recognized it could not make credibility determinations or weigh evidence, and it never did. *See* 1-ER-13. Plaintiffs never explain where or how the District Court "weighed" evidence, and as shown above, it did not: it simply pointed out the holes in White's approach.

## II.    SUMMARY JUDGMENT WAS APPROPRIATE.

Without a defect, there is no case. After excluding White, the District Court granted summary judgment, because without his opinion, there was no evidence of a common design defect. As the District Court explained:

> Aside from White's opinions and testimony, Plaintiffs have not
> proffered any evidence that the Design Defect causes the water pumps

in the Class Vehicles to fail prematurely. Although Plaintiffs point to numerous production documents that they assert are consistent with White's Design Defect theory, none of the documentary evidence that Plaintiffs have proffered posits a causal link between water pump failures in the Class Vehicles and the design of the Class Vehicles' water pumps or engines. To prove that the Class Vehicles' water pumps fail prematurely due to the Design Defect, Plaintiffs rely entirely on White's analysis. Thus, if White's testimony regarding the effect of the Design Defect on the Class Vehicles' water pumps is excluded, Plaintiffs have no evidence that the Design Defect causes the Class Vehicles' water pumps to fail.

1-ER-29-30. The Court reached a similar conclusion for the named plaintiffs' individual claims, determining there was no evidence they "each experienced premature water pump failure due to the Defect." 1-ER-31. Because of this "failure of proof," summary judgment was appropriate. 1-ER-37-38.

## A. Plaintiff's Damages Evidence Does Not Get Them Past Summary Judgment

Plaintiffs' first and primary response is to claim the District Court "erred by ignoring record evidence of a cognizable injury." AOB46. They believe the District Court should have considered their "evidence of causation of harm and damages," specifically the conjoint survey prepared by their damages experts. AOB49-50. They claim this survey "found that consumers would pay less if it is was disclosed that the vehicle had the Defect" and "[t]his evidence, combined with Plaintiffs' testimony that they would have paid less for their Vehicles if the Defect had been disclosed, established triable issues of fact." AOB50.

In other words, Plaintiffs are claiming because they and their experts testified Plaintiffs had been damaged, they survive summary judgment. Such a view is nonsensical. Plaintiffs' self-serving testimony speaks only to their claim of damages, not to the other elements of the cause of action, such as causation. They axiomatically cannot be damaged by a defect without first proving the existence of that defect, and here, the problem is they had no such proof, as the District Court held. *See* 1-ER-37 ("Mazda has met its burden of demonstrating lack of proof supporting causation by proffering evidence showing that there are many possible causes unrelated to the Design Defect that can cause water pump failure and Plaintiffs have not presented any evidence that their water pumps failed due to the Defect."). Plaintiffs need to prove causation not only at an individual level, but also show causation can be appropriately adjudicated on a classwide basis. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1174 (9th Cir. 2010) (noting that causation must still be proven at the individual and class level). They proved neither.

Pointing to their conjoint survey provides them no more assistance. The conjoint survey *assumes* liability, but is not itself evidence of liability. *See Siqueiros*, 2022 WL 74182, at *10 (collecting cases on how it is "well established that experts on damages can assume causation"). The conjoint survey to which Plaintiffs point is simply their damages model (and an insufficient one at that): it cannot be used to

supplant the other evidentiary requirements in the case, particularly on causation, since the model *assumes* causation.

### B. Plaintiffs Have No Evidence of a Defect

Plaintiffs' next response is to claim "Mazda's documents support the existence of a design defect causing Water Pump failures in the Vehicles sufficient to create triable issues of fact." AOB47. To Plaintiffs, because their pumps "failed before their Vehicle reached the end of the useful life of the engine," they should survive summary judgment. But that is not enough: they need evidence the pumps failed *because of* the defect. They cannot eschew "but for" causation. To hold otherwise would be an absurdity: vehicles and vehicle parts can fail, but the mere fact failure happens does not portend a defect. Both sides in this case agree water pump failures can and do happen for a variety of reasons, including reasons that do not implicate any defect of whatever nature (such as contaminated coolant). 1-ER-35.[22] The question in this case is whether pumps were actually failing because of the defect. There is no admissible evidence they were.

The three documents to which Plaintiffs point are both inadequate and inapposite. Citing the first document, Plaintiffs say "Mazda internally referred to the mechanical seal as 'Defected.'" AOB48. But the document to which they are

---

[22] *See* Footnote 16.

referring is simply a translation of a photo with a leak. It does not describe or recount a defect; it does not state any sort of cause; it does not say anything about the water pump in other vehicles; it certainly does not say anything about Plaintiffs' HNBR-based defect theory. *See* 9-ER-1792. Plaintiffs' take-quotes-out-of-context approach is not enough to get them before a jury. It takes more—far more—than an out-of-context photo caption to get past summary judgment. The second document they cite is of no more use. It is simply a teardown of analysis of warranty returns from all causes. *See* 9-ER-1799-1800. It does not confirm the defect: in fact, it says the seals passed their pressure test, making "identifying the root cause of the customer observed leakage" with the seals "more difficult." The third document refers to the pumps as "defected," but it is just an email for the aforementioned photo, translated from Japanese. 9-ER-1802.

Plaintiffs need more than these documents to show their defect theory. None of these documents *mention* their defect theory, or anything akin to it. Without White, there is no evidence of a defect, and these documents do nothing to change that.

## C. There Is No Evidence of Materiality

Plaintiffs' final retort is to claim the defect "poses an unreasonable safety risk and results in costly repairs" and thus was material. AOB49. Plaintiffs are, once again, missing the mark: evidence of materiality is not evidence of causation. As the

District Court held, Plaintiffs must prove both "the Existence of the Design Defect" and that "its existence is a material fact that Mazda should have disclosed to consumers." 1-ER-16. They never meet the causation part of that test, as explained above.

But they never offer admissible evidence either. The District Court concluded that "[b]ecause Plaintiffs have not proffered competent evidence of either the Defect's effect on the Class Vehicles' real-world performance or its impact on their safety, the Court concludes that Plaintiffs cannot show that it would be material to a reasonable consumer." 1-ER-34. Not even White presented evidence on real-world performance. Plaintiffs never point to any in their brief.

There was also no admissible evidence of a safety hazard. The alleged safety risk cannot be "speculative and unsupported by factual allegations." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1028 (9th Cir. 2017). White never testified to safety. Plaintiffs do not point to any known injuries from this so-called safety defect, despite the class vehicles having been on the road for more than a decade. Instead, Plaintiffs simply claim the matter is one of "common sense" and point to the "dangerous driving experiences" of the named plaintiffs when their water pumps failed. AOB50. But that is not enough. Any vehicle part can fail. And, given an attenuated chain of events, any vehicle part failing could pose some ginned-up safety

risk. Nothing in the record suggests this defect exists, let alone it exists and poses a safety hazard.

Plaintiffs point to *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015), which held "[a]lleged defects that create 'unreasonable safety risks' are considered material"—but that case is inapposite. In that case, this Circuit said "Plaintiffs have put forth sufficient evidence … that the Focus experienced premature and more frequent tire wear," and driving can be dangerous when tires are excessively worn. *Id.* at 1226. But here, Plaintiffs have no analogous evidence. They have no evidence the water pumps are failing prematurely or more frequently like the tires in *Daniel*. Without that evidence, they cannot say there is a safety risk here—let alone an *unreasonable* safety risk—since there is no evidence a single water pump has ever failed from their alleged defect.

In a similar vein, Plaintiffs point to *Beaty v. Ford*, 854 F. App'x 845, 849-50 (9th Cir. 2021), an unpublished opinion, noting this Circuit held the 0.05% failure rate of sunroofs there could be material to a reasonable consumer. AOB55-56. They made a similar argument in the District Court, but the District Court found *Beaty* inapposite for two reasons. First, it rightly noted *Beaty* was premised on the part in question (panoramic sunroofs) being a "luxury accessory." Second, the District Court noted "[w]ater pumps can and do fail for various reasons," a fact that is both

common sense and disclosed, so "the relative likelihood of that happening—rather than its mere possibility—would be the material information." 1-ER-35-36.

But even beyond these well-reasoned points by the District Court, *Beaty* is premised on there being evidence of a "small risk" of actual panoramic sunroof failure. 854 F. App'x at 849-50 ("[A] reasonable juror could find that even a small risk that a PSR might explode without warning is a material fact, given that the practical question is whether to purchase a luxury accessory at a premium."). Here, there is no chance of any risk—i.e. less than a small risk—since Plaintiffs point to no real world failure of their water pumps from their hypothesized defect. That undoes any similarity to *Beaty*.

Plaintiffs' final retort is to complain about the cost of water pump repairs following the expiration of a limited warranty. For this, they again use *Beaty*, claiming that case "is analogous because here there is record evidence to support the inference that a reasonable consumer may consider the Defect material due to the high costs of repair." AOB56. But *Beaty* says no such thing. *Beaty* is about the safety risk: it does not somehow say, either directly or by analogy, that because a repair is costly after the expiration of a limited warranty, a consumer would consider it material.

Such a view is economically illogical. The expected cost to a consumer is zero or near zero—even if the repair would be very costly—if there is zero or a near zero

chance of the repair being made. Plaintiffs disagree, saying the costliness of a repair "could be considered material by a reasonable consumer, regardless of the rate at which such failures occur." AOB55. No case has ever held that. Plaintiffs offer no evidence, expert or otherwise, for their view. And such a view is as absurd as it is unworkable. Vehicle manufacturers should not have to warn about every conceivable harm that could befall a vehicle, no matter how low the risk, just because the post-warranty repair could be costly.[23] No statute, regulation, caselaw, or other rule says otherwise.

### D. Plaintiffs Have No Evidence of Pre-Sale Knowledge

Even if White's testimony were admitted, and even if Plaintiffs could provide evidence of the other elements of their causes of action, summary judgment was appropriate because Plaintiffs cannot show pre-sale knowledge of the Defect to support their causes of action. *See, e.g., Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145–46 & n.5 (9th Cir. 2012) ("[T]he failure to disclose a fact that a manufacturer does not have a duty to disclose, i.e., a defect of which it is not aware, does not constitute an unfair or fraudulent practice [under the UCL]."). This provides

---

[23] But, here, a federally-mandated "Buyers Guide" informed purchasers of used vehicles that an "[i]mproperly functioning water pump" is one of the "major defects that may occur in used vehicles." 2-SER-389; 1-SER-220–221; 1-SER-249. The Powertrain Limited Warranty also disclosed to all purchasers the "Water Pump and Gaskets" are parts that may require warranty service, suggesting the water pump is a part that can fail. 2-SER-410.

an independent basis for affirming the district court. *Thompson v. Paul*, 547 F.3d 1055, 1058-59 (9th Cir. 2008) ("[W]e can affirm on any ground supported by the record.").[24]

At the summary judgment stage, evidence that merely shows knowledge of a generalized concern cannot be sufficient to create a triable issue of material fact regarding pre-sale knowledge. Rather, to create a triable issue of material fact, there must be evidence that the defendant had knowledge of, at a minimum, the potential root cause of an alleged defect, especially where—as here—there are multiple potential causes for the same failure. *Victorino v. FCA US LLC*, 2018 WL 1083395, at *8 (S.D. Cal. Feb. 27, 2018) ("When addressing a defendant's pre-sale knowledge, courts have held that the defendant must have knowledge of the specific defect alleged, not a general defect."), *on reconsideration*, 2018 WL 2149223 (S.D. Cal. May 10, 2018); *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liaiblity Litig.*, 2019 WL 7185524, at *3 (C.D. Cal. Oct. 29, 2019) ("Plaintiff has the burden to show that, at the time he purchased his vehicle, Ford knew of the allegedly material facts that Ford allegedly failed to disclose. When addressing a defendant's

---

[24] The District Court ordered supplemental briefing on this issue prior to ruling on summary judgment. *See* ECF 537 (Plaintiffs' Briefing); ECF 539 (Mazda's Briefing).

pre-sale knowledge, courts have held that the defendant must have knowledge of the specific defect alleged, not a general defect.") (cleaned up).

White's defect theory was never raised at Mazda before this litigation. Thus, there is no pre-sale knowledge for which liability can attach. In their facts section, Plaintiffs refer to four documents as evidence that Mazda knew of the alleged Defect "[a]s early as 2005." AOB7-AOB8. None of those documents mention or discuss the alleged "Defect" so they are not evidence of Mazda's knowledge of the "Defect." Putting that aside, Plaintiffs omit key information that make clear the documents are not evidence of Mazda's knowledge of the "Defect."

*First*, Plaintiffs cite to Ford's 2/4/05 "Project Update" concerning a Ford Design for Six Sigma (DFSS) Project. AOB7-AOB8 (citing 8-ER-1587). Plaintiffs cite to no evidence in this case Mazda was aware of or received the "Project Update." *See* 1-SER-24–25.

*Second*, Plaintiffs cite to an email exchange on October 23, 2006 between Ford employees and others. AOB8 (citing 8-ER-1669). As evident on the face of the document, Mazda was not a party to the email; Plaintiffs cite to no evidence Mazda had any knowledge about the email's substance or existence.

*Third*, Plaintiffs refer to an email sent on May 17, 2007, about a single vehicle identified in the field that experienced engine overheating. AOB8 (citing 8-ER-1673–74). "SCATT" activity refers to "an activity in which a Mazda personnel will

go on assignment to the local site to be able to promptly identify and resolve issues that occur out in the field." 8-ER-1610–12 (describing a failure that can be fixed, as opposed to a defect). That same email indicates "the most common cases [of engine overheat] are that the water leakage occurs outside the engine, water level decreases, temperature around the combustion chamber rises rapidly, head gasket blows out, then water goes into the oil." 8-ER-1673. That is not the "Defect" described by White.

*Fourth*, Plaintiffs cite to a Repair Information (RI) Summary, which states: "(a) If coolant is leaking out of the weep hole, replace the coolant pump. (b) If coolant leaks are found in other locations, this procedure does not apply. Please follow normal diagnostics." 9-ER-1785. It says nothing about the alleged "Defect." The Repair Information is simply information about how to perform a repair.

As described above in Facts Section A.2, Mazda investigated general water pump leaks twice, in 2010 and 2017. In neither investigation was Mazda able to determine the root cause. Thus, the investigations do not constitute evidence of Mazda's pre-sale knowledge of the "Defect."

In short, there is no evidence in this case of Mazda's pre-sale knowledge of the "Defect," which provides an independent basis for affirming the District Court's summary judgment order.

## III.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN

**IT DECERTIFIED ALL CLASSES.[25]**

Plaintiffs contend the District Court "erred" in decertifying the classes, arguing that "[t]he merits issues addressed in its summary judgment opinion have no bearing on whether certification of the Classes was appropriate." AOB58. But the law is clear that "[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *General Telephone Co. v. Falcon,* 457 U.S. 147, 160 (1982) (citing Fed. R. Civ. P. 23(c)(1)). Here, after granting summary judgment, the District Court decertified all classes "for lack of a representative plaintiff" "[b]ecause Plaintiffs no longer [had] individual claims against Mazda." 1-ER-38. Under Fed. R. Civ. P. 23(a)(3) and (4), which require the presence of "representative parties," the District Court did not err. *See Rector v. City & County of Denver*, 348 F.3d 935, 949 (10th Cir. 2003) (decertifying *sua sponte* because otherwise the dismissal of named plaintiffs' claims would preclude absent class members with individual standing from seeking further redress).

Plaintiffs argue a "rigorous Rule 23 analysis" was required before decertifying the classes due to the lack of any representative plaintiffs. AOB4 & AOB58.

---

[25] In this appeal, Plaintiffs do not challenge the District Court's order decertifying the Texas class and the Song-Berverly class. ECF 572.

Plaintiffs cite no law in support. Mazda is not aware of any such law.[26]

In any event, with the exclusion of White's opinions, Plaintiffs had no *evidence* of a common defect, which provides an independent basis to affirm the District Court's decertification order. *Sully v. Ayers*, 725 F.3d 1057, 1067 (9th Cir. 2013) (a court of appeals may affirm the district court on any grounds the record supports). Given the lack of any basis to adjudicate Plaintiffs' claims on a classwide basis, the District Court's decision to decertify all classes was not an abuse of discretion. *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948 (9th Cir. 2011) (holding it was not abuse of discretion for district court to decertify class where the plaintiff failed to provide common proof and a basis to adjudicate misclassification claims classwide).

## CONCLUSION

For the reasons stated above, Mazda ask that this Court affirm the District Court's decision in the entirety.

*(Signature page follows)*

---

[26] Mazda is aware that in the collective action context, where a two-tiered approach to certification applies, at the first stage, the initial decision to certify is based on a fairly lenient standard, and at the second stage, courts conduct a more searching review of the facts to determine whether the plaintiffs in the conditionally certified collective action are truly similarly situated. *Webb v. Alpha & Omega Servs., Inc.*, 2017 WL 3000014, at *2 (C.D. Cal. June 1, 2017). This case is not a collection action case.

Dated: October 30, 2023

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: */s/ Michael L. Mallow*
Michael L. Mallow
Attorneys for Defendants-Appellees

## STATEMENT OF RELATED CASES

There are currently no cases pending before this Court that are related to this action.

Dated: October 30, 2023

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: */s/ Michael L. Mallow*
Michael L. Mallow
Attorneys for Defendants-Appellees

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Ninth Circuit Rule 32–1, the attached brief is proportionately spaced, has a Times New Roman typeface of 14 points, and contains 13,860 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

*/s/ Michael L. Mallow*
Michael L. Mallow

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 30, 2023.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Michael L. Mallow*
Michael L. Mallow

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** | 23-55325

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:



**Description of Document(s)** *(required for all documents)*:

Defendants-Appellees' Answering Brief


**Signature** | s/ Deborah Hillburn | **Date** | Oct 30, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 15** | *Rev. 12/01/2018*